GARY E. KLAUSNER (State Bar No. 69077)
EVE H. KARASIK (State Bar No. 155356)
JEFFREY S. KWONG (State Bar No. 288239)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: GEK@LNBYG.COM; EHK@LNBYG.COM;
JSK@LNBYG.COM
Counsel for 37 Ventures, LLC,
Debtor and Debtor-in-Possession

COHNE KINGHORN, P.C.
George Hofmann (Utah Bar No. 10005)
*Admitted pro hac vice*
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
Telephone:  (801) 363-4300

ZOLKIN TALERICO LLP
Derrick Talerico (State Bar No. 223763)
dtalerico@ztlegal.com
David B. Zolkin (State Bar No. 155410)
dzolkin@ztlegal.com
12121 Wilshire Blvd., Suite 1120
Los Angeles, CA  90025
Telephone:    (424) 500-8551
Facsimile:    (424) 500-8951
Attorneys for Larada Sciences, Inc.,
Debtor and Debtor-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**NORTHERN DIVISION**

| | |
|---|---|
| In re: | ) Case No.: 9:21-bk-10261-DS |
| | ) Chapter 11 Case |
| 37 VENTURES, LLC, | ) |
| | ) **MODIFIED THIRD AMENDED** |
| Debtor and Debtor in Possession. | ) **DISCLOSURE STATEMENT TO** |
| | ) **ACCOMPANY DEBTORS' SECOND** |
| In re: | ) **AMENDED JOINT PLAN OF** |
| | ) **REORGANIZATION DATED** |
| LARADA SCIENCES, INC., | ) **OCTOBER 19, 2021** |
| | ) |
| Debtor and Debtor in Possession. | ) |
| | ) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

☒  Affects both Debtors

☐ Affects 37 Ventures, LLC only

☐ Affects Larada Sciences, Inc. only

)  Hearing:
)  Date:   November 9, 2021
)  Time:  11:30 a.m.
)  Place:  Originating from Courtroom 201
)  1415 State Street, Santa Barbara, CA 93101[1]
)
)
)
)
)
)
)

---

[1] More information on using ZoomGov to participate in this hearing is available on the Court's website at the following web address: https://www.cacb.uscourts.gov/news/zoom-video-hearing-guide-participants.

# TABLE OF CONTENTS

|  |  |  |
|---|---|---|
| A. | Purpose Of This Document | 2 |
| B. | Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing | 3 |
| C. | Disclaimer, Source Of The Information Contained In The Disclosure Statement, And The Accounting Method Used To Produce Financial Information | 5 |
| D. | Request for Additional Documentation Already Provided to Knight and Bishop and Alignment | 5 |

**I.    BACKGROUND** ..... 5

| A. | Description and History of the Debtors' Businesses | 5 |
|---|---|---|
| B. | Principals/Affiliates Of The Debtors | 11 |
| C. | Events Leading to Chapter 11 Filing | 12 |
| D. | The Debtors' Assets | 16 |
| E. | The Debtors' Liabilities | 21 |
| F. | Significant Events During the Chapter 11 Cases | 24 |

**II.    SUMMARY OF THE PLAN OF REORGANIZATION** ..... 28

| A. | Summary Chart of Plan Classes | 28 |
|---|---|---|
| B. | What Creditors and Interest Holders Will Receive Under The Plan | 29 |
| C. | Unclassified Claims | 29 |
| D. | Classified Claims and Interests | 30 |
| E. | Means for Execution of the Plan | 41 |
| F. | Conditions Precedent to Effective Date | 54 |
| G. | Provisions Governing Distributions | 55 |
| H. | Injunctions, Exculpations and Releases Injunction Relating to the Plan | 58 |
| I. | Executory Contracts and Unexpired Leases | 61 |
| J. | Other Plan Provisions | 62 |

**III.    TAX CONSEQUENCES OF THE PLAN** ..... 67

| A. | Tax Consequences to the Debtors | 68 |
|---|---|---|
| B. | Tax Consequences to Creditors | 69 |
| C. | Information Reporting and Backup Withholding | 70 |
| D. | Importance of Obtaining Professional Assistance | 71 |

**IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES** ..... 71

| A. | Who May Vote or Object | 71 |
|---|---|---|
| B. | Who May Vote to Accept/Reject the Plan | 71 |
| C. | What Is an Allowed Claim/Interest | 72 |
| D. | What Is an Impaired Claim/Interest | 72 |

E.      Who Is Not Entitled to Vote ................................................................ 73
F.      Who Can Vote in More Than One Class ............................................. 73
G.      Votes Necessary to Confirm the Plan ................................................. 73
H.      Votes Necessary for a Class to Accept the Plan ................................ 73
I.       Treatment of Non-Accepting Classes ................................................ 74
J.       Request for Confirmation Despite Nonacceptance by Impaired
        Class(es) ................................................................................................. 74
K.      Risk Factors .......................................................................................... 75
L.       Liquidation Analysis ............................................................................ 78
M.      Feasibility .............................................................................................. 82

V.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
        PLAN ................................................................................................................. 84
A.      Liquidation under Chapter 7 ............................................................... 85
B.      Alternative Plan of Reorganization or Liquidation ......................... 85
C.      Sale of Larada as a Going Concern .................................................... 85

VI.     POST-CONFIRMATION MATTERS .......................................................... 86
A.      Post-Confirmation Status Report ....................................................... 86
B.      Post-Confirmation Conversion/Dismissal ......................................... 86
C.      Post-Confirmation U.S. Trustee Fees ................................................. 87
D.      Final Decree .......................................................................................... 87

ii

37 Ventures, LLC ("37 Ventures"), and Larada Sciences, Inc., ("Larada"), the debtors and debtors-in-possession in the above-captioned jointly administered Chapter 11 bankruptcy case (collectively, the "Debtors"), commenced their respective chapter 11 bankruptcy cases by filing voluntary petitions under Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") on March 18, 2021 and March 19, 2021 (the "Petition Date").

Each of the Debtors continues to manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No Official Committee of Unsecured Creditors (the "Committee") has been formed to represent the interests of unsecured creditors in the Debtors' cases.

Chapter 11 allows the Debtors, and, under some circumstances, creditors and other parties in interest, to propose a plan of reorganization. A plan may provide for the debtor to reorganize by continuing to operate, to liquidate by selling the assets of its estate, or a combination of both. In these cases, the Debtors are the co-proponents of the *Second Amended Joint Plan Of Reorganization Dated October 19, 2021* (the "Plan") described herein and sent to you in the same envelope as this *Modified Third Amended Disclosure Statement to Accompany Second Amended Joint Plan Of Reorganization Dated October 19, 2021* (the "Disclosure Statement"). Any terms not specifically defined herein have the meanings ascribed to them in the Plan. In addition, to the extent there is any conflict between the Disclosure Statement and the Plan, the terms of the Plan shall govern.

The effective date of the Plan (the "Effective Date") will be the first Business Day upon which all conditions to the consummation of the Plan as set forth in Section 9.1 of the Plan have been satisfied or waived as provided in Section 9.1 of the Plan, and is the date on which the Plan becomes effective.

The Debtors following the Effective Date shall be referred to as the "Reorganized Debtors."

## A.    Purpose Of This Document

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not

2

to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

**(1)    WHO CAN VOTE OR OBJECT,**

**(2)    WHAT THE TREATMENT OF YOUR CLAIM IS (I.E., WHAT YOUR CLAIM WILL RECEIVE IF THE PLAN IS CONFIRMED), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,**

**(3)    THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR BANKRUPTCY CASES,**

**(4)    WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

**(5)    WHAT IS THE EFFECT OF CONFIRMATION, AND**

**(6)    WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement.  If there are any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.

**B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE

DEBTORS AND ON ALL CREDITORS AND INTEREST HOLDERS IN THE DEBTORS' CASES.

### 1. Time and Place of the Confirmation Hearing

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will commence on February 16, 2022 at 10:00 a.m. via ZoomGov.   Video and audio connection information for the hearing will be provided on Judge Saltzman's publicly posted hearing calendar, which may be viewed online at http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=DS.

### 2. Deadline For Voting For or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote by executing the enclosed ballot and returning the executed ballot in the enclosed envelope to:

Levene, Neale, Bender, Yoo & Golubchik L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:     (310) 229-1234
Facsimile:     (310) 229-1244
Attention:  Jeffrey S. Kwong, Esq.

Your ballot must be received by January 3, 2022, at 5:00 p.m. (Pacific time) or it will not be counted.

### 3. Deadline For Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court and served upon counsel for the Debtors at the address listed in the upper left-hand corner of the first page of this Disclosure Statement by January 24, 2022.

### 4. Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact Jeffrey S. Kwong, Esq. of Levene, Neale, Bender, Yoo & Golubchik L.L.P., 2818 La Cienega Avenue, Los Angeles, California 90034, Telephone: (310) 229-1234.

/ / /

4

**C.    Disclaimer, Source Of The Information Contained In The Disclosure Statement, And The Accounting Method Used To Produce Financial Information**

The financial data relied upon in formulating the Plan is based on the Debtors' books and records which, unless otherwise indicated, are unaudited.  The information contained in this Disclosure Statement is provided solely by the Debtors and their respective officers and/or employees.  The Debtors represent that everything stated in this Disclosure Statement is true and correct to the Debtors' best knowledge.  The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

**D.    Request For Additional Documentation Already Provided To Knight and Bishop and Alignment**

If your claim has been (i) scheduled by the Debtors as not being disputed, contingent, or unliquidated , or (ii) filed with the Bankruptcy Court and has not been objected to, you can obtain certain documentation already provided to Knight and Bishop and Alignment as of October 12, 2021 by: (i) making a written request for specific documents to the Debtors' bankruptcy counsel at the email addresses located on the first page of the Cover Page of this Disclosure Statement; and (2) signing an agreement to be bound by the terms and obligations under the "*Stipulation Among Debtors, Knight and Bishop, L.P., and Alignment Debt Holdings 1, LLC for Protective Order*" [Doc. No. 203] and "*Second Stipulation For Protective Order*" [Doc. No. 246].

**I.**

**<u>BACKGROUND</u>**

**A.    Description and History of the Debtors' Businesses**

**1.    37 Ventures' Business**

37 Ventures is a venture capital investment company founded in 2010 by Yuri Pikover as a Delaware limited liability company.[2]  Yuri Pikover has been its sole member and sole manager

---

[2] Its original Certificate of Formation was filed with the Delaware Secretary of State on June 9, 2010 under the name "37 Technology Ventures, LLC."  On June 15, 2013, it filed a Certificate of Amendment and thereby changed its name to "37 Ventures, LLC."

5

1    since its formation.

2        37 Ventures acquires and holds securities issued by startup and early-stage companies

3    that own inventions suitable for commercial exploitation in a variety of industries, such as

4    computer networking and related "tech" stocks, pharmaceuticals, medical devices, financial

5    services, medical diagnostics and nano-imaging.    37 Ventures (through Mr. Pikover) also

6    advises, consults and mentors the founders and management of the startup companies to assist

7    them in the growth and development of their businesses.    37 Venture's business model (like that

8    of most venture capital firms) anticipates the eventual realization on its investments through

9    what are commonly referred to as "liquidity events," such as an initial public offering of stock, a

10   merger with a publicly traded corporation, a sale for cash or the like.    37 Ventures focuses, in

11   general, on startups founded by individuals who have keen expertise in the scientific or technical

12   field of its particular invention, but who have limited business sophistication or experience in

13   growing a startup into a mature enterprise.    37 Ventures invests in companies in which it can

14   help the founding inventors reach their entrepreneurial goals by helping them translate their

15   goals into tactical and strategic business plans, develop validation of key business ideas, build

16   the right management team and raise strategic financing.    37 Ventures is, thus, both an investor, a

17   strategic advisor, and, frequently, a member of the management team.    A chart providing

18   information about 37 Ventures' investments, from June 15, 2013, in companies that were no

19   longer part of the Portfolio Companies as of the Petition Date, including the name of the

20   company, the amount invested by 37 Ventures, and the ultimate outcome of 37 Ventures'

21   investment – is attached as **Exhibit A** hereto.

22       37 Ventures brings to these sorts of investments the skills and talents of Yuri Pikover.

23   Either formally (as a designated board member and/or c-suite executive), or informally (as a

24   confidential advisor), he helps the founders grow their startup and early-stage companies to the

25   point where they and their venture capital investors can realize a return of, and a return on their

26   investments through a liquidity event.

27

28

Mr. Pikover is particularly well qualified to provide this guidance.[3]  His employment and professional investor history is steeped in the growth of startups to the point of successful liquidity events.  Yuri Pikover immigrated to the United States in 1979 from Russia, at the age of 19.  Living in New York, he first supported himself by driving taxicabs and limousines, while learning to read and speak English.  He soon thereafter was awarded a scholarship to a local engineering college; and two years later, was awarded an associates' degree in electrical engineering.    In 1982, he joined Micom Systems, a manufacturer of telecommunications equipment, as an electrical engineer.   In 1998, after working his way up the ranks to become the director of marketing, he left Micom to become the Sales Director of Fibermux, a 1984 startup in Chatsworth, California that made telecommunications networking equipment. (While working at Fibermux, Mr. Pikover furthered his technical and managerial expertise by attending extension courses in Engineering and Management at UCLA and Pepperdine.)   He was there when Fibermux was sold to ADC Telecommunications in 1991.

Mr. Pikover continued to work at Fibermux (and its successors) until 1993, when he left with Fibermux's founder to form with him a new startup named Xylan Corporation.   Xylan pioneered high-speed desktop switching systems—using technology conceptualized by Mr. Pikover—that enhanced the performance of existing local area networks.   Over the next six years, he and the other co-founder managed the growth of that startup into a mature and profitable company, poised for a liquidity event. The company grew extraordinary fast and went public in 1996.

On March 2, 1999, the telecommunications giant Alcatel-Lucent acquired Xylan at a price of 37 dollars per share when, coincidentally, Mr. Pikover was 37 years of age.   The coincidence of those numbers later was to become the genesis of the name of his venture capital investment company, 37 Technology Ventures, later renamed 37 Ventures.

---

[3] Creditors Alignment and Knight and Bishop have made claims regarding alleged wrongdoing and impropriety by Mr. Pikover that have an impact on, *inter alia*, his competence, integrity and capability to participate in the management of 37 Ventures and Larada.   These claims and assertions are set forth in detail in their respective objections to the Disclosure Statement, *see* (Doc. Nos. 241 & 243), and their "*Joint Motion To Terminate Exclusivity For 37 Ventures,*" *see* (Doc. No. 141).

In 1999 Mr. Pikover became a Chairman and CEO of Access360, which spearheaded automated organization-wide access control technologies.  It was sold to IBM in 2002.

Since that time, Mr. Pikover began investing and advising a series of startups and early-stage companies which, again, initially operated in the telecommunications and data management industries.  By 2010, he had invested in at least 10 different venture capital investments.  In most of those investments, he also became a Board Member.  In some cases, as needed by individual companies, he also was appointed to be the temporary or a full time CEO or Executive Chairman of the portfolio company.[4]

In 2010, he decided to formalize his venture capital investing business as a separate enterprise, with a formal business name; and, accordingly, formed 37 Technology Ventures as a Delaware limited liability company on June 9, 2010.  Within a few short years thereafter, however, he determined that, notwithstanding his technical expertise in network communications and related technologies, it would be wise to continue diversify his portfolio of investments into different industries.[5] The emerging business strategy was to invest in promising startups that could benefit by utilizing Mr. Pikover's then fully developed and extensive experience in the strategic management and growth of startups, regardless of the particular industry in which they operate.

Over the next few years, the portfolio of companies grew to include companies operating in a wider range of industries, including, for example, pharmaceutical companies, medical device manufacturers, entertainment companies, mobile computing enterprises and nano-technology device makers.  To formally mark this transition to a diversified investment strategy, on June 15, 2013, Mr. Pikover caused to be filed with the Delaware Secretary of State a Certificate of Amendment that changed the company's name from "37 Technology Ventures, LLC" to "37 Ventures, LLC."

Mr. Pikover did not transfer his investment portfolio to 37 Ventures immediately upon its formation.  Instead, its portfolio of investments grew over time, as new investments were made

---

[4] During the first ten years of his venture capital investing, he sat on the board of approximately 30, and was the interim CEO or Executive Chairman of 8 of the corporations in which he invested.
[5] An ad hoc diversification was underway before 2010.

(including additional funding rounds in an existing investment).  Typically, Mr. Pikover would fund the new investment with cash he owned personally but would direct the issuance of the newly acquired securities in the name of 37 Ventures.  Mr. Pikover also personally received securities from some of the investments as compensation for his services as a director of the issuing corporation; but these were issued in his own name.  Eventually, as described in more detail below, most of the venture capital investment securities that Mr. Pikover had owned before the formation of 37 Technology Ventures were transferred formally to the entity, except for those awarded to him as compensation for his board services.[6]  The formal transfer of most[7] of the remainder of Mr. Pikover's venture capital investments to 37 Ventures did not occur until shortly after the closing of the Alignment Capital Loan, as described in more detail below.

As set forth in more detail below, on the Petition Date, 37 Ventures owned securities issued by ten privately held and one publicly traded corporation.[8] The securities owned by 37 Ventures have included common stock, preferred stock, warrants and "convertible securities."[9] With the exception of Savara, Inc., none of the Portfolio Companies are publicly traded.  After the Petition Date, MobileCause, experienced a liquidity event that, in substance, constituted a sale of 37 Ventures' MobileCause securities, for which it received net cash proceeds of $4,553,292.68.  Those funds have been maintained in 37 Ventures' debtor-in-possession ("DIP") bank account (except to the extent used, if at all, as permitted by the Code).

37 Ventures does not own a majority of the ownership interests issued by any of those corporations.  Its largest holding, on a percentage basis, is its 43% ownership interest (on an undiluted basis) of Larada.  Otherwise, it does not own more than 10% of the ownership interests of the any of the other Portfolio Companies. Although Mr. Pikover and 37 Ventures retain some ability to influence the liquidity event planning and decisions of the Portfolio Companies, either

---

[6] He also was unable to transfer to 37 Ventures the shares he personally held (and holds) in a company named Caldera Medical, because such a transfer would terminate its qualification as a "Subchapter S Corporation."  See discussion *infra* at I.D.1.

[7] See footnote 4, above

[8] It may also continue to own securities issued by a now-defunct company known as *Ninja Metrics*.

[9] A "convertible security" is a security—usually a bond or a preferred stock—that can be converted into a different security—typically shares of the company's common stock. In most cases, the company has the right to determine when the conversion occurs.

9

by virtue of Mr. Pikover's formal roles within those companies, or because of his familiarity with decision makers in the other Portfolio Companies, he by no means controls those strategic decisions.    He cannot force any of the Portfolio Companies (or Caldera) to pursue or consummate a liquidity event on the timeline he might prefer.[10]

### 2.    Larada's Business

Larada is a Delaware corporation formed in 2006, initially based on utilizing technology licensed from the University of Utah with the goal of taking a newly developed treatment for head lice to market.   Since the inception of its business, Larada has become an established franchisor in the professional lice treatment business.   It provides services to support its franchisees including but not limited to developing a national brand (Lice Clinics of America), hosting franchisee websites and related online lead generation, digital marketing, national marketing, and local marketing, operations best business practices, training, and more—all necessary to operate a professional lice treatment business. Beginning in 2014, Larada conducted business under the trade name "Lice Clinics of America (LCA)."   Its website is located at: liceclinicsofamerica.com.

As part of the franchisor services, Larada provides franchisees with AirAllé® devices, which are exclusive FDA-cleared medical devices that kill head lice and lice eggs in a single treatment, using heated air to quickly dessicate head lice.   The LCA lice treatment process which incorporates the use of the AirAllé is faster and more effective than the older, traditional methods of removing head lice, which generally have required multiple uses of a specialized comb to physically remove lice from the head combined with continued use of topical products or shampoos, typically using pesticides, and often taking weeks to eradicate the lice infestations. The AirAllé device forces air at just the right temperature under the hair and close to the scalp where the lice feed and lay their eggs.   This causes the lice and lice eggs to quickly dehydrate and die, and therefore with a one-hour appointment clients are lice-free without the use of

---

[10]   Although the Savara stock is publicly traded and could be sold for cash immediately, Savara's lead pharmaceutical program has just started a Phase 3 clinical trial which, if successful, will lead to FDA approval and a dramatic improvement in the market value of its stock. *See* discussion, *infra*, at p. 65-66.

pesticides. Through its franchisees (and one company owned location) Larada has provided over 700,000 such lice treatments.

Larada's franchisees serve a crucial role in its ability to reorganize successfully. In addition to the franchise business, Larada also markets pesiticide free do-it yourself home treatment products directly to consumers (and these products are also offered wholesale to the franchisees for retail distribution through their locations).

Larada does business under the name "Lice Clinics of America," as well as "Lice Clinics of Austrailia", "Lice Clinics of Canada" and so forth depending on the country. As of the Petition Date, between franchise locations and the single clinic owned by Larada, there are currently 230 clinics licenced to operate across 26 countries, down from a high of over 260 licensed clinics pre-COVID. Larada currently has 153 franchised clinics open and operating in the United States and approximately 16 locations currently open in 25 foreign countries. Approximately 61 of the 230 clinics worldwide are still temporarily closed due to COVID.

**B.      Principals/Affiliates Of The Debtors**

**1.      37 Ventures**

Yuri Pikover has been, and remains the only member or manager of 37 Ventures since its founding in 2010. It has no other formal or informal principals. 37 Ventures has no "affiliates," as that term is defined in 11 U.S.C. § 101(2) other than Larada.

**2.      Larada**

Larada's has two officers, Claire Roberts, who serves as its Chief Executive Officer, and Yuri Pikover, who has no formal title but serves as co-Chief Executive Officer together with Claire Roberts. At the August 31, 2021 hearing, the Court authorized Larada to compensate Mr. Pikover for his services at the annual salary of $120,000. Larada is governed by a three-person board of directors, comprised of Claire Roberts, Yuri Pikover, and Brent Sloan. Larada has issued common stock, and also Series A preferred stock. It has approximately 85 shareholders, the largest of which by far is 37 Ventures, which holds approximately 43% of Larada's issued and outstanding shares on an undiluted basis.

/ / /

C.    **Events Leading to Chapter 11 Filing**

    1.    **37 Ventures**

37 Ventures' financial difficulties arise from two separate investments. The first is Larada, out of which arises Alignment's (defined below) $10MM breach of guaranty claim against 37 Ventures, as described in more detail below. The second is a now-defunct company named Ninja Metrics, Inc.[11] On August 25, 2020, an investor in Ninja Metrics named Knight and Bishop obtained a Los Angeles Superior Court judgment[12] against "37 Technology Ventures" (and two other shareholders) awarding it $3.7MM of the attorneys' fees and costs it incurred to obtain a declaratory judgment that 37 Ventures had wrongfully removed Knight and Bishop's designated director (Mark Kolokotrones) from the board of Ninja Metrics.

Although these two claims are substantively unrelated, the separate collection efforts of the holders of those claims each reached a critical stage in March of 2021. In mid-December 2020, Knight and Bishop filed a motion to correct the judgment so that it would include "37 Ventures LLC" as an additional and/or alternative to "37 Technology Ventures," as one of the three judgment debtors on the judgment. It was, thus, positioning itself to levy the Ninja Metrics judgment on the assets of 37 Ventures. It set March 25, 2021 as the hearing date on that motion. Meanwhile, on February 8, 2021, Alignment commenced a civil action in New York State court against 37 Ventures by filing of a "Motion for Summary Judgment in Lieu of Complaint." It thereby sought to enforce the Guaranty signed by 37 Ventures in connection with the Loan to Larada, as discussed in more detail below. Alignment set that motion for hearing on March 19, 2021.

Efforts to settle the two claims were unsuccessful. Accordingly, on March 18, 2021, 37 Ventures filed its voluntary petition under the Code.

/ / /

---

[11] Ninja Metrics filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the Central District of California on October 24, 2016, carried under case number 16-bk-24013-BB. The case was converted to a chapter 7 proceeding on February 28, 2019 and was dismissed for cause on June 5, 2019. The website of the Delaware Secretary of State reports that Ninja Metric's corporate charter has been declared "void" for failure to pay franchise tax fees.

[12] The judgment was entered in the case of *Mark Kolokotrones and Knight and Bishop, L.P. v. Ninja Metrics, etc. et al.*, Los Angeles Superior Court Case Number BC 609689 ("Ninja Metrics Case")

2.      **Larada**

The circumstances of the COVID-19 pandemic dealt a severe blow to Larada's business and also that of its franchisees. The reason for this is three-fold. First, the vast majority of head lice infestations occur on children. Because of social distancing requirements, schools teaching partially or entirely by remote instruction, and the elimination of numerous mass gatherings of children (such as athletics, after school events and summer camps), children were simply not spreading head lice from one to another at a normal rate. Second, governmental restrictions, which were different in every single state, classified lice clinics in various manners, and some states required lice clinics to shut down entirely, while others allowed restricted operations. Third, many individuals are reluctant to engage in non-essential commercial activities that require close physical contact, such as hair-cuts, massages, or routine dental services. For this last reason, because of the circumstances of the pandemic, some individuals have and will continue to seek at-home lice treatments, rather than a treatment option involving close contact with a service provider.

Larada's business enjoyed a healthy trajectory before the pandemic, although it did shoulder a relatively expensive debt load. Larada's senior secured lender is ATMedia Investor II, LLC (the "Secured Lender"), acting through its agent Alignment Debt Holdings I, LLC ("Alignment"). As of the Petition Date, Secured Lender claims to be owed approximately $10.7 million. Although Larada has not yet conducted a comprehensive review and analysis of the Secured Lender's liens, and without prejudice or any waiver of Larada's rights with respect thereto, Larada understands that the Secured Lender's lien encumbers substantially all of the Larada's assets in existence as of the Petition Date, other than the proceeds of the government assistance programs.

Larada borrowed money from the Secured Lender in May 2018 in the original principal amount of $7,500,000 (the "Alignment Loan"). The Alignment Loan is supported by a guaranty signed by 37 Ventures discussed in more detail below. The Alignment Loan bears interest payable monthly in cash at a non-default rate of LIBOR plus 11% (approximately 12.5%), plus interest that accrues and is payable in kind at the rate of 4.5%, plus additional default interest that

accrues and is payable in kind at the rate of 4%.  Larada reserves all its rights and defenses relating to the enforceability, amount and priority of Alignment's claims.

The Alignment Loan was one piece of a larger recapitalization to improve Larada's balance sheet.  Although Alignment has questioned whether Larada could have claims against Mr. Pikover for the improper receipt of loan proceeds, in actuality, Alignment was well aware that Mr. Pikover would and did receive a portion of the loan proceeds as part of the entire recapitalization, which Aligment approved.  Larada has no claims against Mr. Pikover or anyone else related to this recapitalization.

Before the Alignment Loan and related recaptilaization, Larada had approximately $8,800,000 in notes payable (the "Pre-Recapitalization Debt"), held by approximately 44 different groups of private investors (25% of whom were also shareholders of Larada).

Through the recapitalization, approximately 55% of the Pre-Recapitalization Debt was converted to equity, approximately 35% of the Pre-Recapitalization Debt was repaid, and approximately 10% was converted to new notes payable that were subordinated to the Alignment Loan.  Each part of the recapitalization transaction was approved by Alignment and each part was dependent on the other.  Closing of the Alignment Loan was conditioned upon the conversion to equity of the amount of the Pre-Recapitalization Debt sufficient to satisfy Alignment.

37 Ventures held approximately $4,400,000 of the Pre-Recapitalization Debt, and as part of the conditions to the closing of the Alignment Loan, converted $3,000,000 of its Pre-Recapitalization Debt to equity, or approximately 68% of the total amount of 37 Ventures' Pre-Recapitalization Debt.  The total amount of Pre-Recapitalization Debt converted to equity in connection with the Alignment Loan was $4,800,000; accordingly, 37 Ventures represented 63% of the total amount of Pre-Recapitalization Debt converted to equity.  Conversely, the total amount of repayment of Pre-Recapitalization Debt upon closing of the Alignment Loan was approximately $3,500,000, of which approximately $1,400,000 (or 40%) was repaid to 37 Ventures.

In summary, the Alignment Loan and recapitalization improved Larada's financial condition in the following respects:  Total assets increased by $1,700,000 (from $4,100,000 to $5,800,000), total liabilities decreased by $1,800,000 (from $11,700,000 to $9,900,000) and stock and paid-in capital increased by $5,000,000 (from $9,400,000 to $14,400,000).  Without 37 Ventures' participation, the other investors would not have approved the Alignment Loan, nor would they have followed 37 Ventures' lead in converting a sufficient amount of their Pre-Recapitalization Debt to equity that was a condition of closing the Alignment Loan.

Although Alignment subsequently asserted that covenant defaults occurred under the Alignment Loan in mid-2019, Larada was in compliance with the payment requirements of the Alignment Loan until May 29, 2020.

On June 5, 2020, Alignment exercised its remedies under a deposit account control agreement and seized all of Larada's funds located in its then-primary operating bank account located at Wells Fargo Bank.  Since that time, Larada has used operating accounts at other institutions because that is the only way it could continue operations.

On July 3, 2020, Alignment provided Larada with a written Notice of Default, Acceleration, and Demand for Payment.

During the period from May through October 2020, Larada attempted to negotiate in good faith a waiver and forbearance agreement with Alignment that, if successful, would have provided Larada with a reasonable path forward with its business and would not have required the filing of a bankruptcy petition.  Those negotiations reached an impasse on or about October 14, 2020.

From October 2020 through February 2021, Larada and Alignment remained at an impasse.  Although Larada continued to make regular financial reports to Alignment and responded to Alignment's inquiries about the Larada's business, Alignment during this period took no additional actions to enforce its rights.

As noted above, on February 8, 2021, Alignment filed a civil action in New York State court against 37 Ventures for breach of the guaranty, with the filing of the motion for summary judgment in lieu of complaint.

1    The financial support that 37 Ventures has and can provide to Larada's business, and in

2    particular 37 Ventures' ability to pay in full the Alignment debt over time, is critical to the

3    success of Larada's business.   Furthermore, if 37 Ventures were to be dismembered by state

4    court litigation processes, the survival of Larada's business would be doubtful.   As a result, in

5    order to preserve the value of its business as an ongoing concern for all creditor constituencies,

6    including the Alignment Loan, and also Larada's obligations to franchisees, subordinated debt

7    holders, trade creditors, and others, Larada concluded in the exercise of its business judgment

8    that this bankruptcy filing and a reasonable restructuring of its obligations going forward was the

9    most prudent path.

10    **D.    The Debtors' Assets**

11        **1.        Primary Assets of 37 Ventures**

12    37 Ventures owns the following securities[13] issued by the following Portfolio Companies:

| Issuer | Securities (Shares of Stock) | Original Cost (All classes, approximately) |
|---|---|---|
| Bitvore, Inc. | 730,044 Preferred Series A-1<br>73,004 Preferred Series A-66<br>73,004 Preferred Series A-81<br>58,402 Common | $600,000 |
| California Cardiac Solutions, Inc. | 500,000 Seed Series Preferred | $250,000 |
| EV Connect, Inc. | 64,273 Common<br>118,734 Series A-1 Preferred<br>105,425 Series A-2 Preferred<br>622,693 Series Seed Shares | $912,000 |
| Larada Sciences, Inc. | 653,430 Common<br>5,874,482 Series A Preferred | $4,850,000 |
| MobileCause, Inc. | Sold during the chapter 11 case | $1,920,000 |
| Molecular Vista, Inc. | 834,761 Series A Preferred<br>117,274 Series A-1 Preferred | $600,000 |

---

[13] The following chart is based on information provided to 37 Ventures by each of the Portfolio Companies.  During the course of 37 Ventures ownership of securities in the Portfolio Companies, the number and type of securities owned by 37 Ventures has changed from time to time as a result of a variety of factors including a Portfolio Company's issuance of new or additional securities in which 37 Ventures may or may not participate.

| Issuer | Securities (Shares of Stock) | Original Cost (All classes, approximately) |
|---|---|---|
| NovaSignal, Inc. (formerly known as NeuralAnalytics) | 93,484 Series AA Preferred 206,429 Series BB Preferred 2,659,200 Series C Preferred 202,702 Series Seed-1 Preferred | $1,492,000 |
| Oticara, Inc. | 226,046 Founders Series Preferred | $100,000 |
| Savara, Inc. | 429,179 Common | $2,567,500 |
| SageMedic Corporation | 435,131 Series A Preferred | $250,000 |
| TranscribeMe, Inc. | 1,950,078 Series Seed 481,284 Series Seed 1 80,214 Series Seed 2 | $390,000 |

Information regarding the number of shares of stock indicated in the above chart were compiled with information provided to 37 Ventures from the respective "Issuers'" Chief Executive Officer or other authorized individual familiar with the company's affairs.  Alignment and Knight and Bishop allege that the shares of stock numbers indicated in the above chart conflict with the information within certain documents that 37 Ventures submitted to Alignment as part of 37 Venture's guaranty for the Alignment Loan.

37 Ventures has possession of a valuation report of its portfolio companies—and of Mr. Pikover's shares in Caldera Medical—prepared on September 29, 2020 by an independent expert named Wayne Platt.  The report states both individual investment values and aggregate portfolio values, at two points in time: (1) estimated value (assuming the existence of an active market of buyers), as of July 22, 2020, and (2) expected future value upon liquidity events.  Mr. Platt updated his investigation and analysis using year-end 2020 figures during the first quarter of 2021 but did not prepare a written report of his conclusions.  He orally reported to Mr. Pikover that, on an aggregate basis, his opinions of value did not materially change, although there were some changes on a company-by-company basis.  By virtue of the confidentiality limitations on the disclosure of any information relating to the portfolio companies' valuation, 37 Ventures is

17

1    not submitting with this Disclosure Statement, and will not publicly file either valuation report

2    (or the opinions expressed therein on an individual company basis).    Copies of the reports,

3    however, will be provided to bona fide creditors of the Debtors if they stipulate to be bound by

4    the Protective Order (defined below).

5    For purposes of this Disclosure Statement, 37 Ventures will nonetheless state Mr. Platt's

6    September 29, 2020 conclusions that the aggregate value of 37 Ventures' interests in the above

7    companies ("Portfolio Companies") and Caldera (together, hereinafter the "Subject Companies")

8    were $7.1MM (excluding Larada) on July 22, 2020 and would generate $43,000,000 in future

9    liquidity event proceeds over the next two to four years.[14]  Mr. Pikover generally agrees with Mr.

10   Platt's conclusions on an aggregate basis, although on a company by company basis, his value

11   conclusions might differ. However, if 37 Ventures' minority interests in the Subject Companies

12   were to be liquidated outside of naturally occurring liquidity events, the value of 37 Ventures'

13   interests would be substantially discounted and generate less than what would be needed to pay

14   its creditors in full.  See (Section IV 1. A. hereof).

15   The composition of the securities owned by 37 Ventures has changed over the past three

16   years, but only by virtue of either (a) its own purchase of additional securities (by, for example

17   exercising warrants or participation in a subsequent round of capital financing) or (b) conversion

18   of a security from one type or class into another, such as the conversion of convertible notes into

19   common or preferred shares of stock.[15] However, from at least the beginning of May 2018—the

20   month in which the $7.5MM loan Alignment Loan to Larada closed—until now, 37 Ventures has

21   not sold, transferred, pledged or liquidated any security (or any other property) which it owned

22   during that period.

23   When the Alignment Loan was first negotiated, the loan structure did not include a

24   guaranty from 37 Ventures or any other party.  The addition of a 37 Ventures' guaranty came up

25   ───────────────

[14] The 7/22/2020 and future values of MobileCause are excluded from these aggregate sums.

26   [15] Some of the historical reports of the composition of the holdings of 37 Ventures have inaccurately included
     securities awarded to Mr. Pikover as compensation for his board service, as opposed to securities purchased for

27   cash.  Mr. Pikover has never transferred or intended to transfer to 37 Ventures shares he received as personal
     compensation.  Reporting errors in this regard have led to modest discrepancies between reports, to the extent that

28   due-diligence inquiries or responses about the composition of 37 Ventures' investment portfolio have failed to
     distinguish between the two.

1    late in the negotiations, as a concession made by Larada and 37 Ventures in exchange for

2    Alignment's agreement to include a cure period if Larada were to breach any of the non-

3    monetary covenants of the loan agreement.  This trade-off was not fully agreed-to in principle

4    until approximately two weeks before the closing of the Alignment Loan.  The discussions

5    included good faith representations made by 37 Ventures about the composition of its investment

6    portfolio that, by loan closing, were formalized in an exhibit to the guaranty it signed.

7         Given the shortness of time and the number of other tasks required to finalize and close

8    the Loan, however, 37 Ventures was unable to verify before the closing of the Alignment Loan

9    how many of Mr. Pikover's venture capital investments had been formally transferred to 37

10   Ventures and how many of them remained titled in his own name; and Alignment did not have

11   sufficient time to conduct due diligence on that question.  Accordingly, the portfolio exhibit to

12   the guaranty was obviously incomplete.  More to the point, Alignment agreed that the loan

13   closing should not be delayed and that the reconciliation of the composition of 37 Ventures'

14   investment portfolio would be a post-closing matter.  Accordingly, the guaranty included the

15   following covenant "Within fifteen (15) days following the Closing Date, the Sole member [Mr.

16   Pikover] shall deliver to the Collateral Agent evidence in a form reasonably satisfactory to the

17   Collateral Agent that the Investments listed on Exhibit A are held of record by the Guarantor."

18        In the weeks following the closing of the loan, Mr. Pikover, assisted by Claire Roberts,

19   either delivered the required evidence or, for securities not then formally "held of record" by 37

20   Ventures, caused them to be transferred from Mr. Pikover to 37 Ventures.  There was, however,

21   one exception.  Caldera Medical is one of the investments that Mr. Pikover intended to be and

22   believed was included in 37 Ventures portfolio of investments, but was at closing owned by him

23   personally.  As with the other similarly situated investments, Mr. Pikover attempted to transfer

24   record ownership to 37 Ventures.  In this case, however, he was unable to do so.  The investment

25   contracts, bylaws and the like that governed his investment in Caldera prohibited transfers of his

26   shares without the consent of Caldera; and Caldera refused to consent.  It explained that Caldera

27   was classified and treated as a "Subchapter S" corporation for federal income tax purposes and

28   that, in order to maintain that favorable classification and treatment, all of its shareholders must

19

be natural persons, not entities such as a limited liability company.  Caldera, thus, refused to consent to the requested transfer because it would have destroyed the Subchapter S treatment, which would have adversely impacted other shareholders.  Knight and Bishop and Alignment assert that 37 Ventures, not Pikover, owns the stock of Caldera and that such stock should be considered an asset of the 37 Ventures estate.

Alignment was kept apprised of Mr. Pikover's and Ms. Roberts' efforts in this regard and, although Caldera was listed on the exhibit to the Guaranty, Alignment did not declare a default on account of the inability to transfer record ownership of those shares to 37 Ventures. Mr. Pikover nonetheless has committed in the Plan to contribute to 37 Ventures for payment of the claims against it so much of the net cash proceeds of any Caldera Liquidity Event that occurs prior to payment in full of all claims against 37 Ventures, subject to the right of Mr. Pikover to use net cash proceeds to fund or establish a reserve for defense costs in connection with any potential, pending, or threatened litigation by Alignment or Knight and Bishop relating to  their respective alleged claims against Mr. Pikover.

## 2.    Primary Assets of Larada

Larada's principal assets are intangible in nature, and as an ongoing concern, including the franchise network, its trademarks, its goodwill, its superior technology incorporated into products and devices to treat head lice, and in its employees and management team.

As of the Petition Date, the Larada had cash on hand of approximately $267,000, all of which was the proceeds of government assistance programs.  Larada had accounts receivable of approximately $445,000, and inventory of approximately $262,000.  Larada has segregated and, to date, has not expended any of the proceeds of its pre-petition accounts receivable and inventory, all of which it has deposited in its segregated cash collateral account.

Larada has machinery, equipment, office furniture, and heated air devices, with a collective book value of approximately $386,000 as of the Petition Date (net of depreciation).

Larada has intangibles and intellectual property with a collective book value of approximately $317,000 as of the Petition Date (net of depreciation).

Larada believes that its business has far greater value as a going concern than if it were

1    liquidated and, if Larada attempted to find a buyer for its business in today's business

2    environment, there would be insufficient funds to satisfy its principal secured creditor.

3    Accordingly, Larada has proposed to pay its creditors from future revenues and, if and when its

4    business has improved sufficiently, Larada will consider selling its business as a going concern.

5        Larada does not believe that it has any claims or causes of action against any of its

6    directors or officers, including Mr. Pikover.  Although Alignment has made vague allegations

7    that it believes Larada may have a breach of fiduciary duty claim against Mr. Pikover, it has

8    never alleged any concrete legal or factual basis for such claims.  Larada is unaware of any facts

9    that could give rise to such a claim, and accordingly it has no basis to begin any "investigation"

10    into claims.  Nevertheless, the Plan does not provide for a release or discharge of any claims by

11    Larada against Mr. Pikover or any other director or officer of the Larada based on any pre-

12    petition conduct (the Plan does contain a standard exculpation provision for post-petition conduct

13    in Section 11.5).  If a reasonable basis is presented to Larada for the assertion of any breach of

14    fiduciary claims, then Larada will discharge its fiduciary duty to investigate the allegations.

15    Moreover, nothing in the Plan releases or discharges any of Larada's directors or officers from

16    any direct claims that could be asserted against them by creditors.

17    E.    **The Debtors' Liabilities**

18        1.    **The Liabilities of 37 Ventures**

19        Knight and Bishop has a filed a proof of claim against 37 Ventures in the amount of

20    $3,765,659.28, and the proof of claim alleges it is fully secured, although it does not identify the

21    alleged collateral.  The lien allgedly arises by virtue of a "Notice of Judgment Lien" filed by

22    Knight and Bishop with the California Secretary of State on January 25, 2021. Under Section

23    697.530 of the California Code of Civil Procedure, the lien created by that filing, however,

24    attaches only to certain types of (1) accounts receivable, (2) tangible chattel paper, (3)

25    equipment, (4) farm products, (5) inventory, and (6) negotiable documents of title.  37 Ventures

26    does not own any property of these types.  The proof of claim therefore does not even make a

27    prima facia showing that any of the property of 37 Ventures is subject to a lien, much less

28

identify specifically any property supposedly encumbered by virtue of the filing of the Notice of Judgment Lien.  The Plan therefore treats the Knight and Bishop claim as unsecured.[16]

37 Ventures does not dispute the amount of the claim for purposes of this bankruptcy case or the Plan.

Alignment holds an unsecured claim against 37 Ventures under 37 Ventures' guaranty of the Alignment Loan.  Alignment asserts that the approximate amount of its unsecured claim, as of the Petition Date, was $10.7 million, which amount is disputed by 37 Ventures. 37 Ventures reserves all of its rights and defenses relating to the enforceability, amount and priority of Alignment's claims.

Because it is a single-member limited liability company, 37 Ventures is disregarded for federal and state income taxes.  In general, its tax attributes flow up to Mr. Pikover and are reported on his individual federal and state income tax returns.  It therefore owes and will owe to Mr. Pikover distributions sufficient to cover the income tax liabilities created by Portfolio Company liquidity events.  Under the Plan, Mr. Pikover has committed to applying available loss-carryforwards he may own in a given tax year to offset income taxable to him flowing up from 37 Ventures, and thereby to reduce the tax distributions that 37 Ventures otherwise would be required to make to him.  With that application, 37 Ventures believes no tax distribution will be owed to Mr. Pikover on account of the MobileCause sale for income tax purposes.[17]

### 2.    The Liabilities of Larada

As noted above, the Alignment Loan is Larada's first-priority secured debt.  Pursuant to Bankruptcy Code § 506(a), Alignment's claim is secured to the extent of the value of its collateral, and the remainder of its claim is unsecured.  The current value of Larada as a going concern is $5,189,000.  Thus, assuming Alignment's claim as of its bankruptcy petition date was $9,925,119.97 (this figure comes from Larada's Schedule D), and assuming Alignment's

---

[16] Unless Knight and Bishop voluntarily amends its proof of claim to recharacterize it as unsecured, 37 Ventures will file an objection thereto.

[17] Reorganized 37 Ventures will be required under California Revenue and Taxation Code § 17942 to pay an annual fee that varies with the amount of its annual gross receipts.  Assuming 37 Ventures receives no liquidity event proceeds in 2021 other than from the MobileCause transaction, it will owe a fee payment for 2021, due April 15, 2022, in the amount of $6,000.

security interest would attach to the entire proceeds of a going concern sale of Larada's assets, then Alignment's unsecured claim is in the amount of $4,736,119.97.  However, Alignment has not provided Larada with a detailed break-down or calculation of the amount of its claim as of Larada's petition date, and accordingly Larada reserves all rights to dispute the amount of Alignment's claim.

In addition, Larada has issued convertible subordinated promissory notes to approximately 27 separate debt holders in the aggregate principal amount of approximately $4 million (the "Subdebt" and "Subdebt Holders").  The Subdebt bears interest at the rate of 20% per annum, with 10% payable in cash and 10% accrued and payable in kind.  These Subdebt Holders claims are secured by substantially all of Larada's pre-petition assets, although they hold liens junior in priority to the Alignment Loan pursuant to a contractual subordination agreement. Larada believes that the current value of the Subdebt Holders collateral is insufficient to satisfy Larada's obligations to Alignment.  Accordingly, The Plan treats the claims of the Subdebt Holders as unsecured. In addition, Larada has various unpaid trade debt in the aggregate amount of approximately $1.4 million.

Larada has obligations to its franchisees/licensees under various versions of franchise and/or license agreements.  Larada's franchisees are the life-blood of its business and revenue, and its continued honoring of obligations owed to its franchisees is absolutely essential to the preservation of its business as a going concern. Larada held deposits from its franchisees (which are technically debts of Larada owed to franchisees) in the collective amount of approximately $450,000 as of the Petition Date, which are due and payable to franchisees only upon the termination of their franchise and/or license agreement and compliance with termination requirements. Finally, Larada is the recipient of a second-round PPP loan administered by Brighton Bank (the "PPP Loan"), and as of the Petition Date, Larada had remaining PPP Loan proceeds in the approximate amount of $265,000.  The proceeds of the PPP Loan do not constitute the "cash collateral" of Alignment.  As of June 15, 2021, Larada had used all of its PPP Loan proceeds in accordance with that program and on July 12, 2021 submitted its application for complete forgiveness with Brighton Bank, the PPP lender.

F.    **Significant Events During the Chapter 11 Cases**

The following is a summary of the significant events, which have occurred during the Debtors' Chapter 11 Cases:

1.    **Mobile Cause and Other Liquidity Event Proceeds**

In mid-June of this year, MobileCause, Inc., one 37 Ventures' investments, merged with an unrelated corporation. As a result, 37 Ventures received $4,553,292.68 for its MobileCause shares. That amount was wired directly to its debtor-in-possession account.  37 Ventures also received approximately $104,000 as the final payment on a pre-petition liquidity event transaction involving its prior investment in a company named AnyMeeting, Inc.

2.    **Employment of Professionals By Debtors**

37 Ventures filed an application in its case seeking to employ the law firm of Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), effective as of the Petition Date, as its general bankruptcy counsel in its Chapter 11 Case.  The Bankruptcy Court entered an order approving the application to employ LNBYB filed by 37 Ventures on May 13, 2021.[18]

Larada filed applications in its Chapter 11 Case seeking to employ (i) Cohne Kinghorn, P.C. as its general bankruptcy counsel; (ii) Zolkin Talerico LLP as its local bankruptcy counsel; (iii) Rocky Mountain Advisory LLC as its financial advisor; (iv) WSRP, LLC as its general accountants; (v) Thayne Davis LLC as special patent and trademark counsel; (vi) Lewis Brisbois Bisgaard & Smith LLP as special corporate and litigation defense counsel; and (vii) Arcturus Law Firm as special commercial litigation counsel, all effective as of the Petition Date.  The Bankruptcy Court entered orders approving these applications on May 12, 2021.  Subsequently Larada filed an application to employ LonePeak Valuation Group as its valuation expert, which the Bankruptcy Court approved by Order dated August 6, 2021.

3.    **Administrative Matters**

The Debtors were required to address the various administrative matters attendant to the commencement of their Chapter 11 Cases.  These matters included the preparation of the

---

[18] As of the filing of this Disclosure Statement, LNBYB changed its name to Levene, Neale, Bender, Yoo & Golubchik L.L.P.

Debtors' respective Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("SOFAs"), and the preparation of materials required by the Office of the United States Trustee ("OUST"). 37 Ventures filed its Schedules and SOFA on April 12, 2021 and filed certain amendments thereto on June 9, 2021. Larada filed its Schedules April 19, 2021 and its SOFA on April 22, 2021 and filed certain amendments thereto on June 15, 2021.

The Debtors have made every effort to comply with their duties under 11 U.S.C. §§ 521, 1106 and 1107 and all applicable OUST guidelines, including the filing of the Debtors' 7-Day Packages and the Debtors' monthly operating reports with the OUST. The Debtors also attended their initial debtor interviews and meetings of creditors required under 11 U.S.C. § 341(a).

Immediately following the Petition Date, on March 19, 2021, the Debtors filed motions in their respective bankruptcy cases seeking to have their bankruptcy cases jointly administered. The Bankruptcy Court entered an order approving such motion on March 23, 2021.

### 4.    Other Larada Motions

On the Petition Date, Larada filed (a) its Emergency Motion for Order Authorizing the Debtor to Continue Use of its Existing Bank Accounts (the "Bank Account Motion"); (b) its Emergency Motion for Entry of an Order Limiting Notice (the "Motion to Limit Notice"); and (c) its Emergency Motion for an Order Authorizing, but not Directing, the Debtor to Honor Obligations to its Franchisees in the Ordinary Course (the "Franchisee Motion"). The Bankruptcy Court granted the Bank Account Motion (with modifications requested by the OUST) on March 29, 2021. The Bankruptcy Court granted the Franchisee Motion (with modifications requested by Alignment) on April 29, 2021. On June 15, 2021, Larada filed its First Omnibus Motion to Reject Executory Contracts Pursuant to 11 U.S.C. § 365(a) to reject contracts between Larada and Walgreen Co., H.E. Butt Grocery Company, and Meijer, Inc., which motion was granted.

### 5.    Claims Bar Date

On May 17, 2021, the Debtors filed a joint motion seeking the entry of an order establishing a bar date for filing proofs of claim or interest in the Debtors' respective cases (the "Bar Date Motions"). Specifically, by the Bar Date Motions, the Debtors requested that the

1   Court establish July 15, 2021 as the bar date (the "Bar Date") by which parties who wished to

2   assert pre-petition claims against, and interests in, the Debtors would be required to file and

3   serve proofs of claim or proofs of interest in the applicable cases, or be forever barred from

4   asserting such pre-petition claims or interests against one or both of the Debtors.  On May 18,

5   2021, the Bankruptcy Court entered its order establishing July 15, 2021 as the Bar Date in each

6   of the Debtors' cases.

7          On May 28, 2021, the Debtors filed and served their respective notices of the Bar Date on

8   all creditors and known parties in interest.

9          **6.     Other 37 Ventures Motions**

10         On May 26, 2021, Knight and Bishop filed a motion to: (i) direct the Debtors and Mr.

11  Pikover to produce certain documents; (ii) require Mr. Pikover and Ms. Roberts to appear for an

12  examination; and (iii) authorize the issuance of certain subpoenas (the "2004 Motion").

13  Oppositions to the 2004 Motion were filed by the Debtors on June 8, 2021 to address, among

14  other things, the confidentiality issues, and the overly broad scope of production related to the

15  requested documents.  To resolve the confidentiality issues related to the production of the

16  requested documents, on July 12, 2021, the parties filed the "*Stipulation Among Debtors, Knight

17  and Bishop, L.P., And Alignment Debt Holdings 1, LLC For Protective Order*".  The Court

18  entered the order approving that stipulation [Doc. No. 248] (the "Protective Order") on August

19  20, 2021.  The 2004 Motion was resolved by a joint stipulation filed with the Court on August

20  19, 2021 [Doc. No. 245] and approved by Court order entered on August 31, 2021 [Doc. No.

21  259].

22         On June 1, 2021, Alignment and Knight and Bishop filed a joint motion to terminate the

23  Debtors' exclusive period to file a chapter 11 plan (the "Exclusivity Motion").  Oppositions were

24  filed by, among other parties, the Debtors on June 8, 2021.  The Court held a hearing on the

25  Exclusivity Motion on June 22, 2021, and the Court entered its order denying the Exclusivity

26  Motion on June 24, 2021.

27         On August 24, 2021, the Debtors filed a joint Motion for Order Extending Period to

28  Obtain Acceptances to the Plan.  Alignment and Knight and Bishop both objected to this motion,

26

but it was granted by the Bankruptcy Court and the objections were overruled. The current deadline for the Debtors to obtain acceptances to the Plan is November 13, 2021. The Debtors anticipate seeking a further extension.

### 7. Claims

Based on a review of all of the claims scheduled and filed to date, it appears that in the 37 Ventures case there is a disputed IRS Priority Tax Claim, no Priority Non-Tax Claims, and approximately $14 Million of non-Insider General Unsecured Claims against the 37 Ventures Estate.

In the Larada case there are no Priority Tax Claims or Priority Non-Tax Claims. Alignment holds the senior secured claim against Larada, which Alignment asserts is slightly in excess of $10.7 million (which amount Larada disputes) as of the Petition Date, although the collateral securing Alignment's debt has significantly less value than the amount of Alignment's claim. Accordingly, the Plan treats Alignment as an "under-secured" creditor, having both a secured claim and an unsecured deficiency claim.

Larada also has approximately 27 holders of Subdebt Claims in the approximate aggregate amount of $4 million. Although the Subdebt Claims are nominally secured, they are treated as unsecured pursuant to Bankruptcy Code § 506(b). Larada has general unsecured claims (not including Subdebt Claims) of approximately $5 million. The Debtors are reviewing all claims for accuracy and enforceability, and, to the extent that there are objections which cannot be resolved consensually, the Debtors will be filing objections to such claims.

### 8. Procedures Implemented to Resolve Larada Financial Problems

The easing of the pandemic and related reopening of society will solve the root cause of Larada's financial distress. As children return to in-person school, camps, and other social gatherings, lice will naturally return to spreading among children just as has always occurred. Furthermore, with 37 Ventures payment of all or a substantial portion of Alignment's debt pursuant to the Plan, which 37 Ventures guaranteed, and the related restructuring of payments to its creditors pursuant to the Plan, Larada will have the time it needs to eventually repay its creditors in full plus interest.

**9.    Anticipated Future of the Companies**

Attached hereto as **Exhibit "C"** is the Larada plan cash flow projections, on a monthly and an annual basis, for the years 2022 – 2028.  The projections attached as **Exhibits "C"** are based on the assumptions included as part of **Exhibit "C**."

37 Ventures is not generating any cash flow from operations. Rather, its revenue is derived from "liquidity events" of its portfolio companies.  Since the commencement of 37 Ventures' Chapter 11 case, one of its portfolio companies, Mobilecause, was merged into a third party company; and, as a result of that merger, 37 Ventures received approximately $4.6 Million, which it has retained in its debtor-in-possession account. 37 Ventures anticipates that there will be future liquidity events of portfolio companies during the post Effective Date period which will enable 37 Ventures to satisfy all of its creditor claims in full, and to allow 37 Ventures to assist Larada in its business operations, and paying its creditor claims. The timing and future liquidity events cannot be predicted with certainty as the circumstances that create opportunities for liquidity events depend upon the Portfolio Companies' success in their respective markets. Nevertheless, based on the historic performance of other investments made by 37 Ventures and by Mr. Pikover, 37 Ventures believes that an outside date of December 31, 2025 for achieving the funds necessary to pay all of its creditors in full, with interest, is realistic.

**II.**

**SUMMARY OF THE PLAN OF REORGANIZATION**

**A.    Summary Chart of Plan Classes**

Under the Plan, there are classes of creditors and Interest holders for each Debtor, as follows:

| CLASS | TREATMENT |
|---|---|
| Class 1 (a), Priority Claims – 37 Ventures | Unimpaired, not entitled to vote on the Plan |
| Class 1(b), Priority Claims – Larada | Unimpaired, not entitled to vote on Plan |

| Class 2(a), General Unsecured Claims Other Than Knight and Bishop's and Alignment's General Unsecured Claims – 37 Ventures | Impaired, entitled to vote on Plan |
|---|---|
| Class 2(b), Knight and Bishop's General Unsecured Claim – 37 Ventures | Impaired, entitled to vote on Plan |
| Class 3, Alignment Claim against 37 Ventures | Impaired, entitled to vote on the Plan |
| Class 4, Alignment Secured Claim against Larada | Impaired, entitled to vote on the Plan |
| Class 5, Alignment Deficiency Claim against Larada | Impaired, entitled to vote on the Plan |
| Class 6, General Unsecured Claims against Larada | Impaired, entitled to vote on the Plan |
| Class 7, Subdebt Holders | Impaired, entitled to vote on the Plan |
| Class 8(a), Convenience Class Claims against Larada | Impaired, entitled to vote on the Plan |
| Class 8(b), Convenience Class Claims against 37 Ventures | Impaired, entitled to vote on the Plan |
| Class 9, Equity Interests in 37 Ventures | Unimpaired, not entitled to vote on Plan |
| Class 10, Equity Interests in Larada | Unimpaired, not entitled to vote on Plan |

**B.    What Creditors and Interest Holders Will Receive Under the Plan**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.

**C.    Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtors have not placed the following claims in a class:

### 1.    Administrative Expenses

Administrative expenses are claims for costs or expenses of administering the case that are allowed under Bankruptcy Code Section 507(a)(1).  The Bankruptcy Code requires that all administrative claims be paid on the Effective Date unless a particular claimant agrees to a different treatment.  Except as set forth below, Allowed Administrative Claims shall be paid in full in cash on the later of (a) the Effective Date or (b) 14 days after the date of entry of an order of the Bankruptcy Court allowing such Administrative Claims, or as otherwise agreed to by the holders of such Allowed Administrative Claims.  The Court must rule on all professional fees and expenses before the fees will be owed by the Debtors. The professional in question must file and serve a properly noticed fee application, and the Court must rule on the application.  Only the amount of fees allowed by the Court will be owed and required to be paid under the Plan.

### 2.    Priority Tax Claims

Priority Tax Claims include certain income, employment and other taxes described by 11 U.S.C. § 507(a)(8) not secured by a lien in the Debtors' assets.  The Bankruptcy Code requires that each holder of such a Section 507(a)(8) Priority Tax Claim receive the present value of such claim in regular installment payments in cash (i) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such claim; (ii) over a period ending not later than five (5) years after the Petition Date; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for under the Plan.  The Debtors do not believe they owe any Priority Tax Claims.

### D.    Classified Claims and Interests

### 1.   Classes of Secured Claims

Secured claims are claims secured by liens on property of the Estates.  Both Alignment and Knight and Bishop have asserted secured claims.  Knight and Bishop's alleged secured claim against 37 Ventures is disputed and unless the dispute is resolved consensually, 37 Ventures will commence an adversary proceeding for a determination that Knight and Bishop's alleged lien is invalid, unenforceable and/or subject to avoidance under Code section 547.  The only secured claim against Larada is asserted by Alignment.  Larada has proposed to pay the Larada Quarterly

30

Amount to its creditors, which essentially represents its net available cash to distribute to its creditors after payment of its operating expenses and maintaining a reasonable cash reserve on hand.  Larada has proposed to divide the Larada Quarterly Amount, with 70% being paid to Alignment and 30% to its unsecured creditors.  Larada submits that this 70/30 split is reasonable under the circumstances.  Although Alignment is senior in preference to unsecured claims, it must be recognized that under the Plan, 37 Ventures will pay this claim in four years or less, which is a more favorable treatment than will be received by any other creditor of Larada.  Furthermore, according to Larada's Liquidation Analysis attached as Exhibit B, on liquidation (which would be the result if Alignment were to foreclose its secured claim), Alignment would receive $625,000 (the result of a piecemeal asset sale) or $5,189,000 (if Larada could be sold for its going concern value).  In contrast, the Plan proposes to maintain the Debtor's going concern value, and proposes to pay the Larada Quarterly Amount to its creditors (which through 2028, Larada projects to total $6,957,000), and then by 2028 creditors can realize the value of Larada as a going concern at that time (which Larada's experts project to be $15,659,000).  Given the large difference between the result of a liquidation now versus the proposed reorganization, and the commensurate benefits to Alignment, it is fair for Larada's unsecured creditors to receive a relatively small proportion of the Larada Quarterly Amount, which value would evaporate in a foreclosure.

The following table lists all of the Debtors' known Secured Claims and their treatment under the Plan:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| 4 | Larada Claim: Alignment Secured Claim  Total Amount of Alignment Secured Claim: $5,189,000 | N | Y | Alignment's unsecured guaranty claim against 37 Ventures and its partially secured claim and its unsecured deficiency claim against Larada shall be paid in full, with interest.  The sources of payment will be from Liquidity Events of Portfolio Companies, 70% of |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | Collateral: Substantially all of Larada's assets | | | the Larada Quarterly Amount, Debt Recapitalization and/or Larada Asset Sale Liquidity Event proceeds. |

## 2.    Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes.  The Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.  However, a class of Priority Claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims. The Debtors do not believe there are any holders of Priority Claims.

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| 1(a) | 37 Ventures Claim: Allowed Priority Claims<br><br>Total Amount of Allowed Priority Non-Tax Claims: $0.00 | N | N | 37 Ventures does not believe there are any Priority Non-Tax Claims in this Class. If an unknown claim is asserted in this Class that is a valid claim, then the following treatment will apply:<br><br>All Allowed Priority Non-Tax Claims shall be paid in Cash in an amount equal to the amount of the Allowed Claim on the Effective Date of the Plan. |
| 1(b) | Larada Claim: Allowed Priority Claims<br><br>Total Amount of Allowed Priority Non-Tax Claims: $0.00 | N | N | Larada does not believe there are any Priority Non-Tax Claims in this Class. If an unknown claim is asserted in this Class that is a valid claim, then the following treatment will apply:<br><br>All Allowed Priority Non-Tax Claims shall be paid in Cash in an amount equal to the amount |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | of the Allowed Claim on the Effective Date of the Plan. |

3.        **Classes of General Unsecured Claims**

General Unsecured Claims are unsecured claims not entitled to priority under Bankruptcy Code Section 507(a).  The following chart identifies the Plan's treatment of the class containing all of the Debtors' Allowed General Unsecured Claims:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| 2(a) | 37 Ventures Claims: All General Unsecured Claims Other Than Knight and Bishop's and Alignment's General Unsecured Claims<br><br>Total Amount of Claims = $TBD | N | Y | Interest: Except as provided in Section 4.2(c)(i) of the Plan, interest on the Allowed Class 2(a) Claims against 37 Ventures shall accrue at the Plan Rate from the Effective Date until the Allowed Class 2(a) Claims against 37 Ventures are paid in full.<br><br>Satisfaction of Class 2(a) Claims: In full and final satisfaction, settlement, release, and discharge of Allowed Class 2(a) Claims, creditors holding these claims will receive its Pro Rata share of the amounts paid pursuant to Sections 5.7 and 5.8 of the Plan (shared Pro Rata with Knight and Bishop's Class 2 Claim and Alignment's Class 3 Claim against 37 Ventures).<br><br>Allowed Class 2(a) Claims, including accrued but unpaid interest thereon, shall be fully due and payable on December 31, 2025, unless |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | paid prior to that date from a Company Liquidity Event pursuant to Section 5.8 of the Plan, or as otherwise provided under the Plan. |
| 2(b) | 37 Ventures Claims: Knight and Bishop's General Unsecured Claim<br><br>Total Amount of Claims = $3.7 million (estimated) | N | Y | Interest: Except as provided in Section 4.2(c)(i) of the Plan, interest on the Allowed Class 2(b) Claim against 37 Ventures shall accrue at the Plan Rate from the Effective Date until the Allowed Class 2(b) Claim against 37 Ventures is paid in full.<br><br>Satisfaction of Class 2(b) Claim: In full and final satisfaction, settlement, release, and discharge of Knight and Bishop's Allowed Class 2(b) Claim, Knight and Bishop shall receive distributions under one of the two options described in subsections (i) and (ii) below, depending on whether Hawk timely pays the Hawk Contribution[19], as contemplated in Section 5.7(a)(1) of the Plan. In addition, any 37 Ventures Pre-Confirmation Distributions shall be credited as a distribution pursuant to this provision.<br><br>(i) If, prior to the Effective Date, Hawk timely pays the Hawk Contribution |

---

[19] As of the filing of this Amended Disclosure Statement, Mr. Hawk has indicated a willingness to contribute $1.3 Million on or before the Effective Date, subject to certain conditions, including, without limitation, that he and his wife receive releases from Knight and Bishop. 37 Ventures is continuing to negotiate with Knight and Bishop and Mr. Hawk.

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | to Knight and Bishop, then on the 37 Ventures Initial Distribution Date, Reorganized 37 Ventures will pay to Knight and Bishop the balance of the Knight and Bishop Allowed Claim as reduced by the Hawk Contribution, as of the date of payment. |
| | | | | (ii)  If Hawk does not timely pay the Hawk Contribution to Knight and Bishop, Knight and Bishop will receive its Pro Rata share of the amounts paid pursuant to Section 5.7 and 5.8 of the Plan (shared Pro Rata with Class 2(a) Claims, and Alignment's Class 3 Claim against 37 Ventures). |
| | | | | (iii)  In either case, the amount of the Knight and Bishop claim shall be calculated at the time of each distribution after first reducing the amount of the Knight and Bishop Claim by the amount of all then prior payments made by or collections received by virtue of judgment executions on the assets of Bob Hawk or Dmitri Williams on account of the judgment in the Ninja Metrics Case. |
| | | | | Final Payment: The unpaid balance, if any, of the Allowed Class 2(b) Claim, including accrued but unpaid interest thereon, shall be fully due and payable on |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | December 31, 2025, unless paid prior to that date from a Company Liquidity Event pursuant to Section 5.8 of the Plan, or as otherwise provided under the Plan.<br><br>Knight and Bishop is not obligated, and has not agreed to, provide a release to Hawk in exchange for the Hawk Contribution. |
| 3 | 37 Ventures Claims: Alignment Unsecured Claim<br><br>Total Amount of Claims = $[To be determined] | N | Y | Interest:  Interest on Alignment's Class 3 Claim shall accrue at the Plan Rate from the Effective Date until Alignment's Class 3 Claim is paid in full.<br><br>Distributions:  In full and final satisfaction, settlement, release, and discharge of Alignment's Class 3 Claim, Alignment shall receive a Pro Rata share of the amounts paid pursuant Sections 5.7 and 5.8 of the Plan, until the Alignment Claim is paid in full, after giving credit to distributions Alignment receives from Larada.  In addition, any 37 Ventures Pre-Confirmation Distributions shall be credited as a distribution pursuant to this provision. At the time of each distribution to Alignment under either such section, the amount of Alignment's Allowed Claim shall be recalculated to be the sum of the then outstanding principal balances of Alignment's Secured and |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | Deficiency Claims. Application of Payments to Alignment: see Plan section 4.3(e). Final Payment: The unpaid balance of Alignment's Class 3 Claim against 37 Ventures, including accrued but unpaid interest thereon, shall be fully due and payable on December 31, 2025, unless paid prior to that date from a Company Liquidity Event as described in Section 5.8 of the Plan, or as otherwise provided in the Plan. |
| 5 | Larada Claims: Alignment Deficiency Claim Total Amount of Claims = $4,736,119.97 | N | Y | Interest: Interest on the Alignment's Class 5 Claim shall accrue, post Effective Date, at the Plan Rate. Distributions: In full and final satisfaction, settlement, release, and discharge of Alignment's Class 5 Claim, Alignment shall receive from Larada, payments Pro Rata with the holders of Class 6 claims, as provided for in Section 4.6 of the Plan, and all distributions otherwise payable to the Subdebt Holders in Class 7 until such time as Alignment's Class 5 Claim is paid in full, with interest. |
| 6 | Larada Claims: General Unsecured Claims | N | Y | Interest: Interest on General Unsecured Claims shall accrue, post Effective Date, at the Plan Rate. |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | Total Amount of Claims = $5.13 million (estimated) | | | Distributions: Larada shall pay in full Allowed General Unsecured Claims against Larada, Pro Rata with the holders of Class 5 Claims against Larada, as follows: (i) Quarterly Larada Payments. In full and final satisfaction, settlement, release, and discharge of all Class 6 Claims, Larada shall make Quarterly Pro Rata payments to holders of Class 5 and Class 6 Claims, in the Remaining Larada Monthly Amount until such Claims are paid in full with interest, (ii) but not later than December 31, 2028, unless paid prior to that date from a Company Liquidity Event as described in Section 5.8 of the Plan, or as otherwise provided in the Plan. |
| 7 | Larada Claims: Subdebt Claims Total Amount of Claims = $5.3 million (estimated with accrued interest) | N | Y | Interest: Interest on the Subdebt Claims shall accrue, post Effective Date, at the Plan Rate. Distributions: Larada shall pay in full the Subdebt Claims against Larada, Pro Rata with the holders of Class 5 Claims and Class 6 Claims against Larada, as follows: (i) Quarterly Larada Payments. In full and final satisfaction, settlement, release, and discharge of all Class 7 Claims, Larada shall make Quarterly Pro Rata payments |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | to holders of Class 5, Class 6, and Class 7 Claims, in the Remaining Larada Monthly Amount until such Claims are paid in full with interest, |
| | | | | (ii) but not later than December 31, 2028, unless paid prior to that date from a Company Liquidity Event as described in Section 5.8 of the Plan, or as otherwise provided in the Plan. |
| | | | | Termination of Subdebt Holders Security Interest and Subordination to Alignment: All liens and security interests of Subdebt Holders shall be terminated as of the Effective Date and Subdebt Holders claims shall be treated as unsecured claims. |
| | | | | Implementation of Subordination: Pursuant to the inter-creditor agreements the Subdebt Holders Claims are subordinate to Alignment's Secured and unsecured claims (including those held by 37 Ventures by virtue of the 37 Ventures' Subrogation Claim) ("Loan Claims"). Until Alignment's Loan Claims are paid in full as provided for in the Plan, all distributions that would otherwise be payable to Subdebt Holders on account of their Class 7 Claims shall, instead, be paid to Alignment and applied to the satisfaction of Alignment's Class 5 Claim; provided, however, if and when the |

39

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | Loan Claims are paid in full, Class 7 claims shall thereafter be treated as Class 6 claims, without subordination ("Desubordination"), in the following manner. |
| | | | | (i) Class 7 Catch-Up Payments: After Desubordination of the Class 7 claims, all distributions to the holders of Class 6 and Class 7 claims shall be paid first to the holders of Class 7 Claims until the proportionate share of the total distribution made on account of Class 7 claims is equal to the proportionate share of the total distributions made on account of the Class 6 Claims, in each case with respect to the sum of the amounts of the Class 6 and 7 Claims, as the denominator for the Pro Rata calculation. |
| | | | | (ii) After the Class 7 Catch-Up Payment, holders of Class 7 claims shall be treated as holders of Class 6 claims and thereafter receive distributions on a Pro Rata basis with the other holders of Class 6 Claims. |
| 8(a) | Larada Claims: Convenience Claims  Total Amount of Claims = $60,000 (estimated) | N | Y | Distributions: Each holder of an Allowed Convenience Class Claim shall receive Cash in an amount equal to 75% of such Allowed Convenience Class Claim on the later of October 15, 2022 and the date such |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | Convenience Class Claim becomes an Allowed Convenience Class Claim, or as soon thereafter as is practicable. |
| 8(b) | 37 Ventures Claims: Convenience Claims<br><br>Total Amount of Claims = $0.00 (estimated | N | Y | Distributions: Each holder of an Allowed Convenience Class Claim shall receive Cash in an amount equal to 75% of such Allowed Convenience Class Claim on the later of October 15, 2022 and the date such Convenience Class Claim becomes an Allowed Convenience Class Claim, or as soon thereafter as is practicable. |

### 4.  Classes of Interest Holders

Interest holders are the parties who hold an ownership interest (*i.e.*, equity interest) in the Debtors.  The following chart identifies the Plan's treatment of the classes of interest holders:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 9 | All Interests in 37 Ventures | N | Distributions: Each record holder of Equity Interests in 37 Ventures shall retain its interest in 37 Ventures, as Reorganized 37 Ventures. |
| 10 | All Interests Larada | N | Distributions: Each record holder of Equity Interests in Larada shall retain its interest in Larada, as Reorganized Larada. |

## E.  Means for Execution of the Plan

### 1.  Revesting of Property

(a)  Except as otherwise provided in the Plan, Reorganized Larada, as of the Effective Date, shall be vested with all of the assets of the Larada Estate; and Reorganized 37 Ventures, as of the Effective Date, shall be vested with all of the assets of the 37 Ventures Estate,

including all claims and causes of action that existed prior to, on or after the commencement of their respective chapter 11 cases.

(b)    Without limiting the generality of the foregoing and notwithstanding Section 4.10 of the Plan ("Satisfaction of Claims and Release), Reorganized 37 Ventures shall be vested with and retain all rights of contribution, reimbursement, indemnification or the like that it may hold or come to hold against Robert Hawk or Dmitri Williams in connection with the judgment in Ninja Metrics Case, whether those rights are fixed, contingent, liquidated or unliquidated.

**2.    Corporate Existence**

From and after the Effective Date of the Plan, the Reorganized Debtors are authorized to continue their normal business operations and enter into such transactions as each of them deems advisable, free of any restriction or limitation imposed under any provision of the Bankruptcy Code, except to the extent otherwise provided in the Plan.

**3.    Ability to Incur Debt**

Reorganized Larada may incur debt after the Effective Date on a secured or unsecured basis without further notice, opportunity for hearing or order, except only to the extent the terms and provisions of the Plan may expressly forbid.

**4.    Application of Liquidity Event Net Proceeds**

From and after the Effective Date of the Plan and until all claims against both Reorganized Debtors are paid in full, Reorganized 37 Ventures and Pikover shall manage the securities of the Portfolio Companies (including those issued by Larada) ("Portfolio Companies") and Caldera (hereinafter, together, the "Subject Companies") that each respectively owns, as follows:

(a)    No Transfers Inconsistent With The Plan.  Until all Class 2(a), Class 2(b), and Class 3 Claims are paid in full, Pikover and Reorganized 37 Ventures shall not sell, transfer, pledge or hypothecate any of securities issued by the Subject Companies that they respectively own, except in connection with a Company Liquidity Event, as contemplated below ("Sale Restriction").  It shall not be a breach of the Sale Restriction should any of those securities be

converted into a different type or class of securities in a transaction approved, authorized or caused by a given Subject Company with respect to all like securities. Notwithstanding the foregoing, (1) Reorganized 37 Ventures and Pikover may sell or pledge some or all of their respective interests in the Subject Companies to secure a loan of funds to be used to pay some or all of the Claims provided for in the Plan, but only after first obtaining an order of the Court permitting same, after notice and an opportunity to be heard is first given to the then remaining holders of such claims; and (2) Pikover may sell or pledge all or a part of his ownership interest in Caldera to obtain funds to pay for defense costs in connection with any potential, pending, or threatened litigation by Alignment or Knight and Bishop relating to any of their alleged respective claims against Pikover.

(b)    Savara Stock Proceeds.  Reorganized 37 Ventures shall hold the securities issued by Savara ("Savara Securities") until it determines, in the exercise of its commercially reasonable discretion in consultation with the Plan Monitor, that it is prudent to sell those securities, in light of then publicly available information about the approval and/or the prospects for approval by United States Food and Drug Administration of the sale of Savara's molgramostim nebulizer solution.  Notwithstanding the foregoing, Reorganized 37 Ventures may sell the Savara Securities for Cash, in consultation with the Plan Monitor, at any time it reasonably determines that it needs Cash to comply with its obligations under the Plan.  In either event, the Cash proceeds of the sale of such securities shall be managed, held and distributed in the same manner as the Cash proceeds of a Company Liquidity Event, as provided below.

(c)    Company Liquidity Event Proceeds.    Reorganized 37 Ventures and Pikover (each, a "Shareholder") shall use commercially reasonable efforts to encourage the Subject Companies to pursue commercially reasonable Company Liquidity Event transactions. Reorganized 37 Ventures shall cooperate with and shall not unreasonably withhold its consent to any Company Liquidity Event transaction that is formally recommended by the board of directors of the respective Subject Company.  Upon the occurrence of a Company Liquidity Event for any of the Subject Companies, the proceeds distributed to the respective Shareholder on account thereof ("Liquidity Event Proceeds") shall be managed, held and distributed as

43

follows:

(i)     Liquidity Event Proceeds that are publicly traded stock shall be sold for Cash on a public exchange as soon as legally and practicably possible after receipt by the Shareholder, such sale to be brokered by a third-party, nationally recognized securities broker-dealer charging no more than a market-standard commission.  The resulting net Cash, and all other Cash received on account of the Company Liquidity Event, ("Liquidity Event Cash") shall then be managed, held and distributed as follows:

**First**, to pay all reasonable legal and accounting fees and costs of the respective Shareholder and of the Plan Monitor incurred in connection with the Company Liquidity Event.

**Second**, to fund the applicable Income Tax Reserve, determined in accordance with and for further distribution as provided in Section 5.9 of the Plan.

**Third**, if Caldera is the Subject Company giving rise to the Liquidity Event Proceeds, the balance remaining after the first and second uses described above shall be contributed by Pikover to Reorganized 37 Ventures (the "Caldera Contribution") for further use as provided in the Plan.

**Fourth**, from the remaining balance of the Liquidity Event Cash, whether directly received by Reorganized 37 Ventures from a Subject Company Liquidity Event or from the Caldera Contribution, Reorganized 37 Ventures may reserve a reasonable amount, determined in consultation with the Monitor, of Cash to fund the ongoing legal, accounting, administrative and operating expenses of Reorganized 37 Ventures and of the Plan Monitor.

**Fifth**, the balance of the Cash proceeds shall be distributed to the holders of Class 2(a), 2(b), and Class 3 claims, Pro Rata.

**Sixth**, after payment in full of Class 2(a), Class 2(b), and Class 3 claims, Reorganized 37 Ventures may, in its sole discretion, use a portion or all of the remaining Company Liquidity Event Proceeds to pay creditors of Larada or

provide other financial support to Larada.

(ii)    Until all Class 2(a), Class 2(b), and Class 3 Claims are paid in full, Pikover and Reorganized 37 Ventures shall notify the Plan Monitor of all anticipated Company Liquidity Events at least five business days before the anticipated closing of each such Company Liquidity Event.  Upon the receipt by the respective Shareholder of the proceeds of the given Company Liquidity Event, such Shareholder will review in advance with the Plan Monitor the Shareholder's intended disposition of those proceeds, to assure compliance with the use and distribution requirements of Section 5.8 and Section 5.9 of the Plan.

**5.    Officers Of Reorganized Debtors And Post-Confirmation Management**

The existing officers of the Debtors shall retain their positions on behalf of the Reorganized Debtors.  The post-confirmation management of the Reorganized Debtors shall continue to be handled by with Yuri Pikover as Manager of 37 Ventures, and with Claire Roberts as Chief Executive Officer of Larada and Yuri Pikover as the co-Chief Executive Officer of Larada.  Biographical and compensation information for Larada's directors and officers is below:

**Yuri Pikover, Director and Chairman of the Board**

Mr. Pikover has been a director of Larada since 2011 when his venture capital firm, 37 Ventures, made its first investment in Larada. He started his career as an electrical engineer for Micom Systems in 1982. He left Micom in 1988 to be the Sales Director of Fibermux, a 1984 startup, which was sold to ADC Telecommunications in 1991 while he was there. He then left Fibermux/ADC in 1993 to co-found a new startup called Xylan Corporation which pioneered high-speed desktop-switching systems conceptualized by Mr. Pikover. Xylan Corporation went public in 1996 and was later acquired by Alcatel-Lucent in 1999.

In 1999 Mr. Pikover became Chairman and CEO of Access360, which was sold to IBM in 2002. From 1999 until he formed 37 Ventures in 2010, Mr. Pikover personally invested in and advised a series of startups and early-stage companies. In most of those he became a Board Member, and in some cases he was also appointed to be the temporary or full-time CEO or Executive Chairman.

45

Mr. Pikover has used 37 Ventures to continue to invest in, advise, be on the Boards of and (in some cases) manage companies. As of Larada's Petition Date, 37 Ventures owned securities issued by ten privately held and one publicly traded corporations.

37 Ventures owns 5,874,482 Series A Preferred Shares and 653,430 Common Stock Warrants in Larada. Mr. Pikover has 2,743,279 stock options in Larada. Larada pays Mr. Pikover a salary of $120,000 a year in his management role in the company that although not officially titled as such, is commensurate with that of a co-CEO.

**Claire Roberts, Director and CEO**

Ms. Roberts began her career with Deloitte and Touche, and was a board-certified public accountant in the state of Washington.

After leaving public accounting Ms. Roberts has held positions as a CFO, COO, President and CEO, leading companies ranging from startup stage to mature companies facing a turnaround.  Her industry expertise ranges from manufacturing, banking, life sciences, SAAS, and franchising. In her executive management capacity, she has worked for entities backed by private and public investors, including Seattle based venture capital firm Madrona Venture Group, LLC, Indianapolis based leading life sciences organization BioCrossroads, Inc. and the Indianapolis based National Collegiate Athletic Association.

In 2013 Ms. Roberts was recruited by Larada's Board to turn the company around. In her role as CEO she has grown Larada to be the largest lice-treatment services company in the world. She has led Larada through a rebranding, conversion from a licensor to a franchisor, rapid expansion of franchise clinics, the development of many new and superior lice-treatment products, and distribution of its products through new retail channels.

Ms. Roberts has 3,156,527 stock options in Larada. Larada pays Ms. Roberts a salary of $150,000 a year in her role as CEO.

**Brent Sloan, Director**

Mr. Sloan is an attorney who in 1992 created a concept store called Kid to Kid, which specialized in reselling used children's apparel. He opened two more stores and in 1994 he began franchising the concept. There are currently 109 Kid to Kid stores in operation.

Mr. Sloan served as President of BaseCamp (the parent company of Kid to Kid) until 2015. He continues to serve as BaseCamp's Chairman.

In 2008 Mr. Sloan founded a similar concept franchise under the BaseCamp umbrella that resells high-end teen clothing. Those stores are branded as Uptown Cheapskate. There are currently 87 Uptown Cheapskate stores in operation.

In 2012 Mr. Sloan accepted the invitation to be a Director on Larada's Board. In that position he has provided expertise and guidance to Larada's management team as it transitioned Larada from being a medical-device licensing company to a franchisor under the Lice Clinics of America brand.

Mr. Sloan has 601,766 stock options in Larada. He receives no other compensation from Larada.

**Scott Wilson, President**

Scott Wilson began his career as an engineer for Florida Power & Light. During his time there FPL became the first non-Japanese company to pursue the Deming Award, a prestigious international award for Total Quality Management. Scott became FPL's Corporate Analyst and Facilitator leading the effort in FPL's successful pursuit of the award. Soon after, the internet was born for consumers and several internet providers launched. Scott recognized the opportunity and took a position to head quality management for America Online. That led to him to take a role as Director of Customer Satisfaction during a time America Online boomed (1995 to 1999) going from a few hundred thousand subscribers to more than 20 million. He later co-founded LMTT.com, a first-mover solution for distressed tee-time reservations, revenue management and website design used by the golf industry. LMTT was sold to Comcast in 2008 as part of Golf Channel's New Media initiative and was rebranded to GolfNow.com.

Prior to joining Larada in 2016, Mr. Wilson served as the President of NuvoH20, where in just a couple of years he grew it to be the largest salt-free water softener company.

As President of Larada, Mr. Wilson has been instrumental in the initial development and ongoing growth of the Company's retail product line. One of those products, the Lice Remover Kit, has been the top-selling lice-treatment product on Amazon for years.

Mr. Wilson has 1,577,286 stock options in Larada. Larada pays Mr. Wilson a salary of $150,000 a year in his role as President.

**Adam Ward, VP, Legal & Compliance**

Mr. Ward began his career as a financial analyst before taking over as publisher of the Daily Utah Chronicle, a distressed newspaper he turned around and ran from 2001 to 2006. He later managed the operations of a small software company and co-founded an eCommerce business before joining Larada in 2013.

At Larada, Mr. Ward was instrumental in converting the business model to a franchise system. Because Larada is both a medical-device manufacturer and a franchise, it has strict legal, regulatory and compliance requirements that Mr. Ward oversees.

Mr. Ward has 1,332,714 stock options in Larada.  Larada pays Mr. Ward a salary of $150,000 a year in his role as VP, Legal & Compliance.

6.    **Larada Asset Sale Liquidity Event**

If necessary to ensure timely payment of all amounts it owes under the Plan, Reorganized Larada shall, on or before December 31, 2028: (1) obtain a loan in an amount necessary to pay its creditor claims in full ("Plan Loan"), or if such a Plan Loan cannot be obtained, (2) sell all or substantially all of the assets used by Larada in the conduct of its business operations (upon consummation of such a transaction, a "Larada Asset Sale Liquidity Event").  The proceeds of a Plan Loan or a Larada Asset Sale Liquidity Event shall be paid (a) to Alignment, for credit to the remaining balance of its secured claim, (or if applicable to 37 Ventures upon the existence of the 37 Ventures Subrogation Claim) for credit to the secured portion thereof, (b) next to Class 5 and Class 6 General Unsecured Creditors of Larada on a Pro Rata Basis, including Alignment on account of its Unsecured Claim (or if applicable to Reorganized 37 Ventures on account of the unsecured portion of the 37 Ventures Subrogation Claim), (c) next to Subdebt Holders, on a Pro Rata basis unless their claims have been Desubordinated, in which case, they shall share Pro Rata with Class 5 and Class 6 General Unsecured Creditors, and (d) finally to holders of Interests in Larada pursuant to their respective rights and interests. Larada shall obtain this Court's advance approval of any transaction that would result in a Plan Loan or a Larada Asset Sale

48

1    Liquidity Event; with notice and an opportunity to be heard on any application for such approval

2    being first given to the then holders of Claims against Larada.

3          **7.**        **37 Ventures Subrogation Claim**

4          (a)      At the time ("Time of Subrogation") when Alignment receives payment in

5    full of its Allowed Claim against Larada, 37 Ventures shall automatically and without further

6    action be subrogated to and hold all of Alignment's rights, claims, liens and security interests

7    under or relating to the Alignment Loan Documents, and Alignment's rights under the Plan,

8    including without limitation Alignment's Secured and Unsecured Claims against Larada and its

9    rights and claims against third parties (including without limitation Alignment's rights and

10    claims against the Subdebt Holders and Yuri Pikover) (the "37 Ventures Subrogation Claim").

11    The amount of the 37 Ventures Subrogation Claim shall be equal to the total amount paid by

12    Pikover, 37 Ventures and/or Reorganized 37 Ventures for credit to the obligations owed by

13    Larada or Reorganized Larada to Alignment and shall be allocated to Alignment's Secured

14    Claim to the extent their payments to Alignment have been credited to the Secured Claim and

15    then to Alignment's Unsecured Claim.   Alignment shall execute such instruments as 37

16    Ventures shall reasonably request to further evidence, perfect and effectuate such subrogation.

17          (b)      Notwithstanding any contrary provision of the Alignment Loan

18    Documents, from and after the Time of Subrogation and until after payment in full of all Class 6

19    Claims, 37 Ventures shall forbear from enforcing against the property of Larada any of its rights

20    or claims under the 37 Ventures Subrogation Claim, other than to collect distributions otherwise

21    payable to Class 5, 6, and 7 creditors.

22          Subrogation is the substitution of one party to the position of the obligee whose claim it

23    has satisfied. The result of subrogation is that the subrogated party stands in the shoes of the

24    former obligee whose claim was discharged by its performance. The subrogated party thus

25    succeeds to all of the former obligee's rights, priorities, liens, and securities. *Pittsburgh-*

26    *Westmoreland Coal Co. v. Kerr*, 220 N.Y. 137, 115 N.E. 465 (1917).  Under New York law

27    (which governs Alignment's loan documents), "Once a creditor has received payment in full, the

28    guarantor will be equitably subrogated to the rights of the creditor to the extent of the guarantor's

1  payment. *Chemical Bank v. Meltzer*, 93 N.Y.2d 296, 690 N.Y.S.2d 489, 712 N.E.2d 656 (1999);

2  *Becker v. Faber*, 280 N.Y. 146, 19 N.E.2d 997 (1939).  Importantly, while a guarantor's right to

3  subrogation "attaches" when the guaranty is given, the right is not available nor enforceable

4  unless: (1) the guarantor makes payment; and (2) the creditor is paid in full. *Meltzer*, 93 N.Y.2d

5  296, 690 N.Y.S.2d 489, 712 N.E.2d 656 (1999).

6        On May 23, 2018, 37 Ventures and Alignment executed a Guaranty (the "Guaranty"),

7  which expressly provided 37 Ventures subrogation rights.  Guaranty Article IV, Section 401(b).

8  The Guaranty specifically provides "[i]f the Guarantor shall make payment to any Secured Party

9  of all or any of the Obligations, after indefeasible payment in full in Dollars of all Obligations,

10  and the termination of all Commitments the Secured Parties will, at the Guarantor's request and

11  expense, execute and deliver to the Guarantor, without recourse or representation or warranty,

12  appropriate documents necessary to evidence the transfer by subrogation to the Guarantor of an

13  interest in the Obligations resulting from such payment." *Id*.  The Guaranty, therefore,

14  recognizes the right of subrogation and obligates Alignment to assign to 37 Ventures the

15  Alignment loan documents following indefeasible payment in full of all obligations owed to

16  Alignment.  In addition, in conjunction with the Alignment Loan, and with full knowledge and

17  approval of Alignment, Larada entered into a consulting agreement dated May 1, 2018 which

18  requires Larada to indemnify 37 Ventures from any claims made against it as a guarantor of the

19  Alignment Loan.

20        **8.**    **Quarterly Reporting by 37 Ventures/Plan Monitor**

21        (a)    As part of the Confirmation Order, the Court shall appoint a Plan Monitor,

22  selected and empowered as follows:

23           (i)    Prior to the hearing on confirmation of the Plan, 37 Ventures may

24  nominate in writing up to three individuals and Alignment and Knight and Bishop may together

25  nominate in writing up to an additional three individuals, qualified as follows:

26              (A)    each nominee shall be either an individual holding a current

27  professional fiduciary license issued by the Professional Fiduciaries Bureau of the

28  California State Department of Consumer Affairs, or an individual approved by the

50

1    Office of the United States Trustee for the Central District of California to be a panel

2    trustee or a special trustee;

3    (B)    each nominee shall be well experienced and knowledgeable

4    in the field of venture capital and/or private equity investing; and

5    (C)    each nominee shall have agreed in writing to be bound by

6    the Protective Order.

7    (ii)    If, prior to entry of the Confirmation Order, the parties that

8    submitted nominations have not agreed to jointly recommend a single nominee, the Court shall

9    appoint the Plan Monitor from the submitted nominations, at the Court's discretion.

10    (iii)    The Plan Monitor shall be compensated at the expense of

11    Reorganized 37 Ventures and such compensation shall not exceed the sum of $10,000, per

12    month, inclusive of costs and expenses.

13    (b)    The Confirmation Order shall provide that the Plan Monitor shall have: (1)

14    the right to receive directly from each of the Subject Companies copies of all written reports,

15    notices, consent requests, ballots and the like delivered by the Subject Companies, respectively,

16    generally to the holders of their securities; (2) the right to verify directly with the Subject

17    Companies the holdings of Pikover and Reorganized 37 Ventures of securities issued by the

18    Subject Companies, respectively; (3) the right to be informed about any potential or actual

19    liquidity event transactions regarding any of the Portfolio Companies and to report such events to

20    37 Ventures creditors, including Knight and Bishop and Alignment; and (4) the ability to inquire

21    with the Portfolio Companies as to any potential or actual liquidity event transactions involving

22    them and to report such events to 37 Ventures creditors, including Knight and Bishop and

23    Alignment.

24    (c)    Within 30 days after the end of each full calendar quarter after the

25    Effective Date, until all claims against Reorganized 37 Ventures are paid in full, Reorganized 37

26    Ventures will provide to the Plan Monitor a writing, signed under penalty of perjury by Pikover,

27    individually and in his capacity as managing member of Reorganized 37 Ventures, certifying that

28    Reorganized 37 Ventures and Pikover continue to own, free and clear of all liens and security

interests, the same securities, in the same quantities, in the Subject Companies that they respectively owned on the Effective Date, or the conversion proceeds thereof, other than changes in ownership occurring by virtue of a Liquidity Event transaction consistent with the Plan or pledges approved in advance by an order of the Court.

(d)     The Plan Monitor shall not disclose the information it obtains by virtue of his or her status as Plan Monitor to any Person or Entity (as those terms are defined in 11 U.S.C. § 101), unless one of the following "Reportable Events" occurs:

(i)     After consulting with Pikover, the Plan Monitor determines that Pikover or Reorganized 37 Ventures has failed to maintain ownership of the securities issued by the Subject Companies as required by the Plan; or

(ii)     After consulting with Pikover, the Plan Monitor determines that Pikover or Reorganized 37 Ventures intends not to, or has failed to, manage, hold or distribute the proceeds of a Company Liquidity Event or a Larada Asset Sale Liquidity Event in accordance with the requirements of the Plan.

(e)     If a Reportable Event occurs, the Plan Monitor may disclose information relevant thereto only by filing with the Court, under seal, a written report summarizing the facts and circumstances giving rise to his or her determination in that regard, and serve a copy of such report on Pikover, Reorganized 37 Ventures and, if they, respectively, (i) are then bound by the Protective Order and (ii) continue to hold claims against Reorganized 37 Ventures, on Alignment and Knight and Bishop.

**9.     Tax Matters**

All net operating loss and capital loss carryforwards ("Loss Carryforwards") owned by Pikover during the calendar year in which a Company Liquidity Event occurs shall be applied by Pikover, until they are exhausted, to offset (to the extent permitted by applicable law) the taxable income (including but not limited to ordinary income or capital gains) generated by the Company Liquidity Events, whether of Caldera or of any of the Portfolio Companies (including but not limited to the Post-Petition, Pre-Effective Date MobileCause Liquidity Event).

(a)     Promptly following the occurrence of a Company Liquidity Event (and not later

than the last day of the calendar quarter in which the liquidity event has occurred), Pikover shall cause his certified public accountant ("CPA") to provide to the Plan Monitor and Pikover a written estimate, including a statement of the underlying assumptions, facts and calculations on which the estimate is based, of the amount of federal, state and, if applicable, local income tax liabilities which Pikover will owe on account of the given Company Liquidity Event, after application of all then available Loss Carryforwards ("Estimated Tax Liability"). The Estimated Tax Liability shall be the amount of the "Income Tax Reserve Amount" provided for in Section 5.8(c)(1) of the Plan.

(b)    If the Estimated Tax Liability arises from a Caldera Company Liquidity Event, Pikover may retain the Estimated Tax Liability from the Proceeds of the Caldera Company Liquidity Event and pay same to the applicable taxing authorities on or before the deadline for the timely payment of same, including deadlines for making quarterly estimated payments of taxes.

(c)    If the Estimated Tax Liability arises from a Company Liquidity Event of one of the Portfolio Companies, Reorganized 37 Ventures shall pay to Pikover the Estimated Tax Liability at least three business days before the deadline for the timely payment of same, including deadlines for making quarterly estimated payments of taxes; which funds Pikover may then use to make the required payments to the applicable taxing authorities.

### 10.    Exemption From Certain Transfer Taxes

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from the Debtors to the Reorganized Debtors or any other Person in the United States pursuant to the Plan shall not be taxed under any law imposing a stamp tax or other similar tax.  Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan and to the vesting of the property of the Debtors' Estates in the Reorganized Debtors.

### 11.    Corporate Action

On the Effective Date, all actions contemplated or necessary to implement the transactions described in the Plan shall be authorized and approved in all respects pursuant to the Plan.  All matters provided for herein involving the corporate structure of the Debtors or the

Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the officers or directors of the Debtors or the Reorganized Debtors.  On the Effective Date, the appropriate officers or directors of the Reorganized Debtors are authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors without the need for any required approvals, authorizations or consents except for express consents required under the Plan.

**F.    Conditions Precedent to Effective Date**

    **1.    Conditions Precedent to Effectiveness**

The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or waived:

    a.    the Confirmation Order, in form and substance reasonably acceptable to the Debtors, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

    b.    all actions, other documents and agreements necessary to implement the Plan shall have been executed, delivered and, if necessary, properly recorded, and shall have become effective;

    c.    the Bankruptcy Court shall have entered orders (or there shall be agreements satisfactory to the Debtors) concerning Claims, any Liens asserted by holders of Claims, and any interest in the Debtors (which may be orders included within the Confirmation Order) that, in the sole discretion of the Debtors are required for the feasibility and implementation of the Plan; and

    d.    the Estates shall have sufficient Cash to meet all Cash funding obligations under the Plan required to be made on the Effective Date.

    **2.    Failure of Conditions Precedent**

Notwithstanding anything in the Plan to the contrary, the conditions set forth in Section 9.1 of the Plan must be satisfied or waived on or before January 12, 2022.  In the event that the

1    conditions set forth in Section 9.1 of the Plan are not satisfied on or before January 12, 2022 or

2    waived, then the Plan shall be deemed revoked and withdrawn, the Confirmation Order shall be

3    deemed vacated, and Section 11.12 of the Plan shall apply.

4    **3.    Waiver of Conditions**

5    The Debtors may waive one or more of the conditions precedent to the effectiveness of

6    the Plan set forth in Section 9.1 of the Plan, except that the Debtors may not waive the condition

7    that the Estates will have sufficient Cash to meet all payment and funding obligations under the

8    Plan on the Effective Date.

9    **G.    Provisions Governing Distributions**

10    **1.    In General**

11    Subject to Bankruptcy Rule 9010, all distributions under the Plan to be made by the

12    Reorganized Debtors to the holder of each Allowed Claim shall be mailed by first class mail,

13    postage prepaid, to the address of such holder as listed on the Schedules as of the Distribution

14    Record Date, unless the Reorganized Debtors have been notified in writing of a change of

15    address, including, without limitation, by the filing of a proof of claim or notice of transfer of

16    claim filed by such holder that provides an address for such holder different from the address

17    reflected on the Schedules.  The Reorganized Debtors shall have no obligation to locate such

18    holders whose distributions or notices are properly mailed but nevertheless returned.

19    Distributions may be made under the Plan through payments directly from the Reorganized

20    Debtors.

21    **2.    Form of Distributions**

22    Any payment of Cash made by the Reorganized Debtors pursuant to the Plan shall be

23    made by check; provided, however, that after the occurrence of the Effective Date, the

24    Reorganized Debtors are not obligated to make any Cash payment under the Plan unless the

25    payment exceeds ten dollars ($10); provided, further, that Cash equal to 100% of the

26    distributions to which the holder of a Claim would be entitled under the Plan if the payment to

27    such holder was less than or equal to ten dollars ($10) shall be maintained in a reserve (the

28    "Small Payment Reserve") for the benefit of such holder until an aggregate of at least ten dollars

1    is payable to such holder and at such time the holder shall receive a payment equal to 100% of

2    the distributions to which it would otherwise be entitled.

3    **3.      Distributions to be on Business Days**

4    Any payment or distribution required to be made under the Plan on a day other than a

5    Business Day shall be made on the next succeeding Business Day.

6    **4.      Distributions to Holders as of the Distribution Record Date**

7    As of the close of business on the Distribution Record Date, the claims register shall be

8    closed.   The Reorganized Debtors shall have no obligation to recognize any transfer of any

9    Claims occurring after the close of business on the Distribution Record Date, and shall instead be

10   entitled to recognize and deal for all purposes under the Plan with only those holders of record as

11   of the close of business on the Distribution Record Date.

12   **5.      Objections to Disputed Claims**

13   Any objections to Claims against either of the Estates may be prosecuted by the

14   respective Debtors or the Reorganized Debtors unless otherwise ordered by the Court.  Except as

15   otherwise provided by order of the Bankruptcy Court, the Reorganized Debtors may file an

16   objection to any Claim until 180 days after the Effective Date.

17   **6.      Estimation of Claims**

18   The Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy

19   Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code, and the

20   Bankruptcy Court shall have jurisdiction to estimate such Claim at any time, including, without

21   limitation, during litigation concerning such Claim or an objection to such Claim.  The Debtors

22   and the Reorganized Debtors shall be entitled to request that the Bankruptcy Court determine

23   either the Allowed amount of such Claim or a maximum limitation on such Claim.   If the

24   Bankruptcy Court determines the maximum limitation of such Claim, such determination shall

25   not preclude the Debtors or Reorganized Debtors from pursuing any additional proceedings to

26   object to any ultimate payment of such Claim.  If the Bankruptcy Court determines the Allowed

27   amount of such Claim, the amount so determined shall be deemed the amount of the Disputed

28   Claim for all purposes under the Plan.  All such proceedings are cumulative and not exclusive

remedies.

**7.      Reversion of Unclaimed Checks**

The amount of any checks issued for distributions under the Plan that remain uncashed for a period of one year after the date of such distribution shall revert and be vested in the Estates free and clear of any claim or interest of any holder of a Claim under the Plan.

**8.      Effect of Convenience Class Election**

By electing in writing convenience class treatment under the Plan, the holder of a General Unsecured Claim may elect to reduce the amount of such holder's Claim to $2,500, and, in such event, only receive treatment as an Allowed Convenience Claim in the amount of $2,500. Holders of Allowed Convenience Claims shall receive a distribution on October 15, 2022 in accordance with Section 4.8(b) of the Plan.  Such an election constitutes a waiver of the amount of such General Unsecured Claim in excess of $2,500, and the holder of such Allowed Claim shall be deemed to release the Debtor from any and all liability for such excess amount.

**9.      Retention and Preservation of Claim Objections and Causes of Action**

Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, upon entry of the Confirmation Order, the Debtors' and the Reorganized Debtors' rights to object to all Claims and Interests asserted against the Estate and all of the Debtors' or Estates' Causes of Action, including without limitation: (1) the Debtors' Causes of Action asserted in any adversary proceeding, U.S. District Court litigation, state court proceeding, or any other proceeding  which is pending as of the Confirmation Date; (2) all Claims and Causes of Action disclosed in the Schedules which are incorporated herein by reference; (3) all Claims and Causes of Action described in the Disclosure Statement; (4) any Claims and Causes of Action contained in any contested matter or objection to Claim pending on the Confirmation Date; and (5) any and all other Claims and Causes of Action that the Debtors held preconfirmation, including, but not limited to, Claims for unpaid accounts receivable, shall vest in the Post Confirmation Estates.

Unless a Claim or Cause of Action against any Person is expressly waived or released in the Plan or any Final Order of the Bankruptcy Court, the Debtors expressly reserve such Claim or Cause of Action for later adjudication (including without limitation, Claims and Causes of

1    Action not specifically identified or which the Debtors may presently be unaware or which may

2    arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time

3    or facts and circumstances which may change or be different from those which the Debtors now

4    believes to exist) and, therefore, no preclusion doctrine, including without limitation, the

5    doctrines of res judicata, collateral estoppel, issue preclusion, claims preclusion, waiver, estoppel

6    (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon

7    or after the confirmation or consummation of the Plan based on the Disclosure Statement, the

8    Plan, or the Confirmation Order, except where such Claims or Causes of Action have been

9    expressly released in the Plan or any other Final Order of the Bankruptcy Court.

10    37 Ventures has not conducted an analysis or evaluation of potential claims and causes of

11    action against any party other than Knight and Bishop – which includes any claims that 37

12    Ventures may have against Mr. Pikover that Alignment and Knight and Bishop assert that may

13    exist and which Mr. Pikover disputes; and that involve avoidance actions pursuant to 11 U.S.C.

14    §§ 544, 545, 547, 548, 550 and/or 553.  The Plan does not provide for a release of these estate

15    causes of action, which will be preserved.

16    However, 37 Ventures has concluded that Knight and Bishop improperly, and falsely

17    asserted that its approximately $3.75 Million claim against 37 Ventures is secured, based upon

18    its recording of a Notice of Judgment Lien on or about January 25, 2021.  37 Ventures intends to

19    seek a judgment (by claim objection or adversary proceeding) invalidating Knight and Bishop's

20    purported judgment lien and obtaining any other remedies or relief available under applicable

21    law, including the recovery of its attorneys' fees and costs.

22    **H.    Injunctions, Exculpations and Releases Injunction Relating to the Plan**

23    **As of the Effective Date, all Persons are hereby permanently enjoined from**

24    **commencing or continuing, in any manner or in any place, any action or other proceeding,**

25    **whether directly, indirectly, derivatively or otherwise against the Debtors, their Estates, the**

26    **Reorganized Debtors, or their successors-in-interest or assigns, on account of, or respecting**

27    **any Claims, debts, rights, Causes of Action or liabilities discharged or treated pursuant to**

28    **the Plan, except to the extent expressly permitted under the Plan.  Upon entry of the**

58

Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present, future, or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Further, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons who have held, hold, or may hold Claims against the Debtors, or who have held, hold or may hold any debt or interest relating to the Debtors, are permanently enjoined, from and after the Effective Date, to the maximum extent permitted by law, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt or interest against the Reorganized Debtors or the Estates, other than as expressly permitted herein or in the Confirmation Order or (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the immediate or any mediate transferee of any property distributed pursuant to the Plan or of any putative securities, based upon a claim that the transferor's receipt of such property constituted a fraudulent conveyance, preference, violation of bulk sales or other law, or based upon any other claim that receipt and or distribution of property by transfer pursuant to the Plan is wrongful, whether in law or equity.

Broad Injunction.  The intent of paragraph 11.3 of the Plan is to provide the broadest possible injunction permitted by law and, to the extent permitted by law, to expand the scope of that injunction for the benefit of the Reorganized Debtors to the extent that, at any time after the Effective Date, the law is clarified or changed to permit such a broader injunction.  The injunction in the Confirmation Order shall provide that, except as otherwise authorized by the Plan or the Confirmation Order, the holders of Claims shall be enjoined from commencing or continuing any such specified action or proceeding against Reorganized Debtors with respect to any Claim or property of the Estate, including Claims based in whole or in part on an allegation:  (i) that the Debtors breached any contract, with, or any duty or obligation to the Creditor; (ii) that the Debtors are or were the alter ego or instrumentality of another Person; (iii) that the Debtors made any preferential or

59

fraudulent transfer or any other voidable transfer or payment to any Person; or (iv) that the Debtors or the Estates are liable for any act or omission.

Exculpation.  Notwithstanding anything herein to the contrary, the Debtors and their attorneys, accountants, officers, employees, professionals, or agents (the "Exculpated Parties") shall not have or incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any act or omission in connection with, relating to, or arising out of, the Bankruptcy Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Bankruptcy Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to or authorized under the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by Final Order to have constituted actual fraud or gross negligence. In all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan and shall be fully protected in acting or in refraining from acting in accordance with such advice, except to the extent that their actions are determined by Final Order to have constituted actual fraud or gross negligence notwithstanding such advice. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**Release of Claims.**  Except as contemplated by the Plan, the rights afforded to holders of Claims in the Plan shall be in exchange for a complete release, satisfaction and discharge of all Claims against the Debtors or the Reorganized Debtors, and acceptance of such distributions under the Plan shall be deemed irrevocably to release any and all claims of any type, kind or nature against the Debtors.  Persons deemed to have released Claims pursuant to this paragraph shall be forever precluded from asserting against the Debtors, the Reorganized Debtors or their respective assets any Claim, including any Claim of the type released or deemed released herein.

Notwithstanding anything to the contrary herein, the Plan does not provide for the release or discharge of claims by the Debtors or any creditors against any person or entity other than the Debtors upon the Effective Date of the Plan.  Specifically, neither Mr. Pikover nor any other officers, directors, or managers of either of the Debtors is being provided with a release.  The only remedy that has been accorded to Mr. Pikover in connection with the Plan is set forth in Section 5.8 of the Plan which provides that " . . . Pikover may sell or pledge all or a part of his ownership interest in Caldera to obtain funds to pay for defense costs in connection with any litigation instituted by Alignment or Knight and Bishop relating to any of their respective alleged claims against Pikover."

I.    **Executory Contracts and Unexpired Leases**

1.    **Assumption of Contracts and Leases; Deemed Cure Amount**

Any executory contract or unexpired lease which (i) has not expired by its own terms on or prior to the Confirmation Date, (ii) has not been assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, or (iii) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, shall be deemed assumed as of the Effective Date; provided, however, the Debtors shall have a period of 60 days after the Effective Date to change the designation of any executory contract from assumed to rejected. If there has been a default in an executory contract or unexpired lease, then the Reorganized Debtor who is the counterparty to such contract shall cure or provide adequate assurance that it will promptly cure such default prior to its assumption of such lease or contract,

as required under (and subject to the limitations of) Bankruptcy Code Section 365(b), unless otherwise agreed to by the applicable Reorganized Debtor and the counterparty to such lease or executory contract. Unless the counter-party to an unexpired lease or executory contract provides notice to the Debtors on or before the Confirmation Date, any existing defaults shall be deemed cured as of the Effective Date, and the deemed cure amount for any such lease or contract is $0. Any dispute regarding a cure amount or the cure of any other existing default under an unexpired lease or executory contract shall be heard and determined by the Bankruptcy Court. Any claim for a cure amount or the cure of any other existing default under an assumed lease or executory contract must be filed with the Court and served on the Reorganized Debtors by no later than 30 days after the Confirmation Date. Notwithstanding the foregoing, no contracts or agreements with Alignment or Knight and Bishop shall be assumed pursuant to the Plan; all of which shall be rejected as of the Effective Date.

### 2. Post-Petition Agreements Unaffected By Plan

Except as otherwise expressly provided herein, nothing contained in the Plan shall alter, amend or supersede any agreements or contracts entered into by the Debtors after the Petition Date that were otherwise valid, effective and enforceable against the Debtors as of the Confirmation Date.  The Reorganized Debtors shall be deemed to be substituted for any Debtors in such contract or agreement, as applicable, and the Reorganized Debtors shall have all right, title and interest of the Debtors under such contract or agreement as if the Reorganized Debtors had been the original contracting party thereunder.

### J. Other Plan Provisions

### 1. Retention of Jurisdiction

After the Effective Date, the Bankruptcy Court shall have exclusive jurisdiction of the following specified matters arising out of, and related to, the Bankruptcy Cases and the Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code:

(a)     to hear and determine any and all objections to the allowance of any Claims or any controversies as to the classification of any Claims or estimate any Disputed Claim;

(b)     to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced before the Confirmation Date, including, any proceeding with respect to a Cause of Action or Avoidance Action;

(c)     to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)     to hear and determine any application to modify the Plan in accordance with Section 1127 of the Bankruptcy Code and to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(e)     to hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(f)     to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

(g)     to enforce all orders previously entered by the Bankruptcy Court;

(h)     to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

(i)     to hear and determine any and all applications by Professionals for compensation and reimbursement of expenses;

(j)     to hear and determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases, and fix and allow any Claims resulting therefrom;

(k)     to enforce the provisions of the Plan subject to the terms thereof;

(l)     to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and the intent

63

1    of the Plan;

2          (m)    to determine any Claim or liability to a Governmental Unit which may be

3    asserted as a result of the transactions contemplated herein;

4          (n)    to hear and determine matters concerning state, local, and federal taxes in

5    accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

6          (o)    to determine such other matters as may be provided for in the

7    Confirmation Order;

8          (p)    to hear any other matter not inconsistent with the Bankruptcy Code;

9          (q)    to determine whether to approve a transaction that would result in a

10    Larada Asset Sale Liquidity Event; and

11          (r)    to enter a final decree closing the Bankruptcy Cases.

12    **2.    Closure of Case**

13          (a)    Closing the Bankruptcy Case.    As soon as the Reorganized Debtors

14    determine that there is no further need for administration of the Case by the Bankruptcy Court,

15    the Bankruptcy Case shall be closed pursuant to 11 U.S.C. § 350 upon (i) the filing of a report

16    and recommendation to close the Bankruptcy Cases, (ii) after twenty-eight (28) days' notice to

17    parties-in-interest, and (iii) the entry of an appropriate final decree and/or Order by the Court

18    closing the Bankruptcy Cases.    Absent an order extending the time for entry of a final decree

19    entered after notice and opportunity for hearing, a final decree closing the Bankruptcy Cases

20    shall be entered not later than 1 year after the Confirmation Date, and is anticipated to be entered

21    as soon as the Effective Date.    Subject to the Bankruptcy Court's discretion, the Bankruptcy

22    Cases may be closed notwithstanding that: (i) adversary proceedings related to the Bankruptcy

23    Cases may be, and remain, pending; and (ii) distributions remain to be paid under the Plan.

24          (b)    Post-Confirmation Payments to United States Trustee.    Until entry of an

25    Order closing, dismissing or converting the Bankruptcy Cases, any quarterly payments due to the

26    office of the United States Trustee prior to the Effective Date of the Plan shall be paid in

27    accordance with 28 U.S.C. § 1930(a)(6) by the Reorganized Debtor. No quarterly payments shall

28    come due or be required after the Bankruptcy Cases are closed.

(c)    Reopening Case.  At any time, the Reorganized Debtors may obtain entry of an order reopening the Bankruptcy Cases to obtain any relief or order from the Bankruptcy Court consistent with section 10.1 of the Plan.

**3.    Administrative Claims Bar Date**

Except as otherwise provided in the Plan, all applications for allowance of Administrative Claims shall be filed with the Bankruptcy Court not later than thirty days of the Effective Date, other than (a) fees and expenses of Professionals Allowed pursuant to an Order of the Bankruptcy Court, and (b) fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930.  All Administrative Claims not filed within thirty days after the Effective Date shall be barred.  The deadline in the preceding sentence shall be construed and have the same force and effect as a statute of limitations.  The Reorganized Debtors shall provide notice to all creditors listed on the mailing matrix of this bar date within ten days after the Effective Date.  The Bankruptcy Court shall determine all Administrative Claims.

**4.    Post-Confirmation Fees, Final Decree**

The Debtors shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C. §1930 and the filing of post-confirmation reports with the Bankruptcy Court, as required, until a final decree is entered.  The Reorganized Debtors will submit quarterly post-confirmation reports to the U.S. trustee, which will include: the total disbursements for the quarter, a comparison between the Plan payments made in each period and the payments projected under the Plan, and a complete list of creditors, payments, and time frames for payment.

**5.    Modifications and Amendments**

Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with Section 1125 of the Bankruptcy Code.  The Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the

requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under Section 1129 of the Bankruptcy Code.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder. The Debtors may, without notice to holders of Claims insofar as it does not materially and adversely affect the interests of any such holders, correct any defect or omission in the Plan and any exhibit hereto.

### 6.    Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, upon the request of the Debtors, alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alternation or interpretation.  The Confirmation Order shall constitute a judicial determination that each term and provision of the

Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms.

### 7.    Successors and Assigns and Binding Effect

The rights, duties and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

### 8.    Compromises and Settlements

From and after the Effective Date, the Reorganized Debtors may compromise and settle various Claims against them and/or Retained Litigation Rights and other claims that they may have against other Persons without any further approval by the Bankruptcy Court.

### 9. Revocation, Withdrawal, or Non-Consummation

The Debtors shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C. §1930 and the filing of post-confirmation reports with the Bankruptcy Court, as required, until a final decree is entered. The Reorganized Debtors will submit quarterly post-confirmation reports to the U.S. trustee, which will include: the total disbursements for the quarter, a comparison between the Plan payments made in each period and the payments projected under the Plan, and a complete list of creditors, payments, and time frames for payment.

### 10. Governing Law

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California, without giving effect to the principles of conflicts of law of such jurisdiction.

### III.

### TAX CONSEQUENCES OF THE PLAN

INTERNAL REVENUE SERVICE ("IRS") CIRCULAR 230 DISCLOSURE:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL INCOME TAX CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "TAX CODE"); (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following discussion summarizes certain of the important federal income tax consequences of the transactions described herein and in the Plan.  This discussion is for informational purposes only and does not constitute tax advice.  This summary is based upon the Internal Revenue Code and the Treasury Regulations promulgated thereunder, including judicial authority and current administrative rulings and practice.  Neither the impact on foreign holders of claims and equity interests nor the tax consequences of these transactions under state and local law is discussed.  Also, special tax considerations not discussed herein may be applicable to certain classes of taxpayers, such as financial institutions, broker-dealers, life insurance companies and tax-exempt organizations.  Furthermore, due to the complexity of the transactions contemplated in the Plan, and the unsettled status of many of the tax issues involved, the tax consequences described below are subject to significant uncertainties.  No opinion of counsel has been obtained and no ruling has been requested from the Internal Revenue Service ("<u>IRS</u>") on these or any other tax issues.  There can be no assurance that the IRS will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained.  **HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE THEREFORE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

To ensure compliance with requirements imposed by the IRS in Circular 230, we inform you that, unless we expressly state otherwise in this communication (including any attachments), any tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or other matter addressed.

## A.    Tax Consequences to the Debtors

Although the Plan proposes the compromise of Claims, ultimately the Plan proposes the payment in full of all claims.  Any income corresponding to the payment of claims at a discount

68

should not constitute taxable income to the Debtors, since the debt forgiveness arises in connection with a case under Title 11 of the United States Code.

In any event, 37 Ventures is a single member, limited liability company and, as such, is disregarded for federal and state income tax purposes. Its tax attributes (income, expenses, etc.) are passed through to and reported on the income tax returns of its sole member, Yuri Pikover. Conditioned on confirmation of the proposed Plan, Mr. Pikover has agreed nonetheless to apply his loss carryovers to income generated by Portfolio Company liquidity events, as set forth in more detail elsewhere in the Plan, and thereby reduce the tax distributions that Reorganized 37 Ventures would be required to pay to him in connection with future liquidity events.

After application to the Mobile Cause liquidity event, the remaining carryovers owned by Mr. Pikover are estimated to be capital loss carryovers of approximately $500,000 and $9,700,000 in net operating loss carryovers, $9,200,000 of which will expire in 2028 if not utilized.

For taxable years beginning on or after January 1, 2020, and before January 1, 2023, California has suspended the net operating loss (NOL) carryover deduction. Taxpayers may continue to compute and carryover an NOL during the suspension period. However, taxpayers with net business income or modified adjusted gross income of less than $1,000,000 or with disaster loss carryovers are not affected by the NOL suspension rules. This could impact Mr. Pikover's ability to utilize the NOL for California during the suspension period. 37 Ventures LLC will need to pay an LLC fee from the Mobile Cause capital gain. We expect the LLC fee will be $6,000 and will be due April 15, 2022. The LLC fee is due every year and varies with the gross income of the LLC. The maximum LLC fee is $11,790 for income greater than $4,999,999.

**B.    Tax Consequences to Creditors**

In General. The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether its Claim constitutes a debt or security for federal income tax purposes, (b) whether the claimant receives consideration in more than one tax year, (c) whether the claimant is a resident of the United States, (d) whether all the

consideration by the claimant is deemed by be received by that claimant as part of an integrated transaction, (e) whether the claimant reports income using the accrual or cash method of accounting, and (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

Gain or Loss on Exchange.  Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his or her Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hand of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.  Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset.  For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

## C.    Information Reporting and Backup Withholding

Under the backup withholding rules of the Internal Revenue Code, holders of Claims may be subject to backup withholding at the rate of 31 percent with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income.  Any amount withheld under these rules will be credited against the holder's federal income tax liability.  Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of

1    backup withholding.

2    **D.    Importance of Obtaining Professional Assistance**

3    **THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A**

4    **SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE**

5    **FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE**

6    **COMPLEX AND, IN MANY AREAS, UNCERTAIN.   ACCORDINGLY, EACH**

7    **HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO**

8    **CONSULT WITH HIS OWN TAX ADVISOR REGARDING SUCH TAX**

9    **CONSEQUENCES.**

10                                    **IV.**

11                **CONFIRMATION REQUIREMENTS AND PROCEDURES**

12    PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN

13    SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

14    CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.   The following

15    discussion is intended solely for the purpose of alerting readers about basic confirmation issues,

16    which they may wish to consider, as well as certain deadlines for filing claims.  The Debtors

17    CANNOT and DO NOT represent that the discussion contained below is a complete summary of

18    the law on this topic.

19    Many requirements must be met before the Court can confirm a plan.   Some of the

20    requirements include that the plan must be proposed in good faith, acceptance of the plan,

21    whether the plan pays creditors at least as much as creditors would receive in a Chapter 7

22    liquidation, and whether the plan is feasible.  These requirements are not the only requirements

23    for confirmation.

24    **A.    Who May Vote or Object**

25    Any party in interest may object to the confirmation of the Plan, but, as explained below,

26    not everyone is entitled to vote to accept or reject the Plan.

27    **B.    Who May Vote to Accept/Reject the Plan**

28    A creditor or Interest holder has a right to vote for or against the Plan if that creditor or

interest holder has a claim or interest which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class. All Allowed Claims in Classes 2(a), 2(b), 3, 4, 5, 6, 7, 8(a), 8(b) shall be entitled to vote under the Plan. All Claims and Interests in Classes 1(a), 1(b), 9 and 10 are Unimpaired and are deemed to accept the Plan, and therefore are not entitled to vote under the Plan.

**C.      What Is an Allowed Claim/Interest**

As noted above, a creditor or interest holder must first have an Allowed Claim or Interest to have the right to vote. Generally, any Proof of Claim or Interest will be allowed, unless a party in interest files an objection to the Claim or Interest. When an objection to a Claim or Interest is filed, the creditor or interest holder holding the Claim or Interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the Claim or Interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THE DEBTORS' CASES ON ACCOUNT OF PRE-PETITION CLAIMS WAS JULY 15, 2021. A creditor or Interest holder may have an Allowed Claim or Interest even if a Proof of Claim or Interest was not timely filed. A Claim is deemed Allowed if (1) it is scheduled on the Debtors' Schedules and such Claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the Claim. An Interest is deemed Allowed if it is scheduled and no party in interest has objected to the Interest.

**D.          What Is an Impaired Claim/Interest**

As noted above, an allowed Claim or Interest has the right to vote only if it is in a Class that is impaired under the Plan. A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class. For example, a Class comprised of General Unsecured Claims is impaired if the Plan fails to pay the members of that Class 100% of what they are owed.

The Debtors believe that members of Classes 2(a), 2(b), 3, 4, 5, 6, 7, 8(a), 8(b) are impaired and entitled to vote to accept or reject the Plan. Parties who dispute the Debtors' characterization of their Claim or Interest as being impaired or unimpaired may file an objection

1    to the Plan contending that the Debtors have incorrectly characterized the Class.

2    **E.    Who Is <u>Not</u> Entitled to Vote**

3         The following four types of claims are <u>not</u> entitled to vote: (1) Claims that have been

4    disallowed; (2) Claims in unimpaired classes; (3) Claims entitled to priority pursuant to

5    Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8); and (4) Claims in classes that do not

6    receive or retain any value under the Plan.  Claims in unimpaired Classes are not entitled to vote

7    because such Classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant

8    to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such

9    Claims are not placed in Classes and they are required to receive certain treatment specified by

10   the Bankruptcy Code.  Claims in Classes that do not receive or retain any value under the Plan

11   do not vote because such Classes are deemed to have rejected the Plan.  EVEN IF YOUR

12   CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO

13   OBJECT TO THE CONFIRMATION OF THE PLAN.

14   **F.    Who Can Vote in More Than One Class**

15        A creditor whose Claim has been allowed in part as a Secured Claim and in part as an

16   Unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one ballot

17   for the secured part of the Claim and another ballot for the Unsecured Claim.

18   **G.    Votes Necessary to Confirm the Plan**

19        Because there are impaired Classes, the Court cannot confirm the Plan unless (1) at least

20   one impaired Class has accepted the Plan without counting the votes of any insiders within that

21   class, and (2) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be

22   confirmed by "cramdown" on non-accepting Classes, as discussed below.

23   **H.    Votes Necessary for a Class to Accept the Plan**

24        A Class of Claims is considered to have accepted the Plan when more than one-half (1/2)

25   in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted on

26   the Plan, voted in favor of the Plan.  A Class of interests is considered to have "accepted" the

27   Plan when at least two-thirds (2/3) in amount of the interest-holders of such Class which actually

28   voted on the Plan, voted to accept the Plan.

73

1    **I.    Treatment of Non-Accepting Classes**

2    As noted above, even if <u>all</u> impaired Classes do not accept the proposed Plan, the Court

3    may nonetheless confirm the Plan if the non-accepting Classes are treated in the manner required

4    by the Bankruptcy Code.  The process by which non-accepting Classes are forced to be bound by

5    the terms of the Plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the

6    Plan to be "crammed down" on non-accepting classes of Claims or Interests if it meets all

7    consensual requirements except the voting requirements of Section 1129(a)(8) and if the Plan

8    does not "discriminate unfairly" and is "fair and equitable" toward each impaired Class that has

9    not voted to accept the Plan as required by Section 1129(b) and applicable case law.

10    **J.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)**

11    The Debtors will ask the Court to confirm the Plan by cramdown on any and all impaired

12    Classes that do not vote to accept the Plan.

13    To obtain nonconsensual confirmation of the Plan, the Debtors must demonstrate to the

14    Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to

15    each impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition

16    of the phrase "fair and equitable."   The Bankruptcy Code provides that a plan is "fair and

17    equitable" with respect to a Class of creditors or equity holders if:

18    <u>Secured Creditors</u>.  Either (i) each impaired creditor retains its liens securing its

19    Secured Claim and receives on account of its Secured Claim Cash payments having a present

20    value equal to the amount of its Allowed Claim, (ii) each impaired secured creditor realizes the

21    "indubitable equivalent" of its allowed Secured Claim, or (iii) the property securing the Claim is

22    sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment

23    of such liens on proceeds to be as provided in clause (i) or (ii), above.

24    <u>Unsecured Creditors</u>.  Either (i) each impaired unsecured creditor receives or

25    retains under the Plan property of a value equal to the amount of its Allowed Claim, or (ii) the

26    holders of Claims and equity interests that are junior to the Claims or Interests of the non-

27    accepting Class will not receive any property under the Plan, except that in a case in which the

28    debtor is an individual, the debtor may retain property included in the estate under Section 1115

of the Bankruptcy Code, subject to the requirements of subsection (a)(14) of Section 1129 of the Bankruptcy Code.

**K.      Risk Factors**

HOLDERS OF CLAIMS OR INTERESTS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

The principal risks associated with the Plan are as follows:

**1.      Liquidity Event Timing Risk**

Performance of 37 Ventures' obligations under the Plan depends upon the occurrence of events which, although they can be encouraged and supported by Mr. Pikover and Reorganized 37 Ventures, largely will be out of their control. Reorganized 37 Ventures' plan obligations will be paid using the cash proceeds of the sale of some combination of the securities it owns, together with the proceeds of the Caldera stock owned by Mr. Pikover. With the exception of the Savara stock, none of the securities owned by them (together, the "Subject Companies") could be sold for anything other than a small fraction of the Subject Companies anticipated liquidity event values. There simply is no active market for minority interests in non-publicly traded stocks like those issued by the Subject Companies. Any sale of a given non-publicly traded Subject Companies outside of a company-wide liquidity event would be at a very deep discount, resulting in payments of pennies on the dollar to the holders of claims against Reorganized 37 Ventures.

**a.**      Although the Savara stock could be sold today on a public exchange, it would not be prudent to do so, because the value of that stock is artificially depressed, pending completion of the currently pending phase 3 clinical trial of its lead program drug, molgramostim

1    nebulizer solution (molgramostim), an inhaled granulocyte-macrophage colony-stimulating

2    factor (GM-CSF) in Phase 3 development for autoimmune pulmonary alveolar proteinosis

3    (aPAP).  That clinical trial has just commenced.  It is likely to be completed in the next 18 to 36

4    months.  There is, of course, a risk that the trial will not be successful but, if it is, the value of the

5    Savara stock undoubtedly will increase materially.  (More definitive opinions of the future value

6    of the Savara stock are stated in the Wayne Platt value reports, which, as noted above, will be

7    provided to bona fide creditors upon execution of the Protective Order.)

8         **b.**      The risks described above are mitigated by the fact that the investments

9    are diversified and, taken together, have an aggregate future value of approximately

10    $43,000,000.  In addition, the Subject Companies are relatively mature.  The investments by Mr.

11    Pikover and/or 37 Ventures in the Subject Companies date back as far as 2009 for Caldera; 2011

12    for Larada and MobileCause; 2012 for EV Connect, MolecularVista and TranscribeMe; 2013 for

13    Bitvore; 2014 for NovaSignal and 2018 for California Cardiac Solutions, Oticara and

14    SageMedic.  The typical investment cycle for venture capital investments varies but, in general,

15    the time from the startup phase to liquidity event is about ten years.  Most of the investments are

16    thus in the late stage of the investment cycle.  The diversity and maturity of the investments, not

17    to mention their anticipated liquidity event values, mitigates the risks resulting from the lack of

18    control over the timing of the liquidity events.  The probabilities are high that within the five-

19    year period of the plan, more than sufficient proceeds will be generated from liquidity events to

20    pay all claims in full.

21         **2.**      **Larada Revenue Risks**

22         These risks include the following:  (i) market conditions identified above; (ii) the ongoing

23    potential for closures and disruptions related to the COVID-19 pandemic; (iii) the risk that

24    franchisees will choose to close their businesses or terminate their relationship with Larada; (iv)

25    the risk that new technologies will emerge that could make Larada's technology less attractive or

26    useful to its franchisees; and (v) the risk that  refinancing of the then existing debt of Larada does

27    not occur and/or that the proceeds of the sale of Larada's business as a whole by 2028 could

28    yield less proceeds than Larada has estimated. These risks may cause the revenues generated by

1    Larada's business operations during the period of the Plan to be lower than projected by Larada

2    and/or that the operating expenses and other expenses required by the operation of Larada's

3    business during the period of the Plan are higher than projected by Larada, which could

4    potentially prevent the Reorganized Larada from complying with its obligations under the Plan.

5        Creditors should note that if the Debtors are unable to timely repay Alignment's secured

6    claim as is proposed under the Plan, Alignment asserts the right to foreclose on Larada's assets,

7    which would likely leave millions of dollars of general unsecured claims against Larada without

8    hope of any significant repayment.

9        **3.    Other Risks**

10        **a.**    A risk exists that the Plan may not be confirmed if the Classes entitled to

11    vote on the Plan (*i.e.*, Classes 2(a), 2(b), 3, 4, 5, 6, 7, 8(a), 8(b)) all vote to reject the Plan.

12    However, this risk would be resolved prior to confirmation of the Plan.

13        **b.**    Even if one or more of the Classes entitled to vote on the Plan votes to

14    accept the Plan, the Plan might not be confirmed by the Bankruptcy Court.  Section 1129 of the

15    Bankruptcy Code sets forth the requirements for confirmation and requires, among other things,

16    that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or

17    the need for further financial reorganization, and that the value of distributions to dissenting

18    creditors and equity security holders not be less than the value of distributions such creditors and

19    equity security holders would receive if the debtor were liquidated under Chapter 7 of the

20    Bankruptcy Code.    The Debtors believe that the Plan satisfies all the requirements for

21    confirmation of a plan of reorganization under the Bankruptcy Code.  There can be no assurance,

22    however, that the Bankruptcy Court will also conclude that the requirements for confirmation of

23    the Plan have been satisfied.

24        **c.**    If the Reorganized Debtors default on their obligations under the Plan

25    prior to the issuance of a Final Decree and closure of the Chapter 11 Cases, a Creditor may file a

26    motion with the Bankruptcy Court to convert the Chapter 11 Cases to one under Chapter 7 of the

27    Bankruptcy Code.  If the Reorganized Debtors default on their obligations under the Plan after

28    the issuance of a Final Decree and closure of the Chapter 11 Cases, then a Creditor may

1    commence a lawsuit.

2    **L.    Liquidation Analysis**

3            Another confirmation requirement is the "Best Interest Test", which requires a liquidation

4    analysis.  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and

5    that claimant or interest holder does not vote to accept the Plan, then that claimant or interest

6    holder must receive or retain under the Plan property of a value not less than the amount that

7    such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the

8    Bankruptcy Code.

9            In a Chapter 7 case, the debtor's assets are usually sold by a Chapter 7 trustee.  Secured

10    creditors are paid first from the sales proceeds of properties on which the secured creditor has a

11    lien.    Administrative Claims are paid next.    Next, unsecured creditors are paid from any

12    remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same

13    priority share in proportion to the amount of their Allowed Claims in relationship to the amount

14    of total Allowed unsecured Claims. Finally, Interest holders receive the balance that remains

15    after all creditors are paid, if any.

16            For the Court to be able to confirm the Plan, the Court must find that all creditors and

17    Interest holders who do not accept the Plan will receive at least as much under the Plan as such

18    holders would receive under Chapter 7 liquidations of the Debtors.  The Debtors maintain that

19    this requirement is clearly met.

20            The impaired Classes under the Plan consist of Classes 2(a), 2(b), 3, 4, 5, 6, 7, 8(a), 8(b).

21    The Debtors must therefore satisfy the "best interest of creditors test" with respect to members of

22    Classes 2(a), 2(b), 3, 4, 5, 6, 7, 8(a), 8(b) who do not vote to accept the Plan.

23        **1.    Classes 2(a), 2(b), 3, 4, 5, 6, 7, 8(a), 8(b)**

24            The Debtors believe that they can satisfy the "best interest of creditors test" with respect

25    to members of Classes 2(a), 2(b), 3, 4, 5, 6, 7, 8(a), 8(b) who do not vote to accept the Plan.

26            **a.    Liquidation Analysis for 37 Ventures**

27        Reorganized 37 Ventures' plan obligations will be paid using the cash proceeds of

28    company-wide liquidity events of corporations in which it owns shares, as the liquidity events

78

1  occur between the Effective Date and December 31, 2025.  The expected value of all such future

2  liquidity events will be more than sufficient to pay all claims against 37 Ventures, totaling

3  approximately $15,000,000, with interest. While the Plan provides for an end date of no later

4  than December 31, 2025, 37 Ventures believes that liquidity events for some of the Portfolio

5  Companies will be closed during the Plan period, thus enabling 37 Ventures to pay its creditors

6  in full prior to December 31, 2025. Conversion to Chapter 7 would not provide a better result for

7  creditors of 37 Ventures for several reasons.

8  First, in a Chapter 7 case, distributions to creditors are delayed until the very end of the

9  case, after the trustee completes all administrative matters and obtains approval from the court to

10  make distributions.  In a typical Chapter 7 case, the final accounting and approval for

11  distributions to creditors takes at least 2-3 years from conversion. During that time, there are

12  rarely any interim distributions to creditors.  In contrast, 37 Ventures will be distributing at least

13  $3-4 Million to its creditors on the Effective Date, and depending on whether the Hawk

14  Contribution is made, Knight and Bishop may be paid off entirely.  Also, although 37 Ventures

15  cannot predict with certainty the timing of liquidity events involving the Portfolio Companies, 37

16  Ventures believes that it is likely for there to be liquidity events within the first 3 years post

17  Effective Date.  Thus, conversion to Chapter 7 will delay payments to creditors.

18  Second, if a Chapter 7 trustee were to attempt to sell 37 Ventures' minority ownership

19  interest in any of the Portfolio Companies (other than Savara which is a publicly traded

20  company) prior to a liquidity event, the trustee would be confronted with numerous value

21  depleting obstacles.   Most, if not all, of the agreements and corporate documents that govern 37

22  Ventures' shareholdings provide the respective companies and/or their shareholders with a so-

23  called "Right of First Refusal." The right of first refusal requires any prospective sale to be

24  offered first to the respective company and/or its shareholders on the same terms.  If the offer to

25  the company/shareholders is not accepted, but only then, can the sale to the proposed purchaser

26  be consummated.  Most investors have little interest in putting in the level of work and incurring

27  the expenses needed to make their investment decisions, only to face the possibility that the

28  transaction they have negotiated will be taken away from them by the holder of a right of first

1    refusal.  Once they learn of the right of first refusal, a prospective buyer's interest in a potential

2    acquisition is likely to evaporate or result in a heavily discounted offer.

3         Third, there simply is no active market of willing buyers and sellers for minority interests

4    in non-publicly traded securities issued by corporations in various stages of evolution from

5    startup to a liquidity event.  Securities issued by such companies are sold almost exclusively as

6    part of a funding round promoted by the issuing companies in an attempt to raise capital that will

7    be paid into the companies in exchange for the securities.  In that context, the issuing company is

8    motivated to give only to approved prospective investors the kind of information and access that

9    venture capital investors require in order to conduct due diligence and make their investment

10   decisions.  Even then, the due diligence, market analysis and negotiation period is a months'-

11   long process, that is time-consuming, burdensome and expensive for the prospective investor, as

12   well as the issuing company.  A trustee's ability to meet those criteria is doubtful.

13        A sale by a Chapter 7 trustee of minority interests in a corporation, of course, is entirely

14   different from a sale of a new series of securities by an issuing corporation in order to raise

15   capital.  Outside the funding round context, a corporation has little incentive to cooperate with

16   the information and access requests that a prospective buyer of a minority interest owned by an

17   existing shareholder will demand; and this is especially so if the prospective buyer is unknown to

18   or unvetted by the corporation.  On the contrary, in that context the subject company can only be

19   expected to comply with its minimal legal obligations to provide shareholder inspection rights;

20   and may well resist anything other than the most perfunctory disclosures, in order to protect its

21   business secrets and confidences.  This doubtless will burden a Chapter 7 trustee's efforts to

22   maximize the orderly liquidation value of the Portfolio Companies.

23        Thus, if the trustee were to attempt to maximize value for creditors and equity, the trustee

24   would likely do exactly what 37 Ventures intends to do; await the opportunity to sell its minority

25   interest in a naturally occurring liquidity event—and not  forfeit substantial value by attempting

26   to sell an interest for which there is no realistic market.

27        Fourth, under the Plan, Mr. Pikover has agreed to contribute the proceeds of the

28   disposition of the Caldera stock, which he owns personally.  No such voluntary contribution will

1  be made if the case is converted to Chapter 7.

2      Finally, in addition to the delays and loss of value, a conversion to Chapter 7 would result

3  in substantial increased administrative costs; including the professional fees (attorneys and

4  accountants, including tax and securities specialists) and the trustee's statutory fees, which given

5  the amounts involved, could, alone, exceed $300,000.   Many of these fees and costs can be

6  avoided if 37 Ventures remains in control of the disposition of the minority interests.

7      Thus conversion to Chapter 7 would not provide a better, faster or more efficient

8  recovery for creditors than the payment in full, plus interest, that 37 Ventures has proposed in the

9  Plan.

10           **b.    Liquidation Analysis for Larada**

11      In the event the Larada Debtor's Chapter 11 Case were to be converted to a case under

12  Chapter 7 of the Bankruptcy Code, the Debtor would be required to cease all operations, and a

13  Chapter 7 trustee would be appointed to liquidate the estates' assets.  Larada's assets include

14  cash, accounts receivable, intellectual property, customer deposits, and equipment having a value

15  as listed in its bankruptcy schedules based on book value of just over $2 million, along with

16  intangibles with no book value including the franchisee contracts and a global network of lice

17  clinic operations under the Lice Clinics of America brand.  Unlike a reorganization, in a Chapter

18  7 liquidation all going concern value would be lost, which would result in a recovery of millions

19  of dollars less than the recovery proposed in the Plan. A liquidation analysis with respect to the

20  Larada's assets is attached as **Exhibit "B."** Two liquidation scenarios are presented on Exhibit

21  B, the first, described as "Enterprise Sale Value" assumes that a Chapter 7 trustee could sell

22  Larada as a going concern with marketing over a reasonable period.   These are significant

23  assumptions that would be difficult for a Chapter 7 trustee to achieve, especially because Chapter

24  7 trustees are prohibited from operating a business without Court permission, and many Chapter

25  7 trustees are reluctant to request that permission.  Under the "Enterprise Sale Value" scenario,

26  Larada has estimated based on its experts' opinion that $5,189,000 could be realized for

27  creditors.  Since Alignment's senior secured claim is greater than this amount, all of the sale

28  proceeds would go to Alignment, and Alignment's claim would not be paid in full.

1    The second liquidation scenario on Exhibit B is "Liquidation Value".  This is simply a

2    liquidation of the assets of Larada in a piecemeal fashion, and is perhaps the most likely Chapter

3    7 scenario.  Under the "Liquidation Value" scenario, total proceeds of the liquidation would

4    equal $625,000, and all of the sale proceeds would again be realized by Alignment, leaving

5    Alignment with a very large deficiency claim.

6    The only other asset a Chapter 7 trustee would be likely to recover are the proceeds of

7    preference claims under Bankruptcy Code § 547.  Larada's analysis of potentially preferential

8    payments is attached as **Exhibit "D."**  As can be seen from this analysis the lion's share of

9    payments made by Larada in the 90 days before its bankruptcy filing are not recoverable as

10    preferences.  For example, many of these payments are "auto pay", payments in advance of

11    goods or services being provided, or otherwise in the ordinary course of business.  Larada

12    estimates that the total of potentially recoverable preference payments is approximately $47,000.

13    The proceeds of any preference recoveries, net of the professional fees required to collect them,

14    would generate at best a pittance for unsecured creditors.

15    Based on the foregoing, the Debtors therefore believe that holders of all Classes of

16    Claims will receive far more under the Plan than they would receive in a Chapter 7 liquidation of

17    the Debtors.

18    **M.    Feasibility**

19    Another requirement for confirmation involves the feasibility of the Plan, which means

20    that confirmation of the Plan is not likely to be followed by the liquidation, or the need for

21    further financial reorganization, of the Reorganized Debtors.

22    There are at least two important aspects of a feasibility analysis.  The first aspect

23    considers whether the Debtors will have enough cash on hand on the Effective Date to pay all the

24    claims and expenses which are entitled to be paid on such date.  Prior to the date of the Effective

25    Date, the Debtors shall in their bank accounts the necessary amount of cash to cover all

26    payments of Allowed Administrative Claims due on or about the Plan Effective Date for 37

27    Ventures and Larada respectively.

28    The second aspect considers whether the Reorganized Debtors will have enough cash

over the life of the Plan to make the required Plan payments. Pursuant to the Plan, Debtors will continue their business operations as they presently exist as described below. Detailed information concerning the Debtors' current financial status is reflected in monthly financial reports the Debtors have filed with the Bankruptcy Court.

### 1.    Larada

Larada will continue to operate as a franchisor of lice clinics around the world, and will continue to realize revenue, including required payments from its franchisees, and remit payments as is feasible to its creditors through the Larada Quarterly Amounts. Not later than 2028, Larada either will refinance its then existing debt or sell its assets in a transaction to be approved by the Bankruptcy Court, which will result in the final payment in full to its creditors.

Attached as **Exhibit "C"** to this Disclosure Statement are cash flow projections for Larada prepared on a monthly and an annual basis for a period of seven (7) years, which demonstrate the ability of the Reorganized Debtors to make all of the Plan payments which are required to be made over time. The cash flow projections also include two years of historical financial data regarding Larada, and more than two years of historical data related to the performance of Larada's franchisees.[20] The assumptions that support the cash flow projections are included within **Exhibit "C"** to the Disclosure Statement. The Larada cash flow projections combined with the Larada Asset Sale Liquidity Event and/or refinancing demonstrate that the Plan is feasible with respect to Larada.

Nevertheless, it should be noted that the projections attached are based upon estimates and assumptions that, although developed and considered reasonable by Larada and its advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond Larada's control. Accordingly, there can be no assurance that the projected performance reflected in the projections will be realized.

The attached projections were prepared by Larada's Chief Executive Officer with the assistance of the Larada management team and accountants. These individuals include

---

[20] Moreover, the LonePeak valuation report contains multiple years of historical financial information of Larada, and can be promptly provided to Alignment and/or other creditors and parties in interest upon request, subject to these parties entering into a non-disclosure agreement agreeing to keep this report and its contents confidential.

professionals with extensive business, accounting, and executive experience. Although every attempt has been made to provide reasonable and supportable projections, any projection of future events is subject to inherent uncertainty and risk.

It must be recognized that the Plan, and the projections provided with the Plan, are not immune to market conditions, and it is possible that the projected market conditions will not improve, or will even decline over the next several years. The Plan does not constitute a risk-free restructuring of debt.

### 2.    37 Ventures

The investments by Mr. Pikover and/or 37 Ventures in the Subject Companies date back as far as 2009 for Caldera; 2011 for Larada and MobileCause; 2012 for EV Connect, MolecularVista and TranscribeMe; 2013 for Bitvore; 2014 for NovaSignal and 2018 for California Cardiac Solutions, Oticara and SageMedic. The typical investment cycle for venture capital investments varies but, in general, the time from the startup phase to liquidity event is about ten years. Most of the investments are thus in the late stage of the investment cycle. The diversity and maturity of the investments, not to mention their anticipated liquidity event values, mitigates the risks resulting from the lack of control over the timing of the liquidity events. The probabilities are high that within the five-year period of the plan, more than sufficient proceeds will be generated from liquidity events to pay all claims in full. At this time, 37 Ventures is unable to predict with any certainty the timing for the liquidity events of the Subject Companies because there are too many unknowns, contingencies, and events over which 37 Ventures has no control (*e.g.*, the timing of the development of products or services being developed by these companies; the ability to create or exploit a market or services; and the Subject Companies' entry into a transaction such as an IPO, sale, or merger).

### V.

### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code; (ii) an alternative plan of reorganization or a plan of liquidation; and (iii) sales of the Debtors as going concerns.

### A.    Liquidation under Chapter 7

If the Plan is not confirmed, the Debtors' Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would liquidate the Debtors' assets for distribution in accordance with the priorities established by Chapter 7 of the Bankruptcy Code.  For the reasons articulated in Article IV, above, the Debtors believe that a liquidation under Chapter 7 would result in smaller and riskier distributions being made to Creditors and Interest holders than those provided for in the Plan.

### B.    Alternative Plan of Reorganization or Liquidation

If the Plan is not confirmed, the Court could confirm a different plan.  However, given the litigation, delay and expense associated with confirming a plan over the objection of the various parties, and the large amount of Administrative Expenses which would have to be funded on the effective date of any plan, the Debtors believe it is unlikely that any party interest will seek to file a competing plan in these Chapter 11 Cases.

The Debtors believe that the Plan described herein enables Creditors and Interest holders to realize the highest and best value under the circumstances.  The Debtors believe that any liquidation of the Property or alternative form of Chapter 11 plan is a much less attractive alternative to Creditors than the Plan because of the far greater returns and certainty provided by the Plan.  Other alternatives could involve diminished recoveries, significant delay, uncertainties and substantial additional administrative costs.

### C.    Sale of Larada as a Going Concern

Neither 37 Ventures nor Larada has sought input from any third party, such as an investment banker, regarding the prospects of sales of their respective businesses on a going concern basis nor are they currently aware of any opportunity to conduct such sales. Nevertheless, Larada has obtained a valuation report from LonePeak Valuation Group ("LonePeak") which concluded that the value of Larada as a going concern as of the petition date was $5,189,000.  Refinancing is thus not a viable option, since no rational lender would loan Larada more than its current value as a going concern.  If Larada were to pursue the sale of its assets as a going concern now, Alignment as the senior secured lender would receive the full

amount of the proceeds if there was a willing buyer at the petition date valuation of $5,189,000. No other creditor class would receive any recovery at all, other than a paltry amount through potential avoidance action recoveries. Thus, the Plan, which proposes to pay Alignment and all other creditors 100% of their claim amounts plus interest, yields a better result for all creditor constituencies as compared with the near term sale of Larada as a going concern.

**VI.**

**POST-CONFIRMATION MATTERS**

**A.      Post-Confirmation Status Report**

Within 120 days after the entry of the order confirming the Plan, the Debtors shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan. The status report must be served on the Office of the United States Trustee, the Reorganized Debtors, the 20 largest unsecured creditors of both Debtors, any secured creditors and priority unsecured creditors entitled to receive distributions under the Plan, and those parties who have requested special notice after the Effective Date. Further status reports shall be filed every 120 days and served on the same entities.

**B.      Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the Chapter 11 Cases under § 1112(b) after the Plan is confirmed if there is a default in performing the Plan. If the Court orders one or both of the Chapter 11 Cases converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Estates, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property, but only to the extent that the Court did not previously authorize relief from stay during the Chapter 11 Cases.

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the order of confirmation.

/ / /

**C.    Post-Confirmation U.S. Trustee Fees**

The Reorganized Debtors shall be responsible for timely payment of all fees incurred after the Effective Date pursuant to 28 U.S.C. Section 1930(a)(6).

**D.    Final Decree**

Once the Estates have been fully administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtors shall file a motion with the Court to obtain a final decree to close their Chapter 11 Cases.  Final decree shall not be entered in these cases until all adversary proceedings initiated in the Bankruptcy Court have been finally adjudicated.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Dated: November **9**, 2021

37 VENTURES, LLC

By: _____
    YURI PIKOVER,
    Manager

LARADA SCIENCES, INC.

By: _____
    Claire Roberts,
    President and Chief Executive Officer

Presented By:

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK, L.L.P.

By: __/s/ Gary E. Klausner_____
    GARY E. KLAUSNER
    EVE H. KARASIK
    JEFFREY S. KWONG
    Attorneys for 37 Ventures, LLC

COHNE KINGHORN

By: _____
    GEORGE HOFMANN
    Attorneys for Larada Sciences, Inc.

ZOLKIN TALERICO LLP

By: _____
    DERRICK TALERICO
    Attorneys for Larada Sciences, Inc.

Dated: November 11, 2021          37 VENTURES, LLC

By: _____
     YURI PIKOVER,
     Manager

LARADA SCIENCES, INC.

By: _____
     Claire Roberts,
     President and Chief Executive Officer

Presented By:

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK, L.L.P.

By:   /s/ Gary E. Klausner
     GARY E. KLAUSNER
     EVE H. KARASIK
     JEFFREY S. KWONG
     Attorneys for 37 Ventures, LLC

COHNE KINGHORN

By: _____
     GEORGE HOFMANN
     Attorneys for Larada Sciences, Inc.

ZOLKIN TALERICO LLP

By: _____
     DERRICK TALERICO
     Attorneys for Larada Sciences, Inc.

Dated: November 11, 2021                37 VENTURES, LLC

                                        By:_____
                                            YURI PIKOVER,
                                            Manager

                                        LARADA SCIENCES, INC.

                                        By:_____
                                            Claire Roberts,
                                            President and Chief Executive Officer

Presented By:

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK, L.L.P.

By:    /s/ Gary E. Klausner
       GARY E. KLAUSNER
       EVE H. KARASIK
       JEFFREY S. KWONG
       Attorneys for 37 Ventures, LLC

COHNE KINGHORN

By:_____
       GEORGE HOFMANN
       Attorneys for Larada Sciences, Inc.

ZOLKIN TALERICO LLP

By:_____
       DERRICK TALERICO
       Attorneys for Larada Sciences, Inc.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## EXHIBIT "A"

[Chart Providing Information About 37 Ventures' Investments, From June 15, 2013, In

Companies That Were No Longer Part Of The Portfolio Companies As Of The Petition Date]

Recapitulation of Pikover/37 Venture Portfolio Companies that Became Valueless or Experienced a Liquidity Event ("Closure") 2013-Present

| Company Name | Cost* | Year of First Investment* | Closure Year | Liquidity Event Proceeds | 37 Ventures or Pikover Investment? | |
|---|---|---|---|---|---|---|
| Gumiyo*** | $   872,000 | 2007 | 2013 | $   746,000 | | |
| EagleView*** | $   930,000 | 2008 | 2013 | $4,040,000 | | |
| Klutch*** | $   225,000 | 2012 | 2015 | n/a** | | |
| HitFix*** | $   450,000 | 2010 | 2016 | n/a** | | |
| P4RC/Coin-in*** | $   500,000 | 2013 | 2017 | n/a** | | |
| AnyMeeting*** | $   500,000 | 2010 | 2017 | $   440,000 | | |
| Ninja Metrics**** | $2,023,000 | 2009 | 2018 | n/a** | | |
| Wedgebuster*** | $1,155,000 | unknown | unknown | n/a** | | |
| Mobile Cause**** | $1,920,000 | 2011 | 2021 | $4,550,000 | | |
| | | | | | | |
| **Total** | **$8,575,000** | | | **$9,776,000** | **Net:** | **$1,201,000** |

*Most, if not all, of the securities for each of the companies, were purchased on different dates, with different rights and at different prices.  The cost figure aggregates the cost of all series of securities purchased.

** N/A means that there was no liquidity event, and that the investment produced no proceeds.

*** Investment was made by Yuri Pikover and not transferred to 37 Ventures.

**** Investment initially was made by Yuri Pikover and subsequently transferred to 37 Ventures.

1

2

## **EXHIBIT "B"**

3

[Larada Liquidation Analysis]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Larada Sciences, Inc.**
**Liquidation Analysis**
**Projected As of December 31, 2021**
**(in 000's)**

| | Note # | Scenario #1 Chapter 11 Plan Value | Scenario #2 Chapter 7 Enterprise Sale Value | Scenario #3 Chapter 7 Liquidation Value |
|---|---|---|---|---|
| **Estimated Gross Proceeds** | | | | |
| Current Assets | | | | |
| Cash | 1 | | | 360 |
| Accounts Receivable | 2 | | | 45 |
| Inventory - raw materials | 3 | | | 94 |
| Inventory - heated air devices | 4 | | | 126 |
| Prepaid Expenses | 5 | | | - |
| Other Current Assets | 6 | | | - |
| **Total Current Assets** | | | | **625** |
| | | | | |
| **Total Going Concern Value** | 7 | | 5,189 | |
| | | | | |
| **Total Preference Payments Recovery** | 8 | | 47 | 47 |
| | | | | |
| **Total Quarterly Larada Amount 2022-2028** | 9 | 6,957 | | |
| | | | | |
| **Total Larada Plan Loan or Enterprise Sale 2028** | 10 | 15,659 | | |
| | | | | |
| **Total Estimated Gross Proceeds Available for Distribution** | | $ 22,616 | $ 5,236 | $ 672 |
| | | | | |
| **Distribution of Proceeds** | | | | |
| Chapter 7 Trustee Fees | | | 204 | 79 |
| Other Professionals | | | 150 | 75 |
| **Total Administrative Creditors** | | | $ 354 | $ 154 |
| | | | | |
| **Proceeds Available for Claims:** | | $ 22,616 | $ 4,882 | $ 518 |
| Larada Claims ($20,400) | | | | |
| Class 4 - Alignment Secured Claim ($5,189) | | 5,189 | 4,835 | 471 |
| Class 5 - Alignment Unsecured Claim ($4,736) | | 4,736 | 15 | 15 |
| Class 6 - General Unsecured Claim ($5,130) | | 5,130 | 16 | 16 |
| Class 7 - Subdebt Claim ($5,300) | | 5,300 | 16 | 16 |
| Class 8 - Convenience Claims ($60) | | 45 | 0.18 | 0.18 |
| | | | | |
| **Total Distributions** | | $ 20,400 | $ 4,882 | $ 518 |
| | | | | |
| **Estimated Recovery %:** | | | | |
| Class 4 - Alignment Secured Claim | | 100% | 93% | 9% |
| Class 5 - Alignment Unsecured Claim | | 100% | 0.3% | 0.3% |
| Class 6 - General Unsecured Claim | | 100% | 0.3% | 0.3% |
| Class 7 - Subdebt Claim | | 100% | 0.3% | 0.3% |
| Class 8 - Convenience Claims | | 75% | 0.4% | 0.4% |
| | | | | |
| **Excess / (Shortfall) - all creditor classes** | | $ 2,216 | $ (15,518) | $ (19,882) |

## ASSUMPTIONS UNDERLYING LARADA LIQUIDATION ANALYSIS

The Larada Liquidation Analysis contemplates three scenarios, each of which produces an estimated amount of proceeds for distribution to creditors.  The Liquidation Analysis uses a waterfall approach to reflect how proceeds would be distributed to each class of Larada's creditors under each of the three scenarios.   The three scenarios are described as follows:

1.    Scenario number one reflects no liquidation by a Ch7 Trustee and instead reflects the available proceeds for distribution to creditors under the Amended Ch. 11 Plan and Disclosure Statement ("Chapter 11 Plan") as presented in Exhibit C.  Under the Chapter 11 Plan the Quarterly Larada Amount plus either a refinancing ("Plan Loan") or an orderly sale of the company as a going concern, using the Concluded Enterprise Value as of December 31, 2028 as published in the report provided by the third party valuation expert engaged by Larada with the court's approval, Mr. Jeffrey Pickett, CPA/ABV, Principal, LonePeak Valuation Group, is estimated to produce proceeds for distribution to the creditors in excess of $22 million. Under the Ch. 11 Plan, the proceeds would allow all creditors to be repaid in full (other than the 75% recovery to Class 8 – Convenience Claims), and would leave an estimated excess of over $2M.

2 .  Although under the supervision of a Chapter 7 Trustee, the second scenario is the sale of Larada as a quasi-going concern on or about December 31, 2021. Under this approach, while it is assumed there are no employees as of the date of the sale, if the Chapter 7 Trustee were to engage a professional to seek a buyer, it is potentially possible to realize a value close to the valuation of Larada as of the petition date as published in the valuation report prepared by Mr. Pickett, LonePeak Valuation Group.  Under such a scenario, the recovery would potentially be far greater than the traditional "hard asset-based" liquidation scenario.  And although Larada management recognizes that if a Chapter 7 Trustee is involved in the process a buyer would most likely apply a discount to the Concluded Enterprise Value, no discount was estimated in the Liquidation Analysis schedule in this Exhibit B to the Amended Disclosure Statement. Even allowing for a potential realization of 100% of the Concluded Enterprise Value, such an approach to liquidation is estimated to provide for just under $4.9M, and leaving a shortfall in excess of $15M.

3 .  Scenario number three reflects a liquidation on or around December 31, 2021, and would be under the

supervision of a Chapter 7 Trustee and would be executed under the traditional "hard asset-based" liquation process. Under this approach it is assumed there are no employees or remaining customers or franchisees, and accordingly the amount realized under such liquidation would be very minimal as there are very few "hard" assets or even much to realize from attempting to collect outstanding accounts receivable. The majority of the value would be in the remaining cash in the bank. Under this scenario there is estimated to be only $518,000 in available proceeds for distribution to creditors, leaving a shortfall in excess of $19 million.

4. It is conceivable under either scenarios number two or three above that a large portion, or even the entirety of Alignment's claim, could be satisfied from a liquidation of 37 Ventures' assets. If this occurred, and Alignment's secured claim was hypothetically paid in full from the proceeds of 37 Ventures, then 37 Ventures would be subrogated to Alignment's claim, and thus the net result to creditors would be exactly the same because 37 Ventures would receive the distributions that would otherwise be paid to Alignment upon liquidation of Larada's assets.

Further notes to the assumptions underlying the Larada Liquidation Analysis:

Note 1: The projected liquidated value of cash is 100% of the projected bank balance at December 31, 2021, or $360k.

Note 2: The liquidation value of accounts receivable is based on assuming only 25% of the projected net book value of receivables of $181k, or $45k, would be recoverable by a Ch. 7 Trustee, as all of the customers (i.e., franchisees) would be gone and the assumption is there would be little to no motivation for them to honor such amounts owed to Larada.

Note 3: The projected book value of Larada's inventory of raw materials and finished goods projected to be on hand as of December 31, 2021 is $187k, primarily comprised of proprietary liquid gel and other components used for production of Larada's retail product (the "Lice Remover Kit") sold on Amazon. It is management's estimate that only 50% of the book value, or $94k, could potentially be realized by a Ch. 7 Trustee as there would be only a small group of potential buyers for these component parts and proprietary liquid gel stored in bulk in drums.

Note 4: The liquidation value of inventory projected to be on hand as of 12/31/21 consists of Larada's heated air devices located at a third party supplier in North Dakota. It is estimated there would be approximately 126 devices and management believes there would be buyers will to pay $1000 per machine in the U.S. professional lice treatment industry, for an estimated liquidation value of $126k.

Note 5: There is a zero value projected for the liquidation of prepaid expenses with a projected net book value of $138k.

Note 6: There is a zero value projected for the liquidation of other miscellaneous current assets with a net book value of $68k.

Note 7: The Ch. 7 liquidation value under a quasi-going concern sale is based on the Concluded Enterprise Value as of March 19, 2021 as published in the valuation report prepared by Mr. Jeffrey Pickett, LonePeak Valuation Group.  The full report is available upon request and subject to confidentiality.

Note 8: Total preference payment recovery is based on the preference analysis performed by management and is estimated to be $47k.  See Exhibit E for the detailed analysis and conclusion on each payment if it is subject to recovery.

Note 9: The Total Quarterly Larada Amount is the amount of proceeds generated over the seven year period 2022-2028 from net operating cash flow after covering operating costs and a minimum cash balance.  Details of each Quarterly Larada Amount, by quarter and by year, can be found in Exhibit C to the Amended Disclosure Statement.

Note 10: The Larada Plan Loan or Enterprise Sale amount is based on the Concluded Enterprise Value of Larada as of December 31, 2028 as published in the valuation report prepared by Mr. Jeffrey Pickett, LonePeak Valuation Group. The full report is available upon request and subject to confidentiality.

1
2
3
## **EXHIBIT "C"**
4
[Cash Flow Projections for Larada]
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CASH FLOW PROJECTIONS FOR LARADA**

In conjunction with developing the Plan of Reorganization ("Plan") described in the Disclosure Statement, to which this is an exhibit, Larada management ("Debtor") has prepared financial projections which may be helpful to holders of claims and interests in reaching their determination of whether to accept or reject the Plan. These projected financial statements are based on the assumptions discussed below.

THE DEBTOR CAUTIONS THAT NO REPRESENTATION CAN BE MADE AS TO THE ACCURACY OF THE PROJECTED FINANCIAL INFORMATION OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. MANY OF THE ASSUMPTIONS UPON WHICH THESE PROJECTIONS ARE BASED ARE NOT DERIVED FROM HISTORICAL RESULTS AND ARE SUBJECT TO SIGNIFICANT ECONOMIC AND COMPETITIVE UNCERTAINIES. ACCORDINGLY, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE PROJECTION PERIOD MAY VARY FROM THE PROJECTED RESULTS. THE VARIATIONS MAY BE MATERIAL AND ADVERSE.

The financial statements and select supporting schedules included herein are:

1. A summary schedule with two years of historical annual financial statements for 2020 and 2021 (comparable to the projected statements) and seven years of projected annual financial statements for 2022 – 2028;

2. Seven years of projected comparative monthly and annual projections, with YOY % change by line item for the following periods:

   • January 1, 2022, through December 31, 2022

   • January 1, 2023, through December 31, 2023

- January 1, 2024, through December 31, 2024

- January 1, 2025, through December 31, 2025

- January 1, 2026, through December 31, 2026

- January 1, 2027, through December 31, 2027

- January 1, 2028, through December 31, 2028;

3. Supporting schedules with historical franchise clinic data from 2014-2020 and projections from 2021-2028, including number of clinics open by month, franchisee treatments by month and by year with YOY % change, average revenue per treatment and average franchise territory sales price.

4. Upon request additional supporting schedules are available in connection with all financial statement line item projections; underlying supporting spreadsheets are in Excel format and too voluminous to include with this Disclosure Statement Exhibit C.

The projected financial statements have been prepared on a cash basis.

These projected financial statements present, to the best of Debtor's knowledge and belief, the cash flows of the Reorganized Debtor for the periods shown.

Accordingly, projections reflect Debtor's judgment, as of the date of this Disclosure Statement, of expected future operating conditions. All balances and assumptions shown within the projections w e r e developed by management. The principal assumptions disclosed herein are those that management believes are significant to the projections. There will normally be differences between the projected and actual results because events and circumstances frequently do not occur as expected.

The projections are based on a number of estimates and assumptions that, although considered reasonable by Debtor, are uncertainties and

contingencies beyond the control of the Reorganized Debtor and its management. The projections are based upon assumptions of future business decisions which are subject to change. Accordingly, there can be no assurance that the projected results will be realized, and actual results may vary materially from those projected. If actual results are lower than those shown, or if the assumptions used in formulating the projections are not realized, the Reorganized Debtor's operating results or cash flows may be adversely affected.

Management does not intend to revise the projections solely to reflect circumstances existing after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events. Management assumes no responsibility to advise users of the projections about any subsequent changes.

WHILE THE DEBTOR BELIEVES THAT THE ASSUMPTIONS UNDERLYING THE PROJECTED FINANCIAL STATEMENTS FOR THE PROJECTION PERIOD, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. THE DEBTOR URGES THAT THE UNDERLYING ASSUMPTIONS BE CAREFULLY CONSIDERED BY HOLDERS OF CLAIMS AND INTERESTS IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.

ASSUMPTIONS:

Larada Sciences, Inc. ("Company") began as a university laboratory research project and has grown into the world's largest lice-treatment services company.  What started as an idea in a scientist's mind has grown into a Company with an FDA-cleared medical device used in over 200 professional lice-treatment clinics and performing over 750,000 successful lice treatments.  The Company's product line also expanded to include patented lice-treatment products sold to millions of consumers for do-it-yourself ("DIY") home use. Along the way, the Company raised equity and debt financing to support pre-profitability growth, with the goal of providing a profitable return on all sources of capital.

Beginning in 2019 the Company pulled back on expansion plans and pivoted to focus on profitability instead of growth, which included reducing expansion internationally and pulling out of U.S. and Canadian big-box retailers.  These changes allowed the company to significantly reduce its overhead and by 4Q19 the company was cash-flow positive from operations.  By February 2020 the Company was profitable and was working on recapitalizing a significant portion of its high-interest-rate debt with Alignment Credit.  In March 2020 COVID-19 hit, and the Company's clinic operations came to a screeching halt overnight.

In March 2021 the Company filed for Ch.11 protection and reorganization. Despite the additional incremental costs and time spent managing both the business and the Ch. 11 process, the Company has begun to recover and is emerging from the pandemic stronger than ever.

Overall, management believes it has taken a conservative, achievable approach to both its revenue and expense projections for the period 2022- 2028.  Further explanation of the major revenue and expense contributors are outlined below.

Management's revenue projections included with this Disclosure Statement show clinic sales and retail sales are expected to decline further in 2021 and are not expected to reach pre-pandemic levels until 2025. This reflects a more conservative anticipated recovery than many of the industries hardest hit by social distancing and other pandemic-related regulations and consumer behavior.

However, it should also be noted that the Company is not relying solely on consumers returning to pre-pandemic behavior to stimulate growth. In recognition of price pressure on its services, the Company and its franchisees expanded their focus to include serving the lower income and disadvantaged that are just as plagued by lice as the higher income demographics.  The Company and the franchisees elected to subsidize those that qualify for Medicare (even though Medicaid and Medicare programs do not actually pay for our lice treatments), and entered into numerous partnerships with foster children agencies, rehabilitation centers and homeless shelters.  The result has been an increase in treatments for those clinics who participate in these "subsidized programs" but at a lower per-treatment revenue ticket to the Company (and the clinic owner).  That dual pricing model and dual target consumer demographic plays an important role in growth in overall per-month-per-treatment volume and therefore resulting gross revenue in future years as the Company rebuilds the number of operating clinics.

The Company's franchisee revenue, or treatment revenue, is a function of the number of open and operating clinics as well as the volume of customers who will pay for treatments, as well as purchase other products in-clinic.  Pre-pandemic, in 2019 the Company reached a high of 220 clinics operating in the U.S., which was a significant increase from the 154 clinics open and operating in the U.S in October 2018.  The financial projections reflect a further decline to only 128 clinics by the end of 2021 in line with maintaining a conservative approach to the projections and not knowing with certainty how many clinic owners will elect to move to a competing technology or leave the industry altogether due to financial pressures.  The Company's projections then reflect slow but steady rebuilding of its clinic network over the coming years, not returning to  pre-pandemic levels of open and operating U.S. clinics until 2028.  In addition to a conservative approach to rebuilding its network of U.S. clinics, the projections also reflect a lower per-territory sales price of $25,000, down from an average of $35,000 per territory sale in prior years.

With regard to forecasted clinic treatments and product sales, the projections also reflect a slow but steady increase to reaching pre-pandemic levels by 2025.  The forecasted increase in average treatments per open U.S. clinic increase 5-8% per year over the period from 2023 – 2028.  The average 'royalty' paid per clinic treatment remains at $28, which is less than the $32 per-treatment average (pre-pandemic) and is a reflection of continuing to subsidize the lower income demographic. No increase is forecast through the end of the

projection period of December 2028.  Product sales are forecasted to remain steady at 20% of treatment volume, consistent with historical consumer purchase patterns once they are in the clinic.

The other primary revenue stream comes from sales of the Company's Lice Remover Kit ("LRK") on Amazon.  The LRK has been the category leader on Amazon since launching in 2017, and there is no reason to expect that to change.  Consumer buying behavior on Amazon is heavily influenced by consumer ratings, and not by legacy brand equity or large advertising budgets that our competitors can rely on in big-box retail distribution.  Not only are we pesticide-free and non-toxic (a claim our legacy brand competitors cannot always make) but our consumers give our product exceptional ratings that surpass those of our competitors.  As a result, we have reflected essentially an average of a 10% per year growth rate on Amazon, with the primary exception in 2022 sales where we reflect a 30% increase over 2021 due to a supply chain disruption that caused us to run out of inventory temporarily.  Since consumer demand was there, the Company's projections reflect overcoming that issue in 2022 then maintaining a very achievable YOY growth of 10% through 2028. Amazon continues to take more and more share from traditional brick and mortar retailers in this category and management believes the Company's sales will continue to increase as a result.

On the cost structure side of the equation management has also taken a conservative approach in the projections, and is reflecting a fairly steep increase (18%) in inventory costs for the LRK in 2022 over 2021, but then leveling out to be 10% annually 2022 through 2028. Management believes this is appropriate given the challenges in the supply chain as well as inflation over the forecast period. The decrease in product purchases, assembly, and shipping in 2022 versus 2021 is due to a change in the Company's clinic wholesale product fulfillment arrangement with it's key supplier.  Franchisees now purchase directly from the Company's designated third party supplier and therefore the Company ceased carrying the cost of inventory for those products distributed through the clinics. After accounting for the anomaly of the decrease from 2022 over 2021, the cost of shipping and assembly (of the LRK) is anticipated to continue to increase from 2023 - 2028, and accordingly the increase in the aggregate line item of product purchases, assembly and shipping has annual increases ranging from 13 – 16% over the projection period.

On the general and administrative expense structure, payroll is the largest expense category.  Management believes it can operate the Company with generally the current head-count structure currently in place even as its revenues increase.  The decrease in compensation cost from 2021 to 2022 is the result of having satisfied payment of sales commissions in 2021 and discontinuing that commission program for territory sales.  For the remainder of the projection period management has forecast an annual increase of 5-7% per year in compensation cost.

Other general and administrative expenses are projected to increase on average 3-5% per year over the projection period.

The second largest expense category is marketing expense, and the projections reflect an increase of 11-13% annually throughout the projection period, putting marketing at approximately 20-25% of clinic revenue over the projection period, which also equates to approximately 4% of the total network gross revenue (what the franchisees realize as their gross revenue). The Company has been working with its Franchisee Advisory Board and clinic owners over the past year to establish a National Marketing Fund that is pegged to be 4% of network-wide gross revenue. The 4% is in line with best practices of successful franchise systems and has been well received by the clinic owners.

In summary, management believes it has taken a conservative, achievable approach to both its revenue and expense projections for the period 2022- 2028.

**Larada Sciences, Inc.**
**2 Yr History and 7 Year Cash Flow Projections**
**Summary 2020-2028**

| 12 Months Ending: | 2 Yr Historical Financials | | 7 Yr Projected Financials | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Act (Accrual) 12/31/20 | Act+Est (Cash) 12/31/21 | 1 12/31/22 | 2 12/31/23 | 3 12/30/24 | 4 12/30/25 | 5 12/30/26 | 6 12/30/27 | 7 12/29/28 | Total 2022-2028 |
| **Cash Receipts:** | | | | | | | | | | |
| Treatments | 2,456,193 | 1,911,659 | 2,153,796 | 2,639,266 | 3,056,688 | 3,559,935 | 4,131,289 | 4,779,967 | 5,516,433 | 25,837,374 |
| Clinic Products | 463,049 | 176,949 | 40,705 | 48,997 | 56,745 | 66,087 | 76,693 | 88,734 | 102,405 | 480,367 |
| Digital Marketing | 175,438 | 377,784 | 346,471 | 372,193 | 402,389 | 439,967 | 477,544 | 515,121 | 552,698 | 3,106,383 |
| Territory Sales | 66,604 | 19,500 | 82,500 | 90,000 | 135,000 | 180,000 | 180,000 | 180,000 | 180,000 | 1,027,500 |
| Amazon, net | 852,089 | 674,474 | 821,000 | 944,150 | 1,038,565 | 1,142,422 | 1,256,664 | 1,382,330 | 1,520,563 | 8,105,693 |
| eCommerce | 0 | 50,316 | 50,316 | 57,863 | 63,650 | 70,015 | 77,016 | 84,718 | 93,190 | 496,767 |
| AR Collections (Big Box Sales in 2020) | 409,235 | 31,719 | 31,722 | 33,308 | 33,308 | 33,308 | 33,308 | 33,308 | 33,308 | 231,570 |
| ERC and PPP Funds | 479,500 | 814,554 | 115,000 | | | | | | - | 115,000 |
| **Total Receipts** | **4,902,108** | **4,056,955** | **3,641,510** | **4,185,777** | **4,786,346** | **5,491,733** | **6,232,514** | **7,064,178** | **7,998,597** | **39,400,655** |
| **Cash Disbursements:** | | | | | | | | | | |
| Product Purchases, Assembly and Shipping | 816,867 | 598,528 | 402,196 | 518,068 | 587,953 | 665,846 | 771,934 | 893,836 | 1,033,873 | 4,873,707 |
| Inventory | 422,842 | 254,111 | 300,000 | 345,000 | 379,500 | 417,450 | 459,195 | 505,115 | 555,626 | 2,961,885 |
| Payroll | 1,970,492 | 1,778,023 | 1,682,705 | 1,766,841 | 1,855,183 | 1,985,045 | 2,123,999 | 2,272,678 | 2,431,766 | 14,118,217 |
| Rent | 154,634 | 47,960 | 48,600 | 50,058 | 51,560 | 54,138 | 56,845 | 59,687 | 62,671 | 383,558 |
| Credit Card Processing/Bank Fees | 197,943 | 151,768 | 153,000 | 160,650 | 168,525 | 176,951 | 185,799 | 195,089 | 204,843 | 1,244,857 |
| Other G&A (IT, Utilities, Admin) | 118,758 | 72,025 | 75,310 | 77,569 | 81,448 | 85,520 | 89,796 | 94,286 | 99,000 | 602,928 |
| 2021 Outstanding Prof Fees (excl $175k retainers) | | 82,000 | 303,000 | | | | | | | 303,000 |
| Ordinary Course Accounting, Legal & Regulatory | 737,215 | 286,840 | 252,000 | 264,600 | 277,830 | 291,722 | 312,142 | 333,992 | 357,371 | 2,089,657 |
| Marketing | 303,489 | 526,315 | 529,963 | 599,961 | 668,565 | 749,947 | 838,874 | 936,295 | 1,043,280 | 5,366,886 |
| Device Deposits | | 66,569 | 18,000 | 36,000 | 42,000 | 48,000 | 54,000 | 60,000 | 66,000 | 324,000 |
| Other (UU, UST Fee, Convenience Claims) | 84,825 | - | 60,650 | - | - | - | - | - | - | 60,650 |
| **Total Disbursements** | **4,807,065** | **3,864,140** | **3,825,424** | **3,818,747** | **4,112,563** | **4,474,619** | **4,892,583** | **5,350,978** | **5,854,431** | **32,329,344** |
| Other Sources (Uses) of cash (AR, AP, Debt Service), net | (442,644) | 145,701 | | | | | | | | |
| **Net Cash Flow from Operations** | **95,043** | **192,815** | **(183,914)** | **367,031** | **673,783** | **1,017,114** | **1,339,931** | **1,713,200** | **2,144,167** | **7,071,311** |
| **Beginning Cash Balance** | 369,946 | 22,345 | 360,861 | 176,946 | 300,000 | 325,000 | 350,000 | 375,000 | 425,000 | 360,861 |
| **Ending Cash Balance** | 22,345 | 360,861 | 176,946 | 300,000 | 325,000 | 350,000 | 375,000 | 425,000 | 475,000 | 475,000 |
| **Minimum Cash Balance** | | | 250,000 | 300,000 | 325,000 | 350,000 | 375,000 | 425,000 | 475,000 | |
| **Quarterly Larada Amount** | | | 0 | 243,977 | 648,783 | 992,114 | 1,314,931 | 1,663,200 | 2,094,167 | 6,957,172 |

**Larada Sciences, Inc.**
**Cash Flow Projection**
**Cash Basis 2022**

| Month Ending: | 1 1/31/22 | 2 2/28/22 | 3 3/31/22 | 4 4/30/22 | 5 5/31/22 | 6 6/30/22 | 7 7/31/22 | 8 8/31/22 | 9 9/30/22 | 10 10/31/22 | 11 11/30/22 | 12 12/31/22 | 2022 Total Proj | 2021 Total Act+Est | Incr (decr) Var | % Var |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | | | | | | | | | | | | |
| Treatments | 134,374 | 157,243 | 137,184 | 153,386 | 147,147 | 144,720 | 168,224 | 219,009 | 255,163 | 210,505 | 219,887 | 206,954 | 2,153,796 | 1,911,659 | 242,136 | 13% |
| Clinic Products | 2,887 | 2,518 | 2,816 | 2,701 | 2,657 | 3,088 | 4,020 | 4,684 | 3,864 | 4,037 | 3,799 | 3,634 | 40,705 | 176,949 | (136,244) | -77% |
| Digital Marketing | 28,183 | 28,630 | 27,959 | 28,183 | 28,407 | 28,630 | 28,854 | 29,078 | 29,301 | 29,525 | 29,749 | 29,972 | 346,471 | 377,784 | (31,313) | -8% |
| Territory Sales | | | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 82,500 | 19,500 | 63,000 | 323% |
| Amazon, net | 66,000 | 72,000 | 68,000 | 66,000 | 62,000 | 62,000 | 66,000 | 70,000 | 75,000 | 72,000 | 72,000 | 70,000 | 821,000 | 674,474 | 146,526 | 22% |
| eCommerce | 4,193 | 4,193 | 4,193 | 4,193 | 4,193 | 4,193 | 4,193 | 4,193 | 4,193 | 4,193 | 4,193 | 4,193 | 50,316 | 50,316 | - | 0% |
| AR Collections | 2,643 | 2,643 | 2,643 | 2,643 | 2,643 | 2,643 | 2,643 | 2,643 | 2,643 | 2,643 | 2,643 | 2,643 | 31,722 | 31,719 | 3 | 0% |
| ERC and PPP Funds | 115,000 | | | | | | | | | | | | 115,000 | 814,554 | (699,554) | -86% |
| **Total Receipts** | 353,280 | 274,728 | 250,296 | 264,607 | 254,546 | 252,774 | 281,434 | 337,107 | 377,665 | 330,403 | 339,771 | 324,897 | 3,641,510 | 4,056,955 | (415,446) | -10% |
| | | | | | | | | | | | | | | | | |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | |
| Product Purchases, Assembly and Shipping | 29,763 | 27,030 | 29,238 | 28,387 | 28,056 | 31,260 | 38,181 | 43,108 | 37,022 | 38,301 | 36,538 | 35,312 | 402,196 | 598,528 | (196,332) | -33% |
| Inventory | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 300,000 | 254,111 | 45,889 | 18% |
| Payroll | 140,225 | 140,225 | 140,225 | 140,225 | 140,225 | 140,225 | 140,225 | 140,225 | 140,225 | 140,225 | 140,225 | 140,225 | 1,682,705 | 1,778,023 | (95,318) | -5% |
| Rent | 4,050 | 4,050 | 4,050 | 4,050 | 4,050 | 4,050 | 4,050 | 4,050 | 4,050 | 4,050 | 4,050 | 4,050 | 48,600 | 47,960 | 640 | 1% |
| Other G&A (IT, Utilities, Admin) | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 153,000 | 151,768 | 1,232 | 1% |
| Credit Card Processing/Bank Fees | 5,341 | 4,659 | 5,210 | 4,998 | 4,915 | 5,713 | 7,438 | 8,666 | 7,149 | 7,468 | 7,029 | 6,723 | 75,310 | 72,025 | 3,285 | 5% |
| 2021 Outstanding Prof Fees | 303,000 | | | | | | | | | | | | 303,000 | 82,000 | 221,000 | |
| Ordinary Course Accounting, Legal & Regulatory | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 252,000 | 286,840 | (34,840) | -12% |
| Marketing | 40,146 | 42,236 | 40,252 | 41,682 | 41,299 | 41,224 | 43,244 | 47,468 | 50,510 | 47,023 | 47,902 | 46,977 | 529,963 | 526,315 | 3,648 | 1% |
| Device Deposits | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 18,000 | 66,569 | (48,569) | -73% |
| Other (UST Fee, Convenience Claims) | 650 | | | | | | | | | | | 60,000 | 60,650 | | 60,650 | |
| **Total Disbursements** | 583,175 | 278,200 | 278,975 | 279,343 | 278,546 | 282,472 | 293,639 | 304,018 | 299,457 | 357,567 | 296,244 | 293,788 | 3,825,424 | 3,864,140 | (38,716) | -1% |
| Other Sources (Uses) of cash (AR, AP, Debt Service), net | | | | | | | | | | | | | | 145,701 | | |
| **Net Cash Flow** | (229,896) | (3,472) | (28,679) | (14,736) | (24,000) | (29,698) | (12,204) | 33,089 | 78,208 | (27,163) | 43,527 | 31,109 | (183,914) | 192,815 | | |
| | | | | | | | | | | | | | | | | |
| Beginning Cash Balance (including Cash Collateral) | 360,861 | 130,965 | 127,493 | 98,814 | 84,078 | 60,078 | 30,380 | 18,176 | 51,265 | 129,473 | 102,310 | 145,837 | 360,861 | 22,345 | | |
| Ending Cash Balance | 130,965 | 127,493 | 98,814 | 84,078 | 60,078 | 30,380 | 18,176 | 51,265 | 129,473 | 102,310 | 145,837 | 176,946 | 176,946 | 360,861 | | |
| Minimum Cash Balance | | | 250,000 | | | 250,000 | | | 250,000 | | | 250,000 | | | | |
| Quarterly Larada Amount | | | 0 | | | 0 | | | 0 | | | 0 | 0 | | | |

**Larada Sciences, Inc.**
**Cash Flow Projection**
**Cash Basis 2023**

| Month Ending: | 1 1/31/23 | 2 2/28/23 | 3 3/31/23 | 4 4/30/23 | 5 5/31/23 | 6 6/30/23 | 7 7/31/23 | 8 8/31/23 | 9 9/30/23 | 10 10/31/23 | 11 11/30/23 | 12 12/31/23 | 2023 Total Proj | 2022 Total Proj | Incr (decr) Var | % Var |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | | | | | | | | | | | | |
| Treatments | 197,955 | 199,253 | 174,625 | 197,908 | 185,149 | 181,899 | 210,159 | 255,718 | 297,951 | 244,067 | 254,876 | 239,703 | 2,639,266 | 2,153,796 | 485,470 | 23% |
| Clinic Products | 3,658 | 3,206 | 3,633 | 3,399 | 3,339 | 3,858 | 4,694 | 5,470 | 4,480 | 4,679 | 4,400 | 4,181 | 48,997 | 40,705 | 8,292 | 20% |
| Digital Marketing | 30,196 | 30,420 | 30,420 | 30,643 | 30,867 | 30,867 | 31,091 | 31,314 | 31,314 | 31,538 | 31,762 | 31,762 | 372,193 | 346,471 | 25,722 | 7% |
| Territory Sales | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 | 82,500 | 7,500 | 9% |
| Amazon, net | 75,900 | 82,800 | 78,200 | 75,900 | 71,300 | 71,300 | 75,900 | 80,500 | 86,250 | 82,800 | 82,800 | 80,500 | 944,150 | 821,000 | 123,150 | 15% |
| eCommerce | 4,822 | 4,822 | 4,822 | 4,822 | 4,822 | 4,822 | 4,822 | 4,822 | 4,822 | 4,822 | 4,822 | 4,822 | 57,863 | 50,316 | 7,547 | 15% |
| AR Collections | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 33,308 | 31,722 | 1,586 | 5% |
| ERC and PPP Funds | | | | | | | | | | | | | 115,000 | 115,000 | (115,000) | -100% |
| **Total Receipts** | 322,807 | 330,776 | 301,976 | 322,948 | 305,753 | 303,022 | 336,942 | 388,100 | 435,094 | 378,182 | 388,936 | 371,243 | 4,185,777 | 3,641,510 | 544,268 | 15% |
| | | | | | | | | | | | | | | | | |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | |
| Product Purchases, Assembly and Shipping | 39,673 | 35,954 | 39,470 | 37,544 | 37,053 | 41,320 | 48,200 | 54,578 | 46,441 | 48,073 | 45,782 | 43,979 | 518,068 | 402,196 | 115,872 | 29% |
| Inventory | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 345,000 | 300,000 | 45,000 | 15% |
| Payroll | 147,237 | 147,237 | 147,237 | 147,237 | 147,237 | 147,237 | 147,237 | 147,237 | 147,237 | 147,237 | 147,237 | 147,237 | 1,766,841 | 1,682,705 | 84,135 | 5% |
| Rent | 4,172 | 4,172 | 4,172 | 4,172 | 4,172 | 4,172 | 4,172 | 4,172 | 4,172 | 4,172 | 4,172 | 4,172 | 50,058 | 48,600 | 1,458 | 3% |
| Other G&A (IT, Utilities, Admin) | 13,125 | 13,125 | 13,125 | 13,125 | 13,125 | 13,125 | 13,650 | 13,650 | 13,650 | 13,650 | 13,650 | 13,650 | 160,650 | 153,000 | 7,650 | 5% |
| Credit Card Processing/Bank Fees | 5,501 | 4,799 | 5,366 | 5,148 | 5,063 | 5,885 | 7,661 | 8,926 | 7,364 | 7,692 | 7,240 | 6,925 | 77,569 | 75,310 | 2,259 | 3% |
| 2021 Outstanding Prof Fees | | | | | | | | | | | | | | 303,000 | (303,000) | |
| Ordinary Course Accounting, Legal & Regulatory | 22,050 | 22,050 | 22,050 | 22,050 | 22,050 | 22,050 | 22,050 | 22,050 | 22,050 | 22,050 | 22,050 | 22,050 | 264,600 | 252,000 | 12,600 | 5% |
| Marketing | 47,777 | 48,003 | 46,013 | 48,015 | 47,105 | 46,843 | 49,247 | 53,049 | 56,461 | 52,228 | 53,222 | 51,996 | 599,961 | 529,963 | 69,998 | 13% |
| Device Deposits | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 | 18,000 | 18,000 | 100% |
| Other (UST Fee, Convenience Claims) | | | | | | | | | | | | | 60,650 | | (60,650) | |
| **Total Disbursements** | 311,285 | 307,090 | 309,183 | 309,040 | 307,554 | 312,381 | 323,967 | 335,411 | 329,124 | 326,852 | 325,102 | 321,759 | 3,818,747 | 3,825,424 | (6,677) | 0% |
| | | | | | | | | | | | | | | | | |
| **Net Cash Flow** | 11,522 | 23,687 | (7,207) | 13,909 | (1,801) | (9,359) | 12,975 | 52,689 | 105,969 | 51,330 | 63,833 | 49,484 | 367,031 | | | |
| | | | | | | | | | | | | | | | | |
| **Beginning Cash Balance** | 176,946 | 188,468 | 212,155 | 204,948 | 218,857 | 217,056 | 207,697 | 220,672 | 273,360 | 379,329 | 351,330 | 415,163 | 176,946 | | | |
| **Ending Cash Balance** | 188,468 | 212,155 | 204,948 | 218,857 | 217,056 | 207,697 | 220,672 | 273,360 | 379,329 | 351,330 | 415,163 | 464,648 | 300,000 | | | |
| | | | | | | | | | | | | | | | | |
| **Minimum Cash Balance** | | | 300,000 | | | 300,000 | | | 300,000 | | | 300,000 | | | | |
| | | | | | | | | | | | | | | | | |
| **Quarterly Larada Amount** | | | 0 | | | 0 | | | 79,329 | | | 164,648 | 243,977 | | | |

**Larada Sciences, Inc.**
**Cash Flow Projection**
**Cash Basis 2024**

| Month Ending: | 1<br>1/31/24 | 2<br>2/28/24 | 3<br>3/30/24 | 4<br>4/29/24 | 5<br>5/30/24 | 6<br>6/29/24 | 7<br>7/30/24 | 8<br>8/30/24 | 9<br>9/29/24 | 10<br>10/30/24 | 11<br>11/29/24 | 12<br>12/30/24 | 2024<br>Total Proj | 2023<br>Total Proj | Incr (decr)<br>Var | % Var |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | | | | | | | | | | | | |
| Treatments | 227,764 | 229,152 | 200,710 | 228,272 | 214,174 | 210,325 | 243,649 | 296,745 | 345,308 | 284,026 | 297,085 | 279,477 | 3,056,688 | 2,639,266 | 417,422 | 16% |
| Clinic Products | 4,209 | 3,687 | 4,176 | 3,920 | 3,863 | 4,461 | 5,442 | 6,347 | 5,193 | 5,445 | 5,129 | 4,875 | 56,745 | 48,997 | 7,749 | 16% |
| Digital Marketing | 31,985 | 32,209 | 32,433 | 32,880 | 33,104 | 33,327 | 33,775 | 33,998 | 34,222 | 34,669 | 34,893 | 34,893 | 402,389 | 372,193 | 30,196 | 8% |
| Territory Sales | 7,500 | 7,500 | 15,000 | 15,000 | 7,500 | 15,000 | 15,000 | 7,500 | 15,000 | 15,000 | 7,500 | 7,500 | 135,000 | 90,000 | 45,000 | 50% |
| Amazon, net | 83,490 | 91,080 | 86,020 | 83,490 | 78,430 | 78,430 | 83,490 | 88,550 | 94,875 | 91,080 | 91,080 | 88,550 | 1,038,565 | 944,150 | 94,415 | 10% |
| eCommerce | 5,304 | 5,304 | 5,304 | 5,304 | 5,304 | 5,304 | 5,304 | 5,304 | 5,304 | 5,304 | 5,304 | 5,304 | 63,650 | 57,863 | 5,786 | 10% |
| AR Collections | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 33,308 | 33,308 | - | 0% |
| ERC and PPP Funds | | | | | | | | | | | | | | | | |
| **Total Receipts** | 363,028 | 371,708 | 346,418 | 371,642 | 345,150 | 349,623 | 389,436 | 441,221 | 502,678 | 438,300 | 443,767 | 423,375 | 4,786,346 | 4,185,777 | 600,568 | 14% |
| | | | | | | | | | | | | | | | | |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | |
| Product Purchases, Assembly and Shipping | 45,997 | 44,031 | 44,934 | 44,936 | 44,148 | 46,361 | 51,339 | 56,730 | 54,153 | 52,825 | 52,057 | 50,441 | 587,953 | 518,068 | 69,885 | 13% |
| Inventory | 31,625 | 31,625 | 31,625 | 31,625 | 31,625 | 31,625 | 31,625 | 31,625 | 31,625 | 31,625 | 31,625 | 31,625 | 379,500 | 345,000 | 34,500 | 10% |
| Payroll | 154,599 | 154,599 | 154,599 | 154,599 | 154,599 | 154,599 | 154,599 | 154,599 | 154,599 | 154,599 | 154,599 | 154,599 | 1,855,183 | 1,766,841 | 88,342 | 5% |
| Rent | 4,297 | 4,297 | 4,297 | 4,297 | 4,297 | 4,297 | 4,297 | 4,297 | 4,297 | 4,297 | 4,297 | 4,297 | 51,560 | 50,058 | 1,502 | 3% |
| Other G&A (IT, Utilities, Admin) | 14,044 | 14,044 | 14,044 | 14,044 | 14,044 | 14,044 | 14,044 | 14,044 | 14,044 | 14,044 | 14,044 | 14,044 | 168,525 | 160,650 | 7,875 | 5% |
| Credit Card Processing/Bank Fees | 5,776 | 5,039 | 5,634 | 5,405 | 5,316 | 6,179 | 8,045 | 9,373 | 7,732 | 8,077 | 7,602 | 7,271 | 81,448 | 77,569 | 3,878 | 5% |
| 2021 Outstanding Prof Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Ordinary Course Accounting, Legal & Regulatory | 23,153 | 23,153 | 23,153 | 23,153 | 23,153 | 23,153 | 23,153 | 23,153 | 23,153 | 23,153 | 23,153 | 23,153 | 277,830 | 264,600 | 13,230 | 5% |
| Device Deposits | 52,700 | 52,933 | 50,755 | 53,224 | 52,206 | 52,016 | 54,950 | 59,361 | 63,405 | 58,696 | 59,872 | 58,449 | 668,565 | 599,961 | 68,604 | 11% |
| Other (UST Fee, Convenience Claims) | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 42,000 | 36,000 | 6,000 | 17% |
| **Total Disbursements** | 335,689 | 333,219 | 332,540 | 334,782 | 332,886 | 335,772 | 345,550 | 356,680 | 356,507 | 350,814 | 350,747 | 347,378 | 4,112,563 | 3,818,747 | 293,816 | 8% |
| | | | | | | | | | | | | | | | | |
| **Net Cash Flow** | 27,339 | 38,488 | 13,878 | 36,860 | 12,264 | 13,851 | 43,886 | 84,541 | 146,171 | 87,486 | 93,020 | 75,998 | 673,783 | 367,031 | | |
| | | | | | | | | | | | | | | | | |
| **Beginning Cash Balance** | 300,000 | 327,339 | 365,828 | 325,000 | 361,860 | 374,124 | 325,000 | 368,886 | 453,427 | 325,000 | 412,486 | 505,506 | 300,000 | | | |
| **Ending Cash Balance** | 327,339 | 365,828 | 379,706 | 361,860 | 374,124 | 387,975 | 368,886 | 453,427 | 599,598 | 412,486 | 505,506 | 581,504 | 325,000 | | | |
| **Minimum Cash Balance** | | | 325,000 | | | 325,000 | | | 325,000 | | | 325,000 | | | | |
| **Quarterly Larada Amount** | | | 54,706 | | | 62,975 | | | 274,598 | | | 256,504 | 648,783 | | | |

**Larada Sciences, Inc.**
**Cash Flow Projection**
**Cash Basis 2025**

| Month Ending: | 1<br>1/31/25 | 2<br>2/28/25 | 3<br>3/31/25 | 4<br>4/30/25 | 5<br>5/31/25 | 6<br>6/30/25 | 7<br>7/31/25 | 8<br>8/31/25 | 9<br>9/30/25 | 10<br>10/31/25 | 11<br>11/30/25 | 12<br>12/31/25 | 2025<br>Total Proj | 2024<br>Total Proj | Incr (decr)<br>Var | % Var |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | | | | | | | | | | | | |
| Treatments | 265,808 | 267,310 | 234,001 | 266,129 | 249,429 | 244,816 | 283,710 | 345,532 | 402,173 | 330,556 | 345,593 | 324,879 | 3,559,935 | 3,056,688 | 503,247 | 16% |
| Clinic Products | 4,911 | 4,301 | 4,868 | 4,570 | 4,498 | 5,192 | 6,337 | 7,391 | 6,048 | 6,337 | 5,966 | 5,667 | 66,087 | 56,745 | 9,342 | 16% |
| Digital Marketing | 35,117 | 35,340 | 35,564 | 36,011 | 36,235 | 36,459 | 36,906 | 37,130 | 37,354 | 37,801 | 38,025 | 38,025 | 439,967 | 402,389 | 37,577 | 9% |
| Territory Sales | 10,000 | 10,000 | 20,000 | 20,000 | 10,000 | 20,000 | 20,000 | 10,000 | 20,000 | 10,000 | 10,000 | 10,000 | 180,000 | 135,000 | 45,000 | 33% |
| Amazon, net | 91,839 | 100,188 | 94,622 | 91,839 | 86,273 | 86,273 | 91,839 | 97,405 | 104,363 | 100,188 | 100,188 | 97,405 | 1,142,422 | 1,038,565 | 103,857 | 10% |
| eCommerce | 5,835 | 5,835 | 5,835 | 5,835 | 5,835 | 5,835 | 5,835 | 5,835 | 5,835 | 5,835 | 5,835 | 5,835 | 70,015 | 63,650 | 6,365 | 10% |
| AR Collections | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 33,308 | 33,308 | - | 0% |
| ERC and PPP Funds | | | | | | | | | | | | | | | | |
| **Total Receipts** | 416,285 | 425,750 | 397,665 | 427,160 | 395,046 | 401,351 | 447,403 | 506,068 | 578,547 | 503,492 | 508,382 | 484,586 | 5,491,733 | 4,786,346 | 705,387 | 15% |
| | | | | | | | | | | | | | | | | |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | |
| Product Purchases, Assembly and Shipping | 53,962 | 53,634 | 52,742 | 53,754 | 53,074 | 53,341 | 55,519 | 58,509 | 59,803 | 57,272 | 57,602 | 56,635 | 665,846 | 587,953 | 77,893 | 13% |
| Inventory | 34,788 | 34,788 | 34,788 | 34,788 | 34,788 | 34,788 | 34,788 | 34,788 | 34,788 | 34,788 | 34,788 | 34,788 | 417,450 | 379,500 | 37,950 | 10% |
| Payroll | 165,420 | 165,420 | 165,420 | 165,420 | 165,420 | 165,420 | 165,420 | 165,420 | 165,420 | 165,420 | 165,420 | 165,420 | 1,985,045 | 1,855,183 | 129,863 | 7% |
| Rent | 4,511 | 4,511 | 4,511 | 4,511 | 4,511 | 4,511 | 4,511 | 4,511 | 4,511 | 4,511 | 4,511 | 4,511 | 54,138 | 51,560 | 2,578 | 5% |
| Other G&A (IT, Utilities, Admin) | 14,746 | 14,746 | 14,746 | 14,746 | 14,746 | 14,746 | 14,746 | 14,746 | 14,746 | 14,746 | 14,746 | 14,746 | 176,951 | 168,525 | 8,426 | 5% |
| Credit Card Processing/Bank Fees | 6,065 | 5,291 | 5,916 | 5,675 | 5,582 | 6,488 | 8,447 | 9,841 | 8,119 | 8,481 | 7,982 | 7,635 | 85,520 | 81,448 | 4,072 | 5% |
| 2021 Outstanding Prof Fees | | | - | | | - | | | - | | | - | | | | |
| Ordinary Course Accounting, Legal & Regulatory | 24,310 | 24,310 | 24,310 | 24,310 | 24,310 | 24,310 | 24,310 | 24,310 | 24,310 | 24,310 | 24,310 | 24,310 | 291,722 | 277,830 | 13,892 | 5% |
| Device Deposits | 59,167 | 59,409 | 56,839 | 59,676 | 58,448 | 58,196 | 61,580 | 66,696 | 71,393 | 65,849 | 67,184 | 65,511 | 749,947 | 668,565 | 81,382 | 12% |
| Other (UST Fee, Convenience Claims) | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 48,000 | 42,000 | 6,000 | 14% |
| **Total Disbursements** | 366,969 | 366,110 | 363,272 | 366,881 | 364,878 | 365,800 | 373,321 | 382,822 | 387,091 | 379,377 | 380,544 | 377,555 | 4,474,619 | 4,112,563 | 362,057 | 9% |
| | | | | | | | | | | | | | | | | |
| **Net Cash Flow** | 49,316 | 59,640 | 34,394 | 60,279 | 30,167 | 35,551 | 74,082 | 123,246 | 191,456 | 124,115 | 127,838 | 107,030 | 1,017,114 | 673,783 | | |
| | | | | | | | | | | | | | | | | |
| **Beginning Cash Balance** | 325,000 | 374,316 | 433,956 | 350,000 | 410,279 | 440,446 | 350,000 | 424,082 | 547,327 | 350,000 | 474,115 | 601,954 | 325,000 | | | |
| **Ending Cash Balance** | 374,316 | 433,956 | 468,350 | 410,279 | 440,446 | 475,997 | 424,082 | 547,327 | 738,783 | 474,115 | 601,954 | 708,984 | 350,000 | | | |
| **Minimum Cash Balance** | | | 350,000 | | | 350,000 | | | 350,000 | | | 350,000 | | | | |
| **Quarterly Larada Amount** | | | 118,350 | | | 125,997 | | | 388,783 | | | 358,984 | 992,114 | | | |

**Larada Sciences, Inc.**
**Cash Flow Projection**
**Cash Basis 2026**

| Month Ending: | 1 1/31/26 | 2 2/28/26 | 3 3/31/26 | 4 4/30/26 | 5 5/31/26 | 6 6/30/26 | 7 7/31/26 | 8 8/31/26 | 9 9/30/26 | 10 10/31/26 | 11 11/30/26 | 12 12/31/26 | 2026 Total Proj | 2025 Total Proj | Incr (decr) Var | % Var |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | | | | | | | | | | | | |
| Treatments | 308,999 | 310,633 | 271,796 | 309,109 | 289,455 | 283,976 | 329,193 | 400,921 | 466,734 | 383,383 | 400,666 | 376,425 | 4,131,289 | 3,559,935 | 571,354 | 16% |
| Clinic Products | 5,710 | 4,998 | 5,655 | 5,309 | 5,220 | 6,023 | 7,353 | 8,575 | 7,018 | 7,350 | 6,917 | 6,566 | 76,693 | 66,087 | 10,606 | 16% |
| Digital Marketing | 38,248 | 38,472 | 38,696 | 39,143 | 39,367 | 39,590 | 40,038 | 40,261 | 40,485 | 40,932 | 41,156 | 41,156 | 477,544 | 439,967 | 37,577 | 9% |
| Territory Sales | 10,000 | 10,000 | 20,000 | 20,000 | 10,000 | 20,000 | 20,000 | 10,000 | 20,000 | 20,000 | 10,000 | 10,000 | 180,000 | 180,000 | - | 0% |
| Amazon, net | 101,023 | 110,207 | 104,084 | 101,023 | 94,900 | 94,900 | 101,023 | 107,146 | 114,799 | 110,207 | 110,207 | 107,146 | 1,256,664 | 1,142,422 | 114,242 | 10% |
| eCommerce | 6,418 | 6,418 | 6,418 | 6,418 | 6,418 | 6,418 | 6,418 | 6,418 | 6,418 | 6,418 | 6,418 | 6,418 | 77,016 | 70,015 | 7,001 | 10% |
| AR Collections | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 33,308 | 33,308 | - | 0% |
| ERC and PPP Funds | | | | | | | | | | | | | | | | |
| **Total Receipts** | 473,174 | 483,503 | 449,425 | 483,777 | 448,136 | 453,683 | 506,800 | 576,097 | 658,230 | 571,065 | 578,139 | 550,486 | 6,232,514 | 5,491,733 | 740,781 | 13% |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | |
| Product Purchases, Assembly and Shipping | 62,604 | 62,275 | 61,154 | 62,384 | 61,577 | 61,816 | 64,278 | 67,705 | 69,377 | 66,346 | 66,769 | 65,648 | 771,934 | 665,846 | 106,087 | 16% |
| Inventory | 38,266 | 38,266 | 38,266 | 38,266 | 38,266 | 38,266 | 38,266 | 38,266 | 38,266 | 38,266 | 38,266 | 38,266 | 459,195 | 417,450 | 41,745 | 10% |
| Payroll | 177,000 | 177,000 | 177,000 | 177,000 | 177,000 | 177,000 | 177,000 | 177,000 | 177,000 | 177,000 | 177,000 | 177,000 | 2,123,999 | 1,985,045 | 138,953 | 7% |
| Rent | 4,737 | 4,737 | 4,737 | 4,737 | 4,737 | 4,737 | 4,737 | 4,737 | 4,737 | 4,737 | 4,737 | 4,737 | 56,845 | 54,138 | 2,707 | 5% |
| Other G&A (IT, Utilities, Admin) | 15,483 | 15,483 | 15,483 | 15,483 | 15,483 | 15,483 | 15,483 | 15,483 | 15,483 | 15,483 | 15,483 | 15,483 | 185,799 | 176,951 | 8,848 | 5% |
| Credit Card Processing/Bank Fees | 6,368 | 5,555 | 6,212 | 5,959 | 5,861 | 6,812 | 8,869 | 10,333 | 8,525 | 8,905 | 8,381 | 8,016 | 89,796 | 85,520 | 4,276 | 5% |
| 2021 Outstanding Prof Fees | | | | | | | | | | | | | - | - | - | |
| Ordinary Course Accounting, Legal & Regulatory | 26,012 | 26,012 | 26,012 | 26,012 | 26,012 | 26,012 | 26,012 | 26,012 | 26,012 | 26,012 | 26,012 | 26,012 | 312,142 | 291,722 | 20,421 | 7% |
| Device Deposits | 66,220 | 66,473 | 63,456 | 66,712 | 65,245 | 64,923 | 68,819 | 74,735 | 80,173 | 73,680 | 75,198 | 73,239 | 838,874 | 749,947 | 88,927 | 12% |
| Other (UST Fee, Convenience Claims) | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 54,000 | 48,000 | 6,000 | 13% |
| **Total Disbursements** | 401,190 | 400,302 | 396,819 | 401,054 | 398,681 | 399,550 | 407,964 | 418,772 | 424,073 | 414,930 | 416,346 | 412,902 | 4,892,583 | 4,474,619 | 417,964 | 9% |
| **Net Cash Flow** | 71,983 | 83,201 | 52,605 | 82,724 | 49,454 | 54,132 | 98,836 | 157,325 | 234,157 | 156,135 | 161,793 | 137,584 | 1,339,931 | 1,017,114 | | |
| **Beginning Cash Balance** | 350,000 | 421,983 | 505,184 | 375,000 | 457,724 | 507,178 | 375,000 | 473,836 | 631,161 | 375,000 | 531,135 | 692,929 | 350,000 | | | |
| **Ending Cash Balance** | 421,983 | 505,184 | 557,789 | 457,724 | 507,178 | 561,311 | 473,836 | 631,161 | 865,317 | 531,135 | 692,929 | 830,513 | 375,000 | | | |
| **Minimum Cash Balance** | | | 375,000 | | | 375,000 | | | 375,000 | | | 375,000 | | | | |
| **Quarterly Larada Amount** | | | 182,789 | | | 186,311 | | | 490,317 | | | 455,513 | 1,314,931 | | | |

**Larada Sciences, Inc.**
**Cash Flow Projection**
**Cash Basis 2027**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 2027 | 2026 | Incr (decr) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month Ending: | 1/31/27 | 2/28/27 | 3/31/27 | 4/30/27 | 5/31/27 | 6/30/27 | 7/31/27 | 8/31/27 | 9/30/27 | 10/31/27 | 11/30/27 | 12/31/27 | Total Proj | Total Proj | Var | % Var |
| **Cash Receipts:** | | | | | | | | | | | | | | | | |
| Treatments | 358,036 | 359,818 | 314,707 | 357,907 | 334,898 | 328,434 | 380,831 | 463,806 | 540,032 | 443,359 | 463,192 | 434,947 | 4,779,967 | 4,131,289 | 648,678 | 16% |
| Clinic Products | 6,616 | 5,789 | 6,547 | 6,147 | 6,040 | 6,966 | 8,507 | 9,920 | 8,121 | 8,499 | 7,997 | 7,587 | 88,734 | 76,693 | 12,041 | 16% |
| Digital Marketing | 41,380 | 41,603 | 41,827 | 42,274 | 42,498 | 42,722 | 43,169 | 43,393 | 43,616 | 44,064 | 44,287 | 44,287 | 515,121 | 477,544 | 37,577 | 8% |
| Territory Sales | 10,000 | 10,000 | 20,000 | 20,000 | 10,000 | 20,000 | 20,000 | 10,000 | 20,000 | 20,000 | 10,000 | 10,000 | 180,000 | 180,000 | - | 0% |
| Amazon, net | 111,125 | 121,227 | 114,493 | 111,125 | 104,390 | 104,390 | 111,125 | 117,860 | 126,279 | 121,227 | 121,227 | 117,860 | 1,382,330 | 1,256,664 | 125,666 | 10% |
| eCommerce | 7,060 | 7,060 | 7,060 | 7,060 | 7,060 | 7,060 | 7,060 | 7,060 | 7,060 | 7,060 | 7,060 | 7,060 | 84,718 | 77,016 | 7,702 | 10% |
| AR Collections | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 33,308 | 33,308 | - | |
| ERC and PPP Funds | | | | | | | | | | | | | - | - | | |
| **Total Receipts** | 536,992 | 548,273 | 507,410 | 547,288 | 507,662 | 512,348 | 573,467 | 654,814 | 747,883 | 646,985 | 656,539 | 624,517 | 7,064,178 | 6,232,514 | 831,664 | 13% |
| | | | | | | | | | | | | | | | | |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | |
| Product Purchases, Assembly and Shipping | 72,534 | 72,205 | 70,817 | 72,301 | 71,348 | 71,553 | 74,341 | 78,272 | 80,382 | 76,774 | 77,304 | 76,006 | 893,836 | 771,934 | 121,902 | 16% |
| Inventory | 42,093 | 42,093 | 42,093 | 42,093 | 42,093 | 42,093 | 42,093 | 42,093 | 42,093 | 42,093 | 42,093 | 42,093 | 505,115 | 459,195 | 45,920 | 10% |
| Payroll | 189,390 | 189,390 | 189,390 | 189,390 | 189,390 | 189,390 | 189,390 | 189,390 | 189,390 | 189,390 | 189,390 | 189,390 | 2,272,678 | 2,123,999 | 148,680 | 7% |
| Rent | 4,974 | 4,974 | 4,974 | 4,974 | 4,974 | 4,974 | 4,974 | 4,974 | 4,974 | 4,974 | 4,974 | 4,974 | 59,687 | 56,845 | 2,842 | 5% |
| Other G&A (IT, Utilities, Admin) | 16,257 | 16,257 | 16,257 | 16,257 | 16,257 | 16,257 | 16,257 | 16,257 | 16,257 | 16,257 | 16,257 | 16,257 | 195,089 | 185,799 | 9,290 | 5% |
| Credit Card Processing/Bank Fees | 6,686 | 5,833 | 6,522 | 6,257 | 6,154 | 7,153 | 9,313 | 10,850 | 8,951 | 9,350 | 8,800 | 8,417 | 94,286 | 89,796 | 4,490 | 5% |
| 2021 Outstanding Prof Fees | | | | | | | | | | | | | - | - | | |
| Ordinary Course Accounting, Legal & Regulatory | 27,833 | 27,833 | 27,833 | 27,833 | 27,833 | 27,833 | 27,833 | 27,833 | 27,833 | 27,833 | 27,833 | 27,833 | 333,992 | 312,142 | 21,850 | 7% |
| Marketing | 73,933 | 74,198 | 70,674 | 74,406 | 72,668 | 72,266 | 76,742 | 83,567 | 89,847 | 82,277 | 84,000 | 81,718 | 936,295 | 838,874 | 97,421 | 12% |
| Device Deposits | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 | 54,000 | 6,000 | 11% |
| Other (UST Fee, Convenience Claims) | | | | | | | | | | | | | - | - | | |
| **Total Disbursements** | 438,700 | 437,783 | 433,560 | 438,510 | 435,716 | 436,519 | 445,942 | 458,235 | 464,726 | 453,948 | 455,651 | 451,688 | 5,350,978 | 4,892,583 | 458,394 | 9% |
| | | | | | | | | | | | | | | | | |
| **Net Cash Flow** | 98,292 | 110,490 | 73,850 | 108,778 | 71,946 | 75,829 | 127,525 | 196,579 | 283,157 | 193,037 | 200,888 | 172,829 | 1,713,200 | 1,339,931 | | |
| | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 375,000 | 473,292 | 583,782 | 425,000 | 533,778 | 605,724 | 425,000 | 552,525 | 749,104 | 425,000 | 618,037 | 818,925 | 375,000 | | | |
| Ending Cash Balance | 473,292 | 583,782 | 657,633 | 533,778 | 605,724 | 681,553 | 552,525 | 749,104 | 1,032,262 | 618,037 | 818,925 | 991,754 | 425,000 | | | |
| Minimum Cash Balance | | | 425,000 | | | 425,000 | | | 425,000 | | | 425,000 | 425,000 | | | |
| Quarterly Larada Amount | | | 232,633 | | | 256,553 | | | 607,262 | | | 566,754 | 1,663,200 | | | |

**Larada Sciences, Inc.**
**Cash Flow Projection**
**Cash Basis 2028**

| Month Ending: | 1 1/31/28 | 2 2/28/28 | 3 3/30/28 | 4 4/29/28 | 5 5/30/28 | 6 6/29/28 | 7 7/30/28 | 8 8/30/28 | 9 9/29/28 | 10 10/30/28 | 11 11/29/28 | 12 12/30/28 | 2028 Total Proj | 2027 Total Proj | Incr (decr) Var | % Var |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | | | | | | | | | | | | |
| Treatments | 413,710 | 415,659 | 363,426 | 413,308 | 386,491 | 378,910 | 439,457 | 535,201 | 623,250 | 511,452 | 534,180 | 501,389 | 5,516,433 | 4,779,967 | 736,466 | 15% |
| Clinic Products | 7,644 | 6,687 | 7,561 | 7,098 | 6,970 | 8,036 | 9,816 | 11,447 | 9,372 | 9,805 | 9,222 | 8,746 | 102,405 | 88,734 | 13,671 | 15% |
| Digital Marketing | 44,511 | 44,735 | 44,958 | 45,406 | 45,629 | 45,853 | 46,300 | 46,524 | 46,748 | 47,195 | 47,419 | 47,419 | 552,698 | 515,121 | 37,577 | 7% |
| Territory Sales | 10,000 | 10,000 | 20,000 | 20,000 | 10,000 | 20,000 | 20,000 | 10,000 | 20,000 | 20,000 | 10,000 | 10,000 | 180,000 | 180,000 | - | 0% |
| Amazon, net | 122,238 | 133,350 | 125,942 | 122,238 | 114,829 | 114,829 | 122,238 | 129,646 | 138,906 | 133,350 | 133,350 | 129,646 | 1,520,563 | 1,382,330 | 138,233 | 10% |
| eCommerce | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 93,190 | 84,718 | 8,472 | 10% |
| AR Collections | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 2,776 | 33,308 | 33,308 | - | 0% |
| ERC and PPP Funds | | | | | | | | | | | | | | | | |
| **Total Receipts** | 608,645 | 620,973 | 572,429 | 618,591 | 574,462 | 578,170 | 648,353 | 743,360 | 848,818 | 732,343 | 744,713 | 707,741 | 7,998,597 | 7,064,178 | 934,419 | 13% |
| | | | | | | | | | | | | | | | | |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | |
| Product Purchases, Assembly and Shipping | 83,942 | 83,613 | 81,916 | 83,693 | 82,571 | 82,735 | 85,899 | 90,410 | 93,029 | 88,753 | 89,408 | 87,905 | 1,033,873 | 893,836 | 140,037 | 16% |
| Inventory | 46,302 | 46,302 | 46,302 | 46,302 | 46,302 | 46,302 | 46,302 | 46,302 | 46,302 | 46,302 | 46,302 | 46,302 | 555,626 | 505,115 | 50,511 | 10% |
| Payroll | 202,647 | 202,647 | 202,647 | 202,647 | 202,647 | 202,647 | 202,647 | 202,647 | 202,647 | 202,647 | 202,647 | 202,647 | 2,431,766 | 2,272,678 | 159,087 | 7% |
| Rent | 5,223 | 5,223 | 5,223 | 5,223 | 5,223 | 5,223 | 5,223 | 5,223 | 5,223 | 5,223 | 5,223 | 5,223 | 62,671 | 59,687 | 2,984 | 5% |
| Other G&A (IT, Utilities, Admin) | 17,070 | 17,070 | 17,070 | 17,070 | 17,070 | 17,070 | 17,070 | 17,070 | 17,070 | 17,070 | 17,070 | 17,070 | 204,843 | 195,089 | 9,754 | 5% |
| Credit Card Processing/Bank Fees | 7,020 | 6,125 | 6,848 | 6,570 | 6,461 | 7,511 | 9,778 | 11,392 | 9,398 | 9,817 | 9,240 | 8,838 | 99,000 | 94,286 | 4,714 | 5% |
| 2021 Outstanding Prof Fees | | | | | | | | | | | | | - | | | |
| Ordinary Course Accounting, Legal & Regulatory | 29,781 | 29,781 | 29,781 | 29,781 | 29,781 | 29,781 | 29,781 | 29,781 | 29,781 | 29,781 | 29,781 | 29,781 | 357,371 | 333,992 | 23,379 | 7% |
| Marketing | 82,388 | 82,666 | 78,567 | 82,839 | 80,793 | 80,301 | 85,435 | 93,292 | 100,527 | 91,736 | 93,693 | 91,043 | 1,043,280 | 936,295 | 106,985 | 11% |
| Device Deposits | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 66,000 | 60,000 | 6,000 | 10% |
| Other (UST Fee, Convenience Claims) | | | | | | | | | | | | | - | | | |
| **Total Disbursements** | 479,873 | 478,927 | 473,854 | 479,625 | 476,348 | 477,070 | 487,635 | 501,617 | 509,477 | 496,829 | 498,864 | 494,310 | 5,854,431 | 5,350,978 | 503,453 | 9% |
| | | | | | | | | | | | | | | | | |
| **Net Cash Flow** | 128,771 | 142,046 | 98,574 | 138,966 | 98,114 | 101,100 | 160,717 | 241,743 | 339,340 | 235,514 | 245,849 | 213,432 | 2,144,167 | 1,713,200 | | |
| | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 425,000 | 553,771 | 695,817 | 475,000 | 613,966 | 712,080 | 475,000 | 635,717 | 877,461 | 475,000 | 710,514 | 956,363 | 425,000 | | | |
| Ending Cash Balance | 553,771 | 695,817 | 794,391 | 613,966 | 712,080 | 813,180 | 635,717 | 877,461 | 1,216,801 | 710,514 | 956,363 | 1,169,794 | 475,000 | | | |
| Minimum Cash Balance | | | 475,000 | | | 475,000 | | | 475,000 | | | 475,000 | | | | |
| Quarterly Larada Amount | | | 319,391 | | | 338,180 | | | 741,801 | | | 694,794 | 2,094,167 | | | |

**Larada Sciences, Inc.**
**Cash Flow Projection Assumptions Support**
**Clinics Open 2014 - 2028 and Franchise Territory Fees 2017 - 2028**

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2014 | 4 | 4 | 4 | 6 | 6 | 7 | 14 | 14 | 20 | 22 | 25 | 27 |
| 2015 | 31 | 34 | 37 | 39 | 42 | 49 | 54 | 58 | 68 | 71 | 73 | 75 |
| 2016 | 84 | 86 | 90 | 95 | 101 | 108 | 112 | 115 | 124 | 127 | 133 | 136 |
| 2017 | 159 | 149 | 145 | 150 | 155 | 157 | 165 | 170 | 179 | 181 | 186 | 185 |
| 2018 | 194 | 193 | 194 | 195 | 196 | 200 | 202 | 205 | 206 | 203 | 201 | 202 |
| 2019 | 203 | 206 | 210 | 214 | 215 | 216 | 220 | 217 | 207 | 203 | 203 | 203 |
| 2020 | 201 | 202 | 199 | 199 | 198 | 199 | 199 | 200 | 197 | 199 | 198 | 196 |
| 2021 | 192 | 180 | 175 | 166 | 164 | 160 | 156 | 152 | 146 | 140 | 133 | 128 |
| 2022 | 126 | 128 | 125 | 126 | 127 | 128 | 129 | 130 | 131 | 132 | 133 | 134 |
| 2023 | 135 | 136 | 136 | 137 | 138 | 138 | 139 | 140 | 140 | 141 | 142 | 142 |
| 2024 | 143 | 144 | 145 | 147 | 148 | 149 | 151 | 152 | 153 | 155 | 156 | 156 |
| 2025 | 157 | 158 | 159 | 161 | 162 | 163 | 165 | 166 | 167 | 169 | 170 | 170 |
| 2026 | 171 | 172 | 173 | 175 | 176 | 177 | 179 | 180 | 181 | 183 | 184 | 184 |
| 2027 | 185 | 186 | 187 | 189 | 190 | 191 | 193 | 194 | 195 | 197 | 198 | 198 |
| 2028 | 199 | 200 | 201 | 203 | 204 | 205 | 207 | 208 | 209 | 211 | 212 | 212 |

**Notes:**

1. Actual clinics open 2014 -2020; actual plus estimated for 2021 based on reported thru May; forecasted 2022-2028)

2. Typically there is one clinic per territory

3. Standard development period from sale of territory to clinic opening is 6 months; extensions granted for multi-territory purchases

4. Average franchise territory sales price 2017-2019 was $32,000

5. Average franchise territory sales price in 2020 was $30,000

6. Average franchise territory sales price for 2021-2028 is forecasted at $25,000

**Larada Sciences, Inc.**
**Cash Flow Projection Assumptions Support**
Treatments 2014 - 2028

| Treatments | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total | YOY % | Clinics | Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | 1,719 | 1,355 | 1,356 | 1,377 | 1,409 | 1,648 | 2,274 | 2,733 | 2,193 | 3,121 | 2,177 | 2,153 | 23,515 | | 27 | 73 |
| 2015 | 2,496 | 2,047 | 2,370 | 2,581 | 2,220 | 2,553 | 3,148 | 5,377 | 3,964 | 4,290 | 3,786 | 3,947 | 38,779 | 65% | 75 | 43 |
| 2016 | 4,421 | 4,484 | 5,000 | 4,835 | 4,487 | 5,177 | 6,334 | 8,041 | 7,101 | 6,881 | 7,101 | 6,807 | 70,669 | 82% | 136 | 43 |
| 2017 | 7,746 | 6,715 | 7,578 | 7,408 | 7,031 | 8,310 | 10,204 | 11,833 | 9,649 | 9,998 | 9,680 | 8,528 | 104,680 | 48% | 185 | 47 |
| 2018 | 9,341 | 8,302 | 9,497 | 8,608 | 8,539 | 10,102 | 12,162 | 13,102 | 11,002 | 11,117 | 10,337 | 9,985 | 122,094 | 17% | 202 | 50 |
| 2019 | 10,830 | 9,000 | 10,474 | 9,089 | 9,472 | 10,682 | 12,724 | 13,560 | 10,816 | 11,384 | 10,466 | 10,145 | 128,642 | 5% | 203 | 53 |
| 2020 | 11,798 | 10,164 | 7,107 | 2,839 | 5,093 | 5,998 | 6,152 | 6,615 | 5,573 | 5,461 | 4,572 | 3,883 | 75,255 | -42% | 196 | 32 |
| 2021 | 5,141 | 4,270 | 7,109 | 6,069 | 4,800 | 5,200 | 5,918 | 6,806 | 5,478 | 5,482 | 5,083 | 4,799 | 66,155 | -12% | 128 | 43 |
| 2022 | 5,616 | 4,899 | 5,478 | 5,255 | 5,169 | 6,008 | 7,822 | 9,113 | 7,518 | 7,853 | 7,391 | 7,070 | 79,192 | 20% | 134 | 49 |
| 2023 | 7,116 | 6,237 | 7,068 | 6,612 | 6,496 | 7,506 | 9,133 | 10,641 | 8,717 | 9,103 | 8,561 | 8,134 | 95,324 | 20% | 142 | 56 |
| 2024 | 8,184 | 7,168 | 8,153 | 7,649 | 7,512 | 8,702 | 10,598 | 12,332 | 10,144 | 10,610 | 9,981 | 9,493 | 110,526 | 16% | 156 | 59 |
| 2025 | 9,547 | 8,357 | 9,505 | 8,908 | 8,743 | 10,133 | 12,340 | 14,363 | 11,806 | 12,343 | 11,603 | 11,036 | 128,683 | 16% | 170 | 63 |
| 2026 | 11,094 | 9,707 | 11,040 | 10,338 | 10,142 | 11,757 | 14,319 | 16,669 | 13,692 | 14,309 | 13,444 | 12,787 | 149,297 | 16% | 184 | 68 |
| 2027 | 12,851 | 11,240 | 12,782 | 11,961 | 11,730 | 13,601 | 16,564 | 19,287 | 15,834 | 16,543 | 15,534 | 14,775 | 172,701 | 16% | 198 | 73 |
| 2028 | 14,845 | 12,979 | 14,761 | 13,803 | 13,532 | 15,695 | 19,114 | 22,259 | 18,266 | 19,078 | 17,907 | 17,033 | 199,273 | 15% | 212 | 78 |

Notes:
1. Actual treatments 2014 -2020; actual plus estimated for 2021 based on reported thru May; forecasted 2022-2028)
2. Actual treatments Jan 2021 - May 2021 as reported by clinic owners through June 15, 2021
3. Forecasted treatments from June 2021 - Dec 2028
4. Seasonality by month based on historical YOY seasonality table using 2014 - 2020 actual treatments
5. Forecasted treatments are a function of both the number of clinics open and the number of years open to ramp up operations and sales
6. Increased average treatments per clinic across the network from 2021 - 2028 is a reflection of weeding out the underperformers
   and initiatives put in place in 2020 to support Clinic Success staff, sharing KPI's and clinic data between franchisees, training on best practices and more
7. Treatment revenue is forecasted at $28 per treatment and is based on historical per treatment revenue realized

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT "D"**

[Larada's Analysis of Potentially Preferential Payments]

**Larada Sciences, Inc.**

**Preference Analysis**

**90-day pre-filing payments to vendors and TTM payments to insiders:**

| Vendor/Insider | Payment Dates | Non-preference Payment Amount | Rationale for Non-preference | Preference Amount |
|---|---|---|---|---|
| Claire Roberts | 3/16/20-3/15/21 | 137,495.62 | Ordinary course (salary) | |
| Yuri Pikover | 3/16/20-3/15/21 | 120,500.00 | Ordinary course (salary) | |
| Brook & Whittle LTD | 01/15/2021 | 3,996.70 | Ordinary course | |
| Brook & Whittle LTD | 03/19/2021 | 5,996.81 | New Value | |
| Capital Premium Financing | 01/05/2021 | 1,516.53 | Ordinary course | |
| Capital Premium Financing | 02/01/2021 | 3,612.31 | Ordinary course | |
| Capital Premium Financing | 02/05/2021 | 1,516.53 | Ordinary course | |
| Capital Premium Financing | 03/02/2021 | 3,612.31 | Ordinary course | |
| Capital Premium Financing | 03/04/2021 | 1,516.53 | Ordinary course | |
| Chasebrook Company | 01/29/2021 | 2,715.00 | Ordinary course | |
| Chasebrook Company | 02/10/2021 | 2,773.95 | Ordinary course | |
| Chasebrook Company | 03/05/2021 | 5,547.90 | New Value | |
| CHT USA | 12/21/2020 | 12,700.80 | Ordinary course | |
| CHT USA | 01/29/2021 | 12,700.80 | Ordinary course | |
| CHT USA | 02/03/2021 | 12,700.80 | Ordinary course | |
| CHT USA | 03/19/2021 | 12,700.00 | Ordinary course | |
| ComDel Innovation Inc. | 12/22/2020 | 2,500.00 | Ordinary course | |
| ComDel Innovation Inc. | 12/30/2020 | 2,500.00 | Ordinary course | |
| ComDel Innovation Inc. | 01/15/2021 | 2,500.00 | Ordinary course | |
| ComDel Innovation Inc. | 01/29/2021 | 2,500.00 | Ordinary course | |
| ComDel Innovation Inc. | 02/02/2021 | 2,500.00 | Ordinary course | |
| ComDel Innovation Inc. | 02/09/2021 | 2,500.00 | Ordinary course | |
| ComDel Innovation Inc. | 02/19/2021 | 2,500.00 | Ordinary course | |
| ComDel Innovation Inc. | 02/26/2021 | 2,500.00 | Ordinary course | |
| ComDel Innovation Inc. | 03/05/2021 | 2,500.00 | Ordinary course | |
| ComDel Innovation Inc. | 03/12/2021 | 2,500.00 | Ordinary course | |
| ComDel Innovation Inc. | 03/19/2021 | 2,500.00 | Ordinary course | |
| Elite OPS | 12/23/2020 | 1,197.91 | Ordinary course | |
| Elite OPS | 12/30/2020 | 1,697.57 | Ordinary course | |
| Elite OPS | 01/08/2021 | 264.57 | Ordinary course | |
| Elite OPS | 01/15/2021 | 2,713.22 | Ordinary course | |
| Elite OPS | 01/16/2021 | 519.70 | Ordinary course | |
| Elite OPS | 01/29/2021 | 885.92 | Ordinary course | |
| Elite OPS | 02/05/2021 | 2,150.57 | Ordinary course | |
| Elite OPS | 02/11/2021 | 3,254.63 | Ordinary course | |
| Elite OPS | 02/19/2021 | 2,176.34 | Ordinary course | |
| Elite OPS | 02/26/2021 | 2,822.48 | Ordinary course | |
| Elite OPS | 03/05/2021 | 881.13 | Ordinary course | |
| Elite OPS | 03/12/2021 | 498.26 | Ordinary course | |
| Elite OPS | 03/19/2021 | | | 5,018.99 |
| Elite OPS | 03/19/2021 | | | 6,500.00 |
| Embassy Freight Systems USA, Inc | 01/26/2021 | 1,573.14 | Ordinary course | |
| Embassy Freight Systems USA, Inc | 01/29/2021 | 981.00 | Ordinary course | |
| Embassy Freight Systems USA, Inc | 02/03/2021 | 1,178.04 | Ordinary course | |
| Fidelitech | 01/15/2021 | 3,996.70 | Ordinary course | |
| Fidelitech | 02/11/2021 | 4,774.92 | Ordinary course | |
| Fidelitech | 03/12/2021 | 4,698.44 | Ordinary course | |
| Fidelitech | 03/11/2021 | 1,844.54 | Ordinary course | |
| Ginesis | 12/23/2020 | 3,500.00 | Ordinary course | |
| Ginesis | 12/30/2020 | 3,500.00 | Ordinary course | |
| Ginesis | 01/06/2021 | 3,500.00 | Ordinary course | |

| Vendor/Insider | Payment Dates | Non-preference Payment Amount | Rationale for Non-preference | Preference Amount |
|---|---|---|---|---|
| Ginesis | 01/15/2021 | 3,500.00 | Ordinary course | |
| Ginesis | 01/22/2021 | 3,500.00 | Ordinary course | |
| Ginesis | 01/29/2021 | 3,500.00 | Ordinary course | |
| Ginesis | 02/24/2021 | 5,000.00 | Ordinary course | |
| Ginesis | 03/03/2021 | 7,500.00 | Ordinary course | |
| Ginesis | 03/12/2021 | 5,000.00 | Ordinary course | |
| Ginesis | 03/17/2021 | 5,000.00 | Ordinary course | |
| Ginesis | 03/19/2021 | | | 35,635.44 |
| Ginesis | 02/09/2021 | 3,500.00 | Ordinary course | |
| Ginesis | 02/11/2021 | 3,500.00 | Ordinary course | |
| Ginesis | 02/19/2021 | 3,500.00 | Ordinary course | |
| Ginesis | 03/19/2021 | 6,232.23 | Ordinary course | |
| Lewis Brisbois | 02/09/2021 | 10,272.50 | Ordinary course | |
| Lewis Brisbois | 03/04/2021 | 8,879.53 | Ordinary course | |
| Lewis Brisbois | 03/19/2021 | 10,000.00 | Retainer | |
| Millennium Systems International | 12/23/2020 | 4,125.00 | Ordinary course | |
| Millennium Systems International | 12/30/2020 | 4,120.00 | Ordinary course | |
| Que Content Kyuzo Corporation | 03/15/2021 | 2,500.00 | Ordinary course | |
| Que Content Kyuzo Corporation | 03/15/2021 | 2,500.00 | Ordinary course | |
| Que Content Kyuzo Corporation | 03/15/2021 | 2,500.00 | Ordinary course | |
| Que Content Kyuzo Corporation | 03/19/2021 | 2,500.00 | Ordinary course | |
| Sentry West Insurance Services | 12/30/2020 | 3,612.31 | Ordinary course | |
| Sentry West Insurance Services | 02/11/2021 | 7,944.00 | Ordinary course | |
| Stephen Gould Corporation | 01/26/2021 | 15,750.00 | Ordinary course | |
| Unishippers | 12/23/2020 | 209.63 | Ordinary course | |
| Unishippers | 12/30/2020 | 135.97 | Ordinary course | |
| Unishippers | 01/08/2021 | 604.75 | Ordinary course | |
| Unishippers | 01/15/2021 | 644.99 | Ordinary course | |
| Unishippers | 01/16/2021 | 206.65 | Ordinary course | |
| Unishippers | 01/29/2021 | 216.79 | Ordinary course | |
| Unishippers | 02/05/2021 | 626.90 | Ordinary course | |
| Unishippers | 02/11/2021 | 639.96 | Ordinary course | |
| Unishippers | 02/19/2021 | 269.96 | Ordinary course | |
| Unishippers | 02/26/2021 | 304.01 | Ordinary course | |
| Unishippers | 03/04/2021 | 238.16 | Ordinary course | |
| Unishippers | 03/12/2021 | 496.30 | Ordinary course | |
| Unishippers | 03/19/2021 | 939.36 | Ordinary course | |
| Unishippers | 12/23/2020 | 1,238.59 | Ordinary course | |
| Unishippers | 12/30/2020 | 392.86 | Ordinary course | |
| Unishippers | 01/08/2021 | 249.60 | Ordinary course | |
| Unishippers | 01/15/2021 | 1,131.79 | Ordinary course | |
| Unishippers | 01/16/2021 | 546.48 | Ordinary course | |
| Unishippers | 01/29/2021 | 330.02 | Ordinary course | |
| Unishippers | 02/05/2021 | 226.06 | Ordinary course | |
| Unishippers | 02/11/2021 | 194.28 | Ordinary course | |
| Unishippers | 02/19/2021 | 134.96 | Ordinary course | |
| Unishippers | 02/26/2021 | 195.99 | Ordinary course | |
| Unishippers | 03/04/2021 | 57.73 | Ordinary course | |
| Unishippers | 03/12/2021 | 392.22 | Ordinary course | |
| Unishippers | 03/19/2021 | 895.96 | Ordinary course | |
| Viko Industries LTD. | 12/23/2020 | 7,160.00 | Prepayment | |
| Viko Industries LTD. | 03/19/2021 | 8,530.00 | Prepayment | |
| WSRP, LLC | 02/15/2021 | 20,112.10 | Ordinary course | |
| WSRP, LLC | 03/05/2021 | 8,000.00 | Ordinary course | |
| WSRP, LLC | 03/17/2021 | 13,000.00 | Ordinary course | |
| WSRP, LLC | 03/19/2021 | 13,000.00 | Ordinary course | |

| Vendor/Insider | Payment Dates | Non-preference Payment Amount | Rationale for Non-preference | Preference Amount |
|---|---|---|---|---|
| Zolkin Talerico LLP | 03/19/2021 | 25,000.00 | Retainer | |
| Google Adwords | 12/28/2020 | 500.00 | Ordinary course | |
| Google Adwords | 01/04/2021 | 500.00 | Ordinary course | |
| Google Adwords | 01/07/2021 | 500.00 | Ordinary course | |
| Google Adwords | 01/12/2021 | 500.00 | Ordinary course | |
| Google Adwords | 01/19/2021 | 500.00 | Ordinary course | |
| Google Adwords | 01/25/2021 | 500.00 | Ordinary course | |
| Google Adwords | 02/01/2021 | 500.00 | Ordinary course | |
| Google Adwords | 02/08/2021 | 500.00 | Ordinary course | |
| Google Adwords | 02/12/2021 | 500.00 | Ordinary course | |
| Google Adwords | 02/18/2021 | 500.00 | Ordinary course | |
| Google Adwords | 02/23/2021 | 500.00 | Ordinary course | |
| Google Adwords | 03/01/2021 | 500.00 | Ordinary course | |
| Google Adwords | 03/08/2021 | 500.00 | Ordinary course | |
| Google Adwords | 03/15/2021 | 500.00 | Ordinary course | |
| Merchant Service | 02/24/2021 | 470.00 | Ordinary course | |
| Merchant Service | 03/17/2021 | 540.00 | Ordinary course | |
| Merchant Service | 01/04/2021 | 4,790.91 | Ordinary course | |
| Merchant Service | 02/02/2021 | 5,076.21 | Ordinary course | |
| Merchant Service | 03/02/2021 | 4,418.70 | Ordinary course | |
| Call Tracking | 01/02/2021 | 273.64 | Ordinary course | |
| Call Tracking | 01/02/2021 | 253.40 | Ordinary course | |
| Call Tracking | 01/04/2021 | 281.83 | Ordinary course | |
| Call Tracking | 01/05/2021 | 263.08 | Ordinary course | |
| Call Tracking | 01/08/2021 | 223.38 | Ordinary course | |
| Call Tracking | 01/09/2021 | 150.02 | Ordinary course | |
| Call Tracking | 01/12/2021 | 150.01 | Ordinary course | |
| Call Tracking | 01/15/2021 | 150.00 | Ordinary course | |
| Call Tracking | 01/19/2021 | 150.33 | Ordinary course | |
| Call Tracking | 01/20/2021 | 155.97 | Ordinary course | |
| Call Tracking | 01/22/2021 | 150.99 | Ordinary course | |
| Call Tracking | 02/01/2021 | 346.72 | Ordinary course | |
| Call Tracking | 02/01/2021 | 332.77 | Ordinary course | |
| Call Tracking | 01/25/2021 | 150.05 | Ordinary course | |
| Call Tracking | 01/27/2021 | 154.36 | Ordinary course | |
| Call Tracking | 01/29/2021 | 150.30 | Ordinary course | |
| Call Tracking | 02/05/2021 | 267.64 | Ordinary course | |
| Call Tracking | 02/03/2021 | 231.28 | Ordinary course | |
| Call Tracking | 02/08/2021 | 225.00 | Ordinary course | |
| Call Tracking | 02/10/2021 | 150.93 | Ordinary course | |
| Call Tracking | 02/13/2021 | 162.85 | Ordinary course | |
| Call Tracking | 02/16/2021 | 150.20 | Ordinary course | |
| Call Tracking | 02/19/2021 | 150.01 | Ordinary course | |
| Call Tracking | 02/22/2021 | 150.02 | Ordinary course | |
| Call Tracking | 02/24/2021 | 189.76 | Ordinary course | |
| Call Tracking | 02/26/2021 | 150.07 | Ordinary course | |
| Call Tracking | 03/01/2021 | 150.08 | Ordinary course | |
| Call Tracking | 03/01/2021 | 256.61 | Ordinary course | |
| Call Tracking | 03/01/2021 | 253.32 | Ordinary course | |
| Call Tracking | 03/02/2021 | 154.94 | Ordinary course | |
| Call Tracking | 03/04/2021 | 245.67 | Ordinary course | |
| Call Tracking | 03/05/2021 | 229.28 | Ordinary course | |
| Call Tracking | 03/08/2021 | 162.75 | Ordinary course | |
| Call Tracking | 03/10/2021 | 229.36 | Ordinary course | |
| Call Tracking | 03/13/2021 | 162.74 | Ordinary course | |
| Call Tracking | 03/16/2021 | 166.80 | Ordinary course | |

| Vendor/Insider | Payment Dates | Non-preference Payment Amount | Rationale for Non-preference | Preference Amount |
|---|---|---|---|---|
| Call Tracking | 03/18/2021 | 150.18 | Ordinary course | |
| Call Tracking | 12/19/2020 | 150.83 | Ordinary course | |
| Call Tracking | 12/22/2020 | 158.49 | Ordinary course | |
| Call Tracking | 12/26/2020 | 165.30 | Ordinary course | |
| Call Tracking | 12/28/2020 | 153.70 | Ordinary course | |
| Call Tracking | 12/31/2020 | 150.00 | Ordinary course | |
| Facebook | 02/22/2021 | 900.00 | Ordinary course | |
| Facebook | 01/26/2021 | 900.00 | Ordinary course | |
| Facebook | 03/08/2021 | 900.00 | Ordinary course | |
| Facebook | 02/01/2021 | 400.69 | Ordinary course | |
| Facebook | 03/19/2021 | 900.00 | Ordinary course | |
| Facebook | 03/09/2021 | 900.00 | Ordinary course | |
| Facebook | 02/12/2021 | 896.76 | Ordinary course | |
| Facebook | 02/24/2021 | 900.00 | Ordinary course | |
| Facebook | 03/01/2021 | 82.96 | Ordinary course | |
| Facebook | 01/19/2021 | 900.00 | Ordinary course | |
| Facebook | 01/07/2021 | 900.00 | Ordinary course | |
| Facebook | 01/25/2021 | 900.00 | Ordinary course | |
| Facebook | 02/08/2021 | 899.88 | Ordinary course | |
| Facebook | 01/04/2021 | 900.00 | Ordinary course | |
| Facebook | 01/19/2021 | 900.00 | Ordinary course | |
| Facebook | 01/05/2021 | 900.00 | Ordinary course | |
| Facebook | 01/14/2021 | 900.00 | Ordinary course | |
| Facebook | 01/12/2021 | 900.00 | Ordinary course | |
| Facebook | 01/28/2021 | 900.00 | Ordinary course | |
| Facebook | 03/04/2021 | 900.00 | Ordinary course | |
| Facebook | 03/15/2021 | 900.00 | Ordinary course | |
| Facebook | 12/24/2020 | 900.00 | Ordinary course | |
| Facebook | 02/26/2021 | 900.00 | Ordinary course | |
| Facebook | 02/16/2021 | 900.00 | Ordinary course | |
| Facebook | 01/25/2021 | 900.00 | Ordinary course | |
| Facebook | 03/11/2021 | 900.00 | Ordinary course | |
| Facebook | 02/01/2021 | 900.00 | Ordinary course | |
| Facebook | 02/18/2021 | 900.00 | Ordinary course | |
| Facebook | 12/31/2020 | 385.38 | Ordinary course | |
| Facebook | 03/15/2021 | 900.00 | Ordinary course | |
| Facebook | 01/11/2021 | 900.00 | Ordinary course | |
| Facebook | 12/28/2020 | 900.00 | Ordinary course | |
| Facebook | 12/21/2020 | 900.00 | Ordinary course | |
| Facebook | 03/17/2021 | 900.00 | Ordinary course | |
| Facebook | 02/16/2021 | 900.00 | Ordinary course | |
| Facebook | 01/11/2021 | 900.00 | Ordinary course | |
| Facebook | 02/09/2021 | 900.00 | Ordinary course | |
| Facebook | 02/02/2021 | 900.00 | Ordinary course | |
| Facebook | 01/21/2021 | 900.00 | Ordinary course | |
| Facebook | 02/04/2021 | 900.00 | Ordinary course | |
| Facebook | 02/22/2021 | 899.99 | Ordinary course | |
| Facebook | 03/01/2021 | 900.00 | Ordinary course | |
| Facebook | 02/08/2021 | 900.00 | Ordinary course | |
| Facebook | 03/02/2021 | 900.00 | Ordinary course | |
| Facebook | 01/19/2021 | 900.00 | Ordinary course | |
| Facebook | 12/30/2020 | 900.00 | Ordinary course | |
| Facebook | 12/29/2020 | 900.00 | Ordinary course | |
| Facebook | 01/04/2021 | 900.00 | Ordinary course | |
| **TOTAL** | | $ 720,235.45 | | $ 47,154.43 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT "E"</u>**

[Debtors' Joint Plan of Reorganization]

GARY E. KLAUSNER (State Bar No. 69077)
EVE H. KARASIK (State Bar No. 155356)
JEFFREY S. KWONG (State Bar No. 288239)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: gek@lnbyb.com; ehk@lnbyb.com
jsk@lnbyb.com
Attorneys for 37 Ventures, LLC

GEORGE HOFMANN (*admitted pro hac vice*)
COHNE KINGHORN, P.C.
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 363-4300
Email: ghofmann@ck.law

DERRICK TALERICO (State Bar No. 223763)
DAVID B. ZOLKIN (State Bar No. 155410)
ZOLKIN TALERICO LLP
12121 Wilshire Blvd., Suite 1120
Los Angeles, California 90025
Telephone: (424) 500-8557
Email:    dtalerico@ztlegal.com; dzolkin@ztlegal.com

Attorneys for Larada Sciences, Inc.

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>37 VENTURES, LLC,<br><br>      Debtor and Debtor in Possession. | Lead Case No.: 9:21-bk-10261-DS<br>Jointly administered with:<br>9:21-bk-10269-DS<br>(Larada Sciences, Inc.).<br><br>Chapter 11 Cases |
| In re:<br><br>LARADA SCIENCES, INC.,<br><br>      Debtor and Debtor in Possession. | **DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED OCTOBER 19, 2021**<br><br>Plan Confirmation Hearing: |
| ☒ Affects both Debtors<br>☐ Affects 37 Ventures, LLC only<br>☐ Affects Larada Sciences, Inc. only | Date:<br>Time:<br>Place:  Courtroom 201<br>      1415 State Street<br>      Santa Barbara, CA 93101 |

# TABLE OF CONTENTS

**DEBTORS' JOINT PLAN OF REORGANIZATION**...............................................................2

**ARTICLE 1:**     **DEFINITIONS AND CONSTRUCTION OF TERMS** ...............................2

**ARTICLE 2:**     **TREATMENT OF ALLOWED ADMINISTRATIVE EXPENSE** ............13
                 **CLAIMS AND ALLOWED PRIORITY TAX CLAIMS**
     **2.1**      **Non-Classification** ....................................................................... 13
     **2.2**      **Administrative Expense Claims**.................................................. 13
     **2.3**      **Priority Tax Claims** .................................................................... 15

**ARTICLE 3:**     **CLASSIFICATION OF CLAIMS** ......................................................... 15

**ARTICLE 4:**     **TREATMENT OF CLAIMS AND EQUITY INTERESTS**..................... 16
     **4.1**      **Class 1 – Priority Claims**............................................................ 16
     **4.2**      **Class 2 – General Unsecured Claims against 37 Ventures**......... 16
     **4.3**      **Class 3 – Alignment's Class 3 Claim Against 37 Ventures** ......... 18
     **4.4**      **Class 4 – Alignment's Secured Claim Against Larada**............... 19
     **4.5**      **Class 5 –  Alignment's Deficiency Claim Against Larada**.......... 20
     **4.6**      **Class 6 –  General Unsecured Claims against Larada, Not Including**....... 20
                 **Alignment's Deficiency Claim.**
     **4.7**      **Class 7 –  Subdebt Holders**........................................................ 21
     **4.8**      **Classes 8 (a) and (b) – Convenience Class Claims** ..................... 22
     **4.9**      **Equity Interests in 37 Ventures** ................................................. 22
     **4.10**     **Equity Interests in Larada** ........................................................ 23
     **4.11**     **Satisfaction of Claims and Release** ........................................... 23
     **4.12**     **No Penalties** ................................................................................ 23
     **4.13**     **No Assumed Liability** ................................................................. 23
     **4.14**     **Satisfaction of Claims and Release** ........................................... 23
     **4.15**     **Amendments to Claims**.............................................................. 23

**ARTICLE 5:**     **MEANS FOR EXECUTION OF THE PLAN** ...................................... 23
     **5.1**      **Revesting of Property** ................................................................ 23
     **5.2**      **Bankruptcy Case Administration**.............................................. 24
     **5.3**      **Continuation of Business Operations**........................................ 24
     **5.4**      **Continuation of Anti-Discrimination Provisions of Bankruptcy Code**........ 24
     **5.5**      **Employment of Professionals**.................................................... 25
     **5.6**      **Ability to Incur Debt**................................................................. 25
     **5.7**      **Net Effective Date Cash** ............................................................ 25
     **5.8**      **Application of Liquidity Event Net Proceeds** ........................... 25
     **5.9**      **Tax Matters** ................................................................................ 28
     **5.10**     **Larada Asset Sale Liquidity Event**........................................... 29
     **5.11**     **7 Ventures Subrogation Claim** ................................................. 29
     **5.12**     **Quarterly Reporting by 37 Ventures/Plan Monitor** ................ 30

**ARTICLE 6:**     **IMPLEMENTATION OF THE PLAN**.................................................. 32
     **6.1**      **Method of Distributions Under the Plan** ................................. 32

| | | |
|---|---|---|
| 6.2 | Objections to Disputed Claims | 33 |
| 6.3 | Estimation of Claims | 33 |
| 6.4 | Reversion of Unclaimed Checks | 34 |
| 6.5 | Effect of Convenience Class Election | 34 |
| 6.6 | Retention and Preservation of Claim Objections and Causes of Action | 34 |

**ARTICLE 7: VOTING ON THE PLAN** .............................................................. 35

| | | |
|---|---|---|
| 7.1 | Voting of Claims | 35 |
| 7.2 | Nonconsensual Confirmation | 35 |

**ARTICLE 8: EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ............ 36

| | | |
|---|---|---|
| 8.1 | Assumption of Executory Contracts and Unexpired Leases; Deemed Cure Amount | 36 |
| 8.2 | Post-Petition Agreements Unaffected By Plan | 37 |

**ARTICLE 9: CONDITIONS PRECEDENT TO EFFECTIVE DATE** .................. 37

| | | |
|---|---|---|
| 9.1 | Conditions Precedent to Effectiveness | 37 |
| 9.2 | Failure of Conditions Precedent | 37 |
| 9.3 | Waiver of Conditions | 38 |

**ARTICLE 10: RETENTION OF JURISDICTION** .......................................... 38

| | | |
|---|---|---|
| 10.1 | Retention of Jurisdiction | 38 |
| 10.2 | Closure of Case | 40 |

**ARTICLE 11: MISCELLANEOUS** .................................................................. 40

| | | |
|---|---|---|
| 11.1 | Continuation of Injunctions or Stays Until Effective Date | 40 |
| 11.2 | Discharge | 40 |
| 11.3 | Injunction Relating to the Plan | 41 |
| 11.4 | Broad Injunction | 42 |
| 11.5 | Exculpation | 43 |
| 11.6 | Release of Claims | 43 |
| 11.7 | Bar Date for Administrative Claims | 44 |
| 11.8 | Default of Plan | 44 |
| 11.9 | Setoffs | 45 |
| 11.10 | Amendment or Modification of the Plan | 45 |
| 11.11 | Severability | 45 |
| 11.12 | Revocation or Withdrawal of the Plan | 46 |
| 11.13 | Binding Effect | 46 |
| 11.14 | Notices | 46 |
| 11.15 | Governing Law | 47 |
| 11.16 | Post-Confirmation Fees, Final Decree | 47 |
| 11.17 | Headings | 47 |
| 11.18 | Filing of Additional Documents | 47 |
| 11.19 | Inconsistency | 48 |
| 11.20 | Exemption From Certain Transfer Taxes | 48 |
| 11.21 | Corporate Action | 48 |

## DEBTORS' JOINT PLAN OF REORGANIZATION

37 Ventures, LLC and Larada Sciences, Inc., the debtors and debtors in possession in the above-captioned, jointly administered chapter 11 bankruptcy cases, propose the following joint plan of reorganization under Section 1121 of Title 11 of the United States Code.

### ARTICLE 1

### DEFINITIONS AND CONSTRUCTION OF TERMS

**Definitions.** The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both singular and plural):

**1.1** **"37 Ventures"** shall mean 37 Ventures, LLC, a Delaware limited liability company.

**1.2** **"37 Ventures Initial Distribution Date"** shall mean the date that is ten court days after the <u>Effective Date, or as soon thereafter as is practicable.</u>

**1.3** **37 Ventures "Net Effective Date Cash"** shall mean the Cash remaining in Reorganized 37 Ventures debtor-in-possession account on the Effective Date after payment of, or reserves for: (1) the administrative fees and expenses of the estate in the 37 Ventures Case as provided for in Article II of this Plan, (2) post-effective date professional fees, and (3) operating expenses of Reorganized 37 Ventures, including but not limited to those of the Plan Monitor. ("Net Effective Date Cash").

**1.4** **"37 Ventures Subrogation Claim"** shall have the meaning ascribed in Section 5.9.

**1.5** **"Administrative Expense Claim"** shall mean a Claim that is Allowed under section 503(b) of the Bankruptcy Code and that is entitled to priority under section 507(a)(1) of the Bankruptcy Code, including, without limitation.

**1.5.1** fees and expenses of Professionals Allowed pursuant to an Order of the Bankruptcy Court, and

**1.5.2** all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930.

**1.5.3** "<u>Allowed</u>" shall mean, with reference to any Claim:

(1)    a Claim that has been listed by either of the Debtors in its Schedules and (i) is not listed as disputed, contingent or unliquidated, (ii) is not a Claim as to which a proof of claim has been filed, and (iii) is not a Claim as to which either of the Debtors has filed an objection;

(2)    a Claim as to which a timely proof of claim has been filed by the Bar Date in a sum certain and (A) is not a Contingent or Unliquidated Claim, and (B) either (i) no objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery has been interposed, the extent to which such Claim has been allowed (whether in whole or in part) by a Final Order;

**1.5.4**    a Claim arising from the recovery of property under section 550 or 553 of the Bankruptcy Code and allowed in accordance with section 502(h) of the Bankruptcy Code; or

**1.5.5**    any Claim expressly allowed under this Plan or pursuant to the Confirmation Order; or

**1.5.6**    any Claim expressly allowed pursuant to a Final Order of the Bankruptcy Court.

**1.6**    "Alignment" shall mean Alignment Debt Holdings 1, LLC, in its capacity as agent under the Alignment Loan Documents.

**1.7**    "Alignment Secured Claim" shall mean any and all Allowed Secured Claims of Alignment against Larada to the extent of the value of Alignment's interest in the Larada Estate's interest in Larada's property as agreed by Larada and Alignment or as determined by the Bankruptcy Court pursuant to Bankruptcy Code § 506(b) on or before the Confirmation Date.

**1.8**    **"Alignment Deficiency Claim"** shall mean the total Allowed Claim of Alignment, minus the amount of the Alignment Secured Claim.

**1.9**    **"Alignment Loan Documents"** shall include (i) a Loan Agreement, dated May 23, 2018, among the Larada, as borrower, 37 Ventures, as guarantor, ATMedia, as the secured party, and Alignment as administrative and collateral agent (ii) a Promissory Note, dated May

3

23, 2018, by and between Larada, as borrower, and ATMedia, in the original principal amount of

$7,500,000 (iii) a Pledge and Security Agreement from Debtor to Alignment; (iv) a Guaranty by

and among the Debtor, Alignment, 37 Ventures, LLC, and Yuri Pikover, as sole member; and (v)

any and all additional documents, certificates, applications, or other items executed or delivered

in connection with any of the foregoing.

  **1.10**  **"ATMedia"** shall mean ATMedia Investor II, LLC.

  **1.11**  **"Avoidance Actions"** shall mean Causes of Action arising or held by the Estates

under sections 502, 510, 541, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code, or under

related state or federal statutes and common law, including fraudulent transfer laws.

  **1.12**  **"Bankruptcy Cases"** shall mean the Debtors' jointly administered cases pending

in the Bankruptcy Court under case number 9:21-bk-10261-DS.

  **1.13**  **"Bankruptcy Code"** shall mean title 11 of the United States Code, as amended

from time to time, as applicable to the Bankruptcy Case.

  **1.14**  **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the

Central District of California in which the Bankruptcy Cases are pending and, to the extent of

any reference under 28 U.S.C. § 157, the unit of such District Court specified pursuant to 28

U.S.C. § 151.

  **1.15**  **"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure as

promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

  **1.16**  **"Bar Date"** shall mean: (i) July 15, 2021 with respect to a Claim against the

Estate other than a Claim of a Governmental Unit; (ii) September 14, 2021 with respect to a

Claim of a Governmental Unit against the Estate; (iii) if applicable, any special deadline for

certain creditors to file proofs of claim as specified by the Court; or (iv) if this Plan and/or an

order of the Court establishes a different bar date for a specific claim or category of claims (e.g.,

rejection damages claims), the date established by the Plan or order of the Court.

  **1.17**  **"Business Day"** shall mean any day other than a Saturday, Sunday or legal

holiday recognized in the State of California.

1.18    **"Cash"** shall mean lawful currency of the United States of America (including wire transfers, cashier's checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks and money orders).

1.19    **"Causes of Action"** shall mean, without limitation, any and all actions, causes of action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands of any nature whatsoever, whether known or unknown, in law, equity or otherwise, including, without limitation, Avoidance Actions.

1.20    **"Claim"** shall mean a claim against a Person or its property as defined in section 101(5) of the Bankruptcy Code, including, without limitation, (i) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.21    **"Class"** shall mean those classes designated in Article III of this Plan.

1.22    **"Collateral"** shall mean any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

1.23    **"Company Liquidity Event"** shall mean a sale, merger, initial public offering or similar event of a Portfolio Company or of Caldera (together the "Subject Companies" and each a "Subject Company") that distributes to the securities holders thereof Cash or publicly traded stock on account of those securities.    Company Liquidity Event also means and includes a sale or leveraged buy-out of substantially all of the assets of one of those companies in a transaction that distributes Cash to the holders of the securities of the Subject Company.

///

5

**1.24** **"Confirmation Date"** shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Bankruptcy Case.

**1.25** **"Confirmation Order"** shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code, and any supplementary orders of the Bankruptcy Court issued in furtherance of the Plan.

**1.26** **"Contingent or Unliquidated Claim"** shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court on or before the applicable Bar Date, but which: (a) was not filed in a sum certain; or (b) is contingent upon any event or condition which has not occurred and/or is dependent upon a future event that has not occurred or may never occur, and which has not been Allowed by a Final Order.

**1.27** **"Convenience Claim"** shall mean all Allowed General Unsecured Claims of a single holder of a type which would otherwise be included in Class 2(a), 2(b), or 6 which are either (i) $2,500 or less in the aggregate; or (ii) greater than $2,500 in aggregate but as to which the holder thereof has elected to voluntarily reduce its Claim to $2,500 by making a Convenience Class Election.

**1.28** **"Convenience Claim Election"** shall mean an election by a holder of a General Unsecured Claim which would otherwise be included in Class 2(a), 2(b), or 6 within the time fixed by the Bankruptcy Court for voting on the Plan, to have such Claim treated as a Convenience Claim.

**1.29** **"Debtors"** shall mean collectively 37 Ventures and Larada.

**1.30** **"Disallowed"** shall mean and refer to any Claim that does not fall within the definition of "Allowed."

**1.31** **"Disclosure Statement"** shall mean the disclosure statement relating to this Plan, including, without limitation, all exhibits and schedules thereto, in the form approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

**1.32** **"Disputed Claim"** shall mean:

**1.32.1** if no proof of claim relating to a Claim has been filed, a Claim that is listed in the Schedules as unliquidated, disputed or contingent; or

6

1.32.2  a Claim as to which an objection or request for estimation, or request to

equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy

Code and the Bankruptcy Rules, has been made, or which is otherwise disputed by either

of the Debtors in accordance with applicable law, which objection, request for estimation,

action to limit recovery or dispute has not been withdrawn or determined by Final Order;

or

1.32.3  a Claim that otherwise is "Allowed," but which is a Contingent or an

Unliquidated Claim.

1.33  **"Disputed Claim Amount"** shall mean the amount set forth in the proof of claim

relating to a Disputed Claim or an amount estimated pursuant to an order of the Bankruptcy

Court in respect of a Disputed Claim in accordance with section 502(c) of the Bankruptcy Code.

1.34  **"Disputed Lien"** shall mean a Lien which is the subject of a pending Avoidance

Action or any other type of judicial challenge to the validity, priority or enforceability of the

Lien, whether prosecuted by either of the Debtors or another party-in-interest and whether filed

in the Bankruptcy Court or another court of competent jurisdiction.  Independent of and in

addition to the foregoing, if the Claim secured by a Lien is a Disputed Claim, the Lien shall be

considered a "Disputed Lien" unless and until the Claim is Allowed.

1.35  **"Distribution Record Date"** shall mean the Confirmation Date.

1.36  **"Effective Date"** shall mean the later of (a) the first Business Day on which the

Confirmation Order is no longer subject to a stay pursuant to Federal Rule of Bankruptcy

Procedure 3020(e) or otherwise, and (b) unless such thirty day period is waived by the Debtors

as permitted under section 9.1 of the Plan, the first Business Day that is at least thirty calendar

days after the Confirmation Date; provided, however, that if, as of such date, all conditions

precedent to the occurrence of the Effective Date set forth in section 9.1 of the Plan have not

been satisfied or waived, then the Effective Date shall be the first Business Day immediately

following the day upon which all such conditions have been satisfied or waived.

///

///

1.37    **"Equity Interest"** shall mean any member or stock interest in either of the Debtors, and all options, warrants and rights, contractual or otherwise, to acquire any such member or stock interests, as such interests exist immediately prior to the Effective Date.

1.38    **"Estates"** shall mean the estates created in the Bankruptcy Cases pursuant to section 541 of the Bankruptcy Code.

1.39    **"Final Larada Distribution Date"** shall mean the twenty-eighth Quarterly Distribution Date; provided, however, that the Final Distribution Date will be the date of the last payment/distribution pursuant to section 4.5(c)(i) of this Plan, if later.

1.40    **"Final Order"** shall mean an order or judgment which has not been reversed, stayed, modified or amended and as to which (i) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending, or (ii) if appeal, review, reargument or certiorari of the order has been sought, the order has been affirmed or the request for review, reargument or certiorari has been denied and the time to seek a further appeal, review, reargument or certiorari has expired, and as a result of which such order shall have become final and nonappealable in accordance with applicable law; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.41    **"General Unsecured Claim"** shall mean a Claim that is not a Secured Claim or that is not entitled to priority of payment under section 507 of the Bankruptcy Code, other than any Claim of Alignment and the Subdebt Claims.

1.42    **"Hawk Contribution"** shall mean the payment made by Robert Hawk on the Effective Date to Knight and Bishop in the amount of $ 2 Million, for Credit to the Allowed Claim of Knight and Bishop against 37 Ventures.

1.43    **"Income Tax Reserve Amount"** is defined in Section 5.9 of this Plan.

1.44    **"Initial Larada Distribution Date"** shall mean and refer to the Larada Distribution Date first occurring after the Effective Date.

/ / /

1.45 **"<u>Interim Larada Distribution Date</u>"** shall mean each Larada Distribution Date other than the Final Larada Distribution Date.

1.46 **"<u>IRS</u>"** shall mean the United States Department of Treasury – Internal Revenue Service.

1.47 **"<u>Larada</u>"** shall mean Larada Sciences, Inc., a Delaware corporation.

1.48 **"<u>Larada Asset Sale Liquidity Event</u>"** shall have the meaning ascribed in Section 5.10.

1.49 **"<u>Larada Distribution Date</u>"** shall mean fourteen (14) days after the last day of each full Quarter following the Effective Date, up to and including the Final Distribution Date, or if the fourteenth day following the last day of any Quarter is not a Business Day, the first Business Day immediately thereafter.

1.50 **"<u>Larada Quarterly Amount</u>"** shall mean any excess amount remaining, calculated Quarterly, of Larada's gross receipts, minus all reasonable or necessary expenditures made in its ordinary course of business, while retaining a cash reserve amount equal to one month of forecasted monthly expenditures.  Such reserve amount shall be calculated quarterly.

1.51 **"<u>Lien</u>"** shall have the meaning set forth in section 101(37) of the Bankruptcy Code; *except that* a Lien that has been avoided in accordance with sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien.

1.52 **"<u>Ninja Metrics Case</u>"** means and refers to the case of <u>Mark Kolokotrones and Knight and Bishop vs. Ninja Metrics, etc., et al.</u>, Los Angeles Superior Court Case No. BC 609689.

1.53 **"<u>Owner</u>"** means and refers to the holder of an Equity Interest.

1.54 **"<u>Person</u>"** shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, Governmental Unit or political subdivision thereof.

1.55 **"<u>Petition Date</u>"** shall mean March 18, 2021 in the case of 37 Ventures; and March 19, 2021 in the case of Larada.

1.56 **"<u>Pikover</u>"** shall mean Yuri Pikover.

1.57 **"Plan"** shall mean this Plan of Reorganization, including, without limitation, the exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time.

1.58 **"Plan Monitor"** has the meaning given to that term in Section 5.12 of this Plan.

1.59 **"Plan Period"** shall mean the period of time commencing on the Effective Date and ending on the Final Distribution Date.  If the treatment of a particular Claim or creditor relates to periods of time preceding the Effective Date (including payments made or received between the Petition Date and the Effective Date), then the Plan Period shall commence on the Petition Date with respect to that particular Claim or creditor.

1.60 **"Plan Rate"** shall mean the interest rate determined pursuant to 28 U.S.C. § 1961 as of the Effective Date; provided, however, for Classes 2(a), 2(b), and 3, the Plan Rate shall be increased by 1 percent on each anniversary of the Effective Date until the Final Distribution Date.

1.61 **"Portfolio Company"** and "Portfolio Companies" shall mean every company that has issued securities that were owned by 37 Ventures on the Petition Date, other than Mobile Cause, Inc.

1.62 **"Prime Rate"** shall mean the per annum rate of interest published from time to time in the Wall Street Journal, Eastern Edition, under the section entitled "Money Rates," which is denoted as the "Prime Rate" as of the Effective Date.

1.63 **"Priority Claims"** shall mean any and all Claims (or portions thereof), if any, entitled to priority under section 507(a) of the Bankruptcy Code other than Administrative Expense Claims.  If a Claim otherwise entitled to priority is a Secured Claim, it shall not be deemed to be, or treated as, a Priority Claim.

1.64 **"Priority Tax Claims"** shall mean any Claim of a Governmental Unit entitled to priority under section 507(a)(8) of the Bankruptcy Code, and that is not a Secured Claim.

1.65 **"Pro Rata"** shall mean a proportionate share of the total distribution made at any particular time under this Plan to the holders of Allowed Claims in a Class (or pair of Classes of equal priority under this Plan, hereinafter "Paired Class"), such that the ratio of the consideration

distributed on account of an Allowed Claim in a Class or Paired Class to the amount of such Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class or Paired Class to the total of all Allowed Claims in such Class or Paired Class.

1.66    **"Protective Order"** shall mean the Order entered by the Bankruptcy Court on or about August 20, 2021 (Doc No. 248).

1.67    **"Professionals"** shall mean (i) those Persons employed pursuant to an order of the Bankruptcy Court in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (ii) those Persons for which compensation and reimbursement is allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.68    **"Quarter"** means and refers to the calendar quarters ending, respectively, on March 31, June 30, September 30 and December 31.

1.69    **"Quarterly"** means on the basis of a Quarter.

1.70    **"Remaining Larada Quarterly Amount"** shall mean the Larada Quarterly Amount, minus any payment obligation under this Plan on account of the Alignment Secured Claim.

1.71    **"Reorganized 37 Ventures"** shall mean 37 Ventures, as reorganized on the Effective Date pursuant to the terms of this Plan.

1.72    **"Reorganized Debtors"** shall mean collectively Reorganized 37 Ventures and Reorganized Larada.

1.73    **"Reorganized Larada"** shall Larada, as reorganized on the Effective Date pursuant to the terms of this Plan.

1.74    **"Schedules"** shall mean the schedules of assets and liabilities, the list of holders of interests and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements have been or may be supplemented or amended from time to time.

1.75    **"Secured Claim"** shall mean any Claim that is secured by a Lien on Collateral to

the extent of the value of such Collateral, as determined in accordance with section 506(a) of the

Bankruptcy Code or, in the event that such Claim is a claim of setoff under section 553 of the

Bankruptcy Code, to the extent of such setoff.

      1.76    **"Subdebt Claims"** shall mean the Allowed Claims against Larada listed on

Exhibit A attached hereto.

      1.77    **"Subdebt Holder"** shall mean each holder of a Subdebt Claim.

**Interpretation; Application of Definitions and Rules of Construction**

      For purposes herein: (a) the words "herein"; "hereof", "hereto," "hereunder," and other

words of similar import refer to the Plan as a whole and not to any particular section, subsection,

or clause contained therein; (b) in the appropriate context, each term, whether stated in the

singular or the plural, shall include both the singular and the plural, and pronouns stated in the

masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter

gender; (c) except as otherwise provided, any reference herein to a contract, lease, instrument,

release, indenture, or other agreement or document being in a particular form or on particular

terms and conditions means that the referenced document shall be substantially in that form or

substantially on those terms and conditions; (d) the words "include" and "including," and

variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be

followed by the words "without limitation;" (e) a term used herein that is not defined herein or

by cross reference shall have the meaning assigned to that term in the Bankruptcy Code; (f) the

rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan; (g)

the headings in the Plan are for convenience of reference only and shall not limit or otherwise

affect the provisions hereof; (h) in the event that a particular term of the Plan (including any

exhibits or schedules hereto) conflicts with a particular term of the definitive documentation

required to be implemented pursuant to the terms of the Plan or any settlement or other

agreement contemplated hereunder, the Plan shall control; provided, for the avoidance of doubt,

to the extent the Confirmation Order conflicts with the Plan, the Confirmation Order shall

control for all purposes; (i) except as otherwise provided, any reference herein to an existing

document or exhibit having been filed or to be filed shall mean that document or exhibit, as it

may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (j) any effectuating provisions may be interpreted by the Reorganized Debtors in a manner consistent with the overall purpose and intent of the Plan and the Confirmation Order; (l) except as otherwise provided, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; and (m) any docket number references in the Plan shall refer to the docket number of any document filed with the Bankruptcy Court in the Chapter 11 Cases.

## ARTICLE 2

## TREATMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS AND ALLOWED PRIORITY TAX CLAIMS

**2.1** __Non-Classification__.

As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified for the purposes of voting on, or receiving distributions under, the Plan. All such Claims instead are treated separately in accordance with the terms in this Article II.

**2.2** __Administrative Expense Claims__.

**2.2.1** __Bar Date__. All applications for allowance of Administrative Expense Claims other than (i) fees and expenses of Professionals Allowed pursuant to an Order of the Bankruptcy Court, and (ii) fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930, shall be filed not later than thirty (30) days after the Effective Date. All Administrative Expense Claims not filed within thirty days after the Effective Date shall be barred. The deadline in the preceding sentence shall be construed and have the same force and effect as a statute of limitations. The Reorganized Debtors shall provide notice to all creditors listed on the mailing matrix of this bar date within ten days after the Effective Date. The Bankruptcy Court shall determine all Administrative Expense Claims. This clause is not intended, and shall not be construed, to set a bar date for fees and expenses incurred by Professionals on behalf of the Reorganized Debtors after the

Effective Date, which fees and expenses will be paid by the Reorganized Debtors as set

forth in Section 2.2(d)(2) of this Plan.

**2.2.2** <u>General</u>.  Except as otherwise agreed to by the Reorganized Debtors and

the holder of an Allowed Administrative Expense Claim, and subject to Section 2.2(b)

below, each such holder shall be paid in full in Cash on the later of (i) the date such

Allowed Administrative Expense Claim becomes due in accordance with its terms, and

(ii) the Effective Date.  If the Reorganized Debtors dispute any portion of an

Administrative Expense Claim, the Reorganized Debtors shall pay such Claim within 30

days after the entry of a Final Order with respect to the allowance of such disputed

Administrative Expense Claim.

(a)    <u>U.S. Trustee's Fees</u>.  The United States Trustee's quarterly fees shall be

paid in full without prior approval pursuant to 28 U.S.C. § 1930.

(b)    <u>Professional Compensation and Expense Reimbursement Claims</u>.

(1)    Each Professional shall file a final application for the allowance of

compensation for services rendered or reimbursement of expenses incurred through and

including the Effective Date within thirty (30) days after the Effective Date.  Any award

granted by the Bankruptcy Court shall be paid (i) within fifteen days of the entry of the

order of the Bankruptcy Court approving such award, unless a stay is obtained, or (ii)

upon such other terms as may be mutually agreed upon between such holder of an

Allowed Administrative Expense Claim and the Reorganized Debtors.

(2)    All fees and expenses of Professionals for services rendered after

the Effective Date in connection with the Bankruptcy Case and the Plan shall be paid by

the applicable Reorganized Debtor upon receipt of reasonably detailed invoices therefor

in such amounts and on such terms as such Professional and such Reorganized Debtor

may agree, without the need for further Bankruptcy Court authorization or entry of a

Final Order.

///

///

14

**2.3**     <u>Priority Tax Claims.</u>

At the sole election of the Debtors, each holder of an Allowed Priority Tax Claim shall be paid either (i) upon such terms as may be agreed to between either of the Debtors and such holder of an Allowed Priority Tax Claim, (ii) in full in Cash on the later of (x) the Effective Date or (y) the date that such Allowed Priority Tax Claim would have been due if the Bankruptcy Case had not been commenced, or (iii) in equal quarterly installments commencing December 31, 2021, in the amount of such Allowed Priority Tax Claim, plus interest at the rate prescribed by Bankruptcy Code § 511, through and including the fifth anniversary of the Petition Date.

**ARTICLE 3**

**<u>CLASSIFICATION OF CLAIMS</u>**

Claims, other than Administrative Expense Claims and Priority Tax Claims, shall be classified for all purposes, including voting on, confirmation, and distribution pursuant to the Plan, as follows:

**Classes 1(a) and 1(b) – <u>Priority Claims.</u>** Class 1(a) shall consist of all Allowed Priority Claims against 37 Ventures. Class 1(b) shall consist of all Priority Claims against Larada.

**Classes 2(a) and 2(b) – <u>General Unsecured Claims against 37 Ventures.</u>** Class 2(a) shall consist of all Allowed General Unsecured Claims against 37 Ventures other than Alignment's and Knight and Bishop's Claims against 37 Ventures. Class 2(b) shall consist of Knight and Bishop's General Unsecured Claim against 37 Ventures.

**Class 3 – <u>Alignment Claim Against 37 Ventures.</u>** Class 3 shall consist of Alignment's Claim against 37 Ventures.

**Class 4 – <u>Alignment Secured Claim.</u>** Class 4 shall consist of Alignment's Secured Claim against Larada.

**Class 5 – <u>Alignment Deficiency Claim.</u>** Class 5 shall consist of Alignment's Deficiency Claim against Larada.

**Class 6 – <u>General Unsecured Claims against Larada.</u>** Class 6 shall consist of all Allowed General Unsecured Claims against Larada, except for Alignment's Deficiency Claim.

**Class 7 – <u>Subdebt Claims.</u>** Class 7 shall consist of the Subdebt Claims against Larada.

15

**Classes 8(a) and 8(b) – <u>Convenience Class Claims</u>.**  Class 8(a) shall consist of all Convenience Claims against Larada and Class 8(b) shall consist of all Convenience Claims against 37 Ventures.

**Class 9 – <u>Equity Interests in 37 Ventures</u>.**  Class 9 shall consist of all Equity Interests in 37 Ventures.

**Class 10 – <u>Equity Interests in Larada</u>.**  Class 10 shall consist of all Equity Interests in Larada.

**ARTICLE 4**

**<u>TREATMENT OF CLAIMS AND EQUITY INTERESTS</u>**

**4.1     Class 1 – <u>Priority Claims</u>**

(a)     <u>Impairment and Voting</u>.  Class 1(a) and 1(b) are unimpaired under the Plan.  Each holder of an Allowed Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     <u>Distributions</u>.  Unless otherwise agreed by a holder of an Allowed Priority Claim, each holder of an Allowed Priority Claim shall receive Cash in an amount equal to such Allowed Priority Claim on the later of the Initial Distribution Date and the date such Priority Claim becomes an Allowed Priority Claim, or as soon thereafter as is practicable.

**4.2     Class 2 – <u>General Unsecured Claims against 37 Ventures</u>[1]**

(a)     <u>Impairment and Voting</u>.  Class 2(a) and Class 2(b) are impaired under the Plan.  Each holder of an Allowed General Unsecured Claim against 37 Ventures shall be entitled to vote to accept or reject the Plan.

(b)     <u>Interest</u>.  Except as provided in Section 4.2(c)(i) below, interest on the Allowed General Unsecured Claims against 37 Ventures shall accrue at the Plan Rate from the Effective Date until the Class 2(a) and Class 2(b) Allowed General Unsecured Claims against 37 Ventures are paid in full.

---

[1] Knight and Bishop has filed a Proof of Claim in which Knight and Bishop designated its claim as "secured."  37 Ventures disputes that designation and will seek an order from the Bankruptcy Court establishing that Knight and Bishop's claim is unsecured.

(c)     Satisfaction of Class 2(a) Claims.  In full and final satisfaction, settlement, release, and discharge of Allowed Class 2(a) Claims, creditors holding these claims will receive its Pro Rata share of the amounts paid pursuant to Sections 5.7 and 5.8 of the Plan (shared Pro Rata with Class 2(b) Claims, and Alignment's Class 3 Claim against 37 Ventures). Allowed Class 2(a) Claims, including accrued but unpaid interest thereon, shall be fully due and payable on December 31, 2025, unless paid prior to that date from a Company Liquidity Event pursuant to Section 5.8 of the Plan, or as otherwise provided under the Plan.

(d)     Satisfaction of Class 2(b) Claims.  In full and final satisfaction, settlement, release, and discharge of Knight and Bishop's Allowed Class 2(b) Claim, Knight and Bishop shall receive distributions under one of the two options described in subsections (i) and (ii) below, depending on whether Hawk timely pays the Hawk Contribution[2], as contemplated in Section 5.7(a)(1) of this Plan.  In addition, any 37 Ventures Pre-Confirmation Distributions shall be credited as a distribution pursuant to this provision.

(i)     If, prior to the Effective Date, Hawk timely pays the Hawk Contribution to Knight and Bishop, then on the 37 Ventures Initial Distribution Date, Reorganized 37 Ventures will pay to Knight and Bishop the balance of the Knight and Bishop Allowed Claim as reduced by the Hawk Contribution, as of the date of payment.

(ii)     If Hawk does not timely pay the Hawk Contribution to Knight and Bishop, Knight and Bishop will receive its Pro Rata share of the amounts paid pursuant to Section 5.7 and 5.8 hereof (shared Pro Rata with Class 2(a) Claims, and Alignment's Class 3 Claim against 37 Ventures).  In addition, any 37 Ventures Pre-Confirmation Distribution shall be credited as a distribution pursuant to this provision.

(iii)     In either case, the amount of the Knight and Bishop claim shall be calculated at the time of each distribution after first reducing the amount of the Knight and Bishop Claim by the amount of all then prior payments made by or collections received by virtue

---

[2] Knight and Bishop is not obligated, and has not agreed to, provide a release to Hawk in exchange for the Hawk Contribution.

of judgment executions on the assets of Bob Hawk or Dmitri Williams on account of the judgment in the Ninja Metrics Case.

(e)    <u>Final Payment</u>.    Allowed Class 2(a) and Class 2(b) Claims, including accrued but unpaid interest thereon, shall be fully due and payable on December 31, 2025, unless paid prior to that date from a Company Liquidity Event pursuant to Section 5.8 hereof, or as otherwise provided in this Plan.

**4.3    Class 3 – <u>Alignment's Class 3 Claim Against 37 Ventures</u>**

(a)    <u>Impairment and Voting</u>.    Class 3 is impaired under the Plan.    Alignment shall be entitled to vote its Class 3 Claim to accept or reject the Plan.

(b)    <u>Interest</u>.    Interest on Alignment's Class 3 Claim shall accrue at the Plan Rate from the Effective Date until Alignment's Class 3 Claim is paid in full.

(c)    <u>Distributions</u>.    In full and final satisfaction, settlement, release, and discharge of Alignment's Class 3 Claim, Alignment shall receive a Pro Rata share of the amounts paid pursuant Sections 5.7 and 5.8 of the Plan, until the Alignment Claim is paid in full, after giving credit to distributions Alignment receives from Larada.    In addition, 37 Ventures Pre-Confirmation Distributions shall be credited as a distribution pursuant to this provision.    At the time of each distribution to Alignment under either such section, the amount of Alignment's Allowed Claim shall be recalculated to be the sum of the then outstanding principal balances of Alignment's Secured (Class 4) and Deficiency (Class 5) Claims.

(d)    <u>Application of Payments to Alignment</u>.    All payments by Reorganized 37 Ventures to Alignment shall be applied as follows:

(1) first to post Effective Date interest accrued on Alignment's Class 3 Claim against Reorganized 37 Ventures, with a dollar-for-dollar credit to accrued but unpaid post Effective Date interest owed by Reorganized Larada to Alignment on account of its Secured Claim against Reorganized Larada, then

(2) to the principal amount of Alignment's Class 3 Claim against Reorganized 37 Ventures, with a dollar-for-dollar credit to the then remaining amount of Alignment's Claims against Reorganized Larada, in the following order of priority:

(A) First to any then remaining accrued but unpaid interest on the Alignment's Secured Claim against Reorganized Larada, then

(B) to the principal balance of Alignment's Secured Claim against Reorganized Larada, then

(C) to post Effective Date interest accrued on Alignment's Deficiency Claim against Reorganized Larada, and then

(D) to the remaining principal balance of Alignment's Deficiency Claim against Reorganized Larada.

(e)     <u>Final Payment</u>.  The unpaid balance of Alignment's Class 3 Claim against 37 Ventures, including accrued but unpaid interest thereon, shall be paid on or before December 31, 2025, unless paid prior to that date from a Company Liquidity Event as described in Section 5.8 hereof, or as otherwise provided in this Plan.

**4.4     Class 4 – <u>Alignment's Secured Claim Against Larada</u>**

(a)     <u>Impairment and Voting</u>.  Class 4 is impaired under the Plan.  Alignment shall be entitled to vote its Class 4 Claim to accept or reject the Plan.

(b)     <u>Interest</u>.  Commencing on the Effective Date, interest on Alignment's Class 4 Claim shall accrue at the Prime Rate plus 3% until paid in full.

(c)     <u>Distributions</u>.  Larada shall repay in full Alignment's Class 4 Claim as follows:

(i)     <u>Quarterly Larada Payments</u>.  Larada shall pay 70% of the Remaining Larada Quarterly Amount to Alignment until the Alignment's Class 4 Claim is paid in full together with interest, from all sources.

(ii)     <u>Proceeds of Larada Asset Sale Liquidity Event</u>.  If a Larada Asset Sale Liquidity Event occurs before such time at Alignment's Class 4 Claim has been paid in full, then Alignment's Class 4 Claim, inclusive of post Effective Date interest, shall be paid in full from the net proceeds of the Larada Asset Sale Liquidity Event, as set forth in more detail below.

(iii)  In the event that 37 Ventures has not paid Alignment's Claim in full, as provided in Section 4.3 hereof, Larada shall pay the balance of Alignment's Class 4 Claim,

19

including then accrued but unpaid interest, on or before December 31, 2028 or as otherwise provided in the Plan.

(d)     Collateral.  Alignment shall retain its security interest in Larada's property pending payment in full of its Class 4 Secured Claim as provided in this Section; provided, however, that at such time at Alignment has received payment of $1 Million from either 37 Ventures and/or Larada, all funds then being held in the Zion's Bank, Cash Collateral DIP Account ending in 7508, shall be released to Larada, free and clear of all of Alignment's claims and liens.  Upon payment in full of Alignment's Secured Claim, Alignment either shall release and discharge any and all Liens it holds on Larada's property, or, if applicable, Alignment's liens shall automatically be transferred to 37 Ventures as provided in section 5.11 hereof.

**4.5     Class 5 – <u>Alignment's Deficiency Claim Against Larada</u>**

(a)     <u>Impairment and Voting</u>.  Class 5 is impaired under the Plan.  Alignment shall be entitled to vote its Class 5 Claim to accept or reject the Plan.

(b)     <u>Interest</u>.  Interest on the Alignment's Class 5 Claim shall accrue, post Effective Date, at the Plan Rate.

(c)     <u>Distributions</u>. In full and final satisfaction, settlement, release, and discharge of Alignment's Class 5 Claim, Alignment shall receive from Larada, payments Pro Rata with the holders of Class 6 claims, as provided in Section 4.6 hereof, and all distributions otherwise payable to the Subdebt Holders in Class 7 until such time as Alignment's Class 5 Claim is paid in full, with interest.

(d)     <u>Final payment</u>.  Class 5 Claims shall be paid in full on or before December 31, 2028 pursuant to section 5.10 hereof or as otherwise provided in the Plan.

**4.6     Class 6 – <u>General Unsecured Claims against Larada, Not Including Alignment's Deficiency Claim.</u>**

(a)     <u>Impairment and Voting</u>.  Class 6 is impaired under the Plan.  Holders of Class 6 General Unsecured Claims against Larada shall be entitled to vote to accept or reject the Plan.

///

(b) <u>Interest</u>. Interest on General Unsecured Claims shall accrue, post Effective Date, at the Plan Rate.

(c) <u>Distributions</u>. Larada shall pay in full Allowed General Unsecured Claims against Larada, Pro Rata, with the holders of Class 5 Claims against Larada, as follows:

In full and final satisfaction, settlement, release, and discharge of all Class 6 Claims,

(i) <u>Quarterly Larada Payments</u>. Larada shall make Quarterly Pro Rata payments to holders of Class 5 and Class 6 Claims, in the amount of 30 percent of the Remaining Larada Quarterly Amount until such Claims are paid in full with interest, and

(ii) <u>Final payment.</u> Class 6 Claims shall be paid in full on or before December 31, 2028 pursuant to section 5.10 hereof or as otherwise provided in the Plan.

**4.7     Class 7 − <u>Subdebt Holders</u>**

(a) <u>Impairment and Voting</u>. Class 7 is impaired under the Plan. Subdebt Holders shall be entitled to vote to accept or reject the Plan.

(b) <u>Interest</u>. Interest on the Subdebt Claims shall accrue, post Effective Date, at the Plan Rate.

(c) <u>Distributions</u>. Larada shall pay in full the Subdebt Claims against Larada, Pro Rata with the holders of Class 5 Claims and Class 6 Claims against Larada, as follows:

(i) <u>Quarterly Larada Payments</u>. In full and final satisfaction, settlement, release, and discharge of all Class 7 Claims, Larada shall make Quarterly Pro Rata payments to holders of Class 5, Class 6, and Class 7 Claims, in the Remaining Larada Monthly Amount until such Claims are paid in full with interest, (ii) but not later than December 31, 2028 pursuant to section 5.10 hereof or as otherwise provided in the Plan.

(d) <u>Termination of Subdebt Holders Security Interest</u>. All liens and security interests of Subdebt Holders shall be terminated as of the Effective Date and Subdebt Holders claims shall be treated as unsecured claims.

(e) <u>Implementation of Subordination</u>. Pursuant to the inter-creditor agreements, the Subdebt Holders Claims are subordinate to Alignment's Secured and unsecured claims (including those held by 37 Ventures by virtue of the 37 Ventures' Subrogation Claim)

21

(collectively the "Loan Claims"). Until the Loan Claims are paid in full as provided for in this Plan, all distributions that would otherwise be payable to Subdebt Holders on account of their Class 7 Claims shall, instead, be paid to Alignment and applied to the satisfaction of Alignment's Class 5 and Class 6 Claims; provided, however, if and when the Loan Claims are paid in full, Class 7 claims shall thereafter be treated as Class 6 claims, without subordination ("Desubordination"), in the following manner.

(i)    Class 7 Catch-Up Payments. After Desubordination of the Class 7 claims, all distributions to the holders of Class 6 and Class 7 claims shall be paid first to the holders of Class 7 Claims until the proportionate share of the total distribution made on account of Class 7 claims is equal to the proportionate share of the total distributions made on account of the Class 6 Claims, in each case with respect to the sum of the amounts of the Class 6 and 7 Claims, as the denominator for the Pro Rata calculation.

(ii) After the Class 7 Catch-Up Payments are completed, holders of Class 7 claims shall be treated as holders of Class 6 claims and thereafter receive distributions on a Pro Rata basis with the other holders of Class 6 Claims as provided in section 5.10 hereof.

**4.8    Classes 8 (a) and (b) – <u>Convenience Class Claims</u>.**

(a)    <u>Impairment and Voting</u>. Class 8(a) and Class 8(b) are impaired under the Plan. Each holder of a Convenience Class Claim shall be entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>. Each holder of an Allowed Convenience Class Claim shall receive Cash in an amount equal to 75% of such Allowed Convenience Class Claim on the later of October 15, 2022 and the date such Convenience Class Claim becomes an Allowed Convenience Class Claim, or as soon thereafter as is practicable.

**4.9    Class 9 – <u>Equity Interests in 37 Ventures</u>.**

(a)    <u>Impairment and Voting</u>. Class 9 is unimpaired under the Plan. Each holder of an Equity Interest in 37 Ventures is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

/ / /

22

(b)    <u>Distributions</u>.  Each record holder of Equity Interests in 37 Ventures shall retain its interest in 37 Ventures, as Reorganized 37 Ventures.

**4.10    Class 10 – <u>Equity Interests in Larada</u>.**

(a)    <u>Impairment and Voting</u>.  Class 10 is unimpaired under the Plan.  Each holder of an Equity Interest in Larada is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Each record holder of Equity Interests in Larada shall retain its interest in Larada, as Reorganized Larada.

**4.11    <u>Satisfaction of Claims and Release</u>.**  As of the Effective Date, all Claims against the Debtors shall be discharged and released except as provided in this Plan.

**4.12    <u>No Penalties.</u>**  Except as expressly stated in the Plan or allowed by the Bankruptcy Court, no late charge or penalty, including but not limited to prepayment penalties, shall be allowed on any Claim accruing subsequent to the Petition Date.

**4.13    <u>No Assumed Liability</u>.**  Except as otherwise expressly set forth in the Plan, the Reorganized Debtors shall not assume or be liable for any Claims or any liability arising from any unassumed executory contracts.

**4.14    <u>Satisfaction of Claims and Release</u>.**  As of the Effective Date, all Claims against the Debtors and the Estates existing as of the Confirmation Date shall be deemed satisfied and released except as provided in the Plan.

**4.15    <u>Amendments to Claims</u>.**  On or after the Confirmation Date, a Claim may not be amended without the prior authorization of the Bankruptcy Court or the consent of the Reorganized Debtors.

**ARTICLE 5**

**MEANS FOR EXECUTION OF THE PLAN**

**5.1    <u>Revesting of Property</u>.**

(a)    Except as otherwise provided in this Plan, Reorganized Larada, as of the Effective Date, shall be vested with all of the assets of the Larada Estate; and Reorganized 37 Ventures, as of the Effective Date, shall be vested with all of the assets of the 37 Ventures Estate,

1  including all claims and causes of action that existed prior to, on or after the commencement of

2  their respective chapter 11 cases

3          (b)      Without limiting the generality of the foregoing and notwithstanding

4  Section 4.10 hereof ("Satisfaction of Claims and Release"), Reorganized 37 Ventures shall be

5  vested with and retain all rights of contribution, reimbursement, indemnification or the like that it

6  may hold or come to hold against Robert Hawk or Dmitri Williams in connection with the

7  judgment in Ninja Metrics Case, whether those rights are fixed, contingent, liquidated or

8  unliquidated.

9          **5.2**      **Bankruptcy Case Administration**.  Except as otherwise provided in this Plan,

10  from and after the Effective Date and continuing through the date on which a final decree closing

11  the Bankruptcy Cases is entered pursuant to section 350 of the Bankruptcy Code and Bankruptcy

12  Rule 3022, the Reorganized Debtors shall possess the rights of a party in interest pursuant to

13  section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the

14  Bankruptcy Case.  In addition to the foregoing, for all matters arising under or related to the

15  Bankruptcy Case, the Reorganized Debtors shall (i) have the right to appear and be heard on

16  matters brought before the Bankruptcy Court or other courts of competent jurisdiction, (ii) be

17  entitled to notice and opportunity for hearing, (iii) participate in all matters brought before the

18  Bankruptcy Court, including but not limited to adversary proceedings, and (iv) receive notice of

19  all applications, motions and other papers and pleadings before the Bankruptcy Court.

20          **5.3**      **Continuation of Business Operations**.  From and after the Effective Date of the

21  Plan, the Reorganized Debtors are authorized to continue their business operations and enter into

22  such transactions as each of them deems advisable, free of any restriction or limitation imposed

23  under any provision of the Bankruptcy Code, except to the extent otherwise provided in the Plan.

24          **5.4**      **Continuation of Anti-Discrimination Provisions of Bankruptcy Code**.  A

25  governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter,

26  franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such

27  a grant against, the Debtors, the Reorganized Debtors, or another Person with whom the Debtors

28  or the Reorganized Debtors have been or are associated or affiliated, solely because of the

commencement, continuation, or termination of the Bankruptcy Case or because of any provision of the Plan or the legal effect of the Plan, and the Confirmation Order will constitute an express injunction against any such discriminatory treatment by a governmental unit.

5.5    **Employment of Professionals**.  The Reorganized Debtors may employ attorneys, accountants, or other professionals as it may deem appropriate and pay such professionals' reasonable fees and expenses.  Professionals employed by the Reorganized Debtors after the Effective Date shall not be subject to Bankruptcy Court approval, their compensation shall not be subject to Bankruptcy Court approval, and their employment shall not be subject to the disinterestedness requirements of the Bankruptcy Code.

5.6    **Ability to Incur Debt**.  Reorganized Larada may incur debt after the Effective Date on a secured or unsecured basis without further notice, opportunity for hearing or order, except only to the extent the terms and provisions of this Plan may expressly forbid.

5.7    **Net Effective Date Cash.**  On the Effective Date, or as soon thereafter is practicable, 37 Ventures shall distribute its Net Effective Date Cash to its Class 2(a), Class 2(b), and Class 3 Claimants, Pro Rata,  subject to the provisions of Section 4.2(c) hereof.

5.8    **Application of Liquidity Event Net Proceeds**. From and after the Effective Date of the Plan and until all claims against both Reorganized Debtors are paid in full, Reorganized 37 Ventures and Pikover shall manage the securities of the Portfolio Companies (including those issued by Larada) ("Portfolio Companies") and Caldera (hereinafter, together, the "Subject Companies") that each respectively owns.

(a)    <u>No Transfers Inconsistent With This Plan</u>.  Until 37 Ventures Class 2(a), Class 2(b), and Class 3 Claims are paid in full, Pikover and Reorganized 37 Ventures shall not sell, transfer, pledge or hypothecate any of securities issued by the Subject Companies that they respectively own, except in connection with a Company Liquidity Event, as contemplated below ("Sale Restriction").  It shall not be a breach of the Sale Restriction should any of those securities be converted into a different type or class of securities in a transaction approved, authorized or caused by a given Subject Company with respect to all like securities.  Notwithstanding the foregoing, (1) Reorganized 37 Ventures and Pikover may sell or pledge some or all of their

respective interests in the Subject Companies to secure a loan of funds to be used to pay some or all of the Claims provided for in this Plan, but only after first obtaining an order of the Court permitting same, after notice and an opportunity to be heard is first given to the then remaining holders of such Claims, and (2) Pikover may sell or pledge all or a part of his ownership interest in Caldera to obtain funds to pay for defense costs in connection with any litigation instituted by Alignment or Knight and Bishop relating to any of their respective alleged claims against Pikover.

(b)    <u>Savara Stock Proceeds</u>.  Reorganized 37 Ventures shall hold the securities issued by Savara ("Savara Securities") until it determines, in the exercise of its commercially reasonable discretion in consultation with the Plan Monitor, that it is prudent to sell those securities, in light of then publicly available information about the approval and/or the prospects for approval by United States Food and Drug Administration of the sale of Savara's molgramostim nebulizer solution.  Notwithstanding the foregoing, Reorganized 37 Ventures may sell the Savara Securities for Cash, in consultation with the Plan Monitor, at any time it reasonably determines that it needs Cash to comply with its obligations under this Plan.  In either event, the Cash proceeds of the sale of such securities shall be managed, held and distributed in the same manner as the Cash proceeds of a Company Liquidity Event, as provided below.

(c)    <u>Company Liquidity Event Proceeds</u>.  Reorganized 37 Ventures and Pikover (each, a "Shareholder") shall use commercially reasonable efforts to encourage the Subject Companies to pursue commercially reasonable Company Liquidity Event transactions. Reorganized 37 Ventures shall cooperate with and shall not unreasonably withhold its consent to any Company Liquidity Event transaction that is formally recommended by the board of directors of the respective Subject Company.  Upon the occurrence of a Company Liquidity Event for any of the Subject Companies, the proceeds distributed to the respective Shareholder on account thereof ("Liquidity Event Proceeds") shall be managed, held and distributed as follows:

(i)    Liquidity Event Proceeds that are publicly traded stock shall be sold for Cash on a public exchange as soon as legally and practicably possible after receipt by

the Shareholder, such sale to be brokered by a third-party, nationally recognized securities broker-dealer charging no more than a market-standard commission.  The resulting net Cash, and all other Cash received on account of the Company Liquidity Event, ("Liquidity Event Cash") shall then be managed, held and distributed as follows:

First, to pay all reasonable legal and accounting fees and costs of the respective Shareholder and of the Plan Monitor incurred in connection with the Company Liquidity Event,

Second, to fund the applicable Income Tax Reserve Amount, determined in accordance with and for further distribution as provided in Section 5.9, below,

Third, if Caldera is the Subject Company giving rise to the Liquidity Event Proceeds, the balance remaining after the first and second uses described above, and after a reasonable reserve for the pending or threatened defense costs described in section 5.8 (a) hereof, shall be contributed by Pikover to Reorganized 37 Ventures (the "Caldera Contribution") for further use as provided in this Plan,

Fourth, from the remaining balance of the Liquidity Event Cash, whether directly received by Reorganized 37 Ventures from a Subject Company Liquidity Event or from the Caldera Contribution, Reorganized 37 Ventures shall reserve a reasonable amount, determined in consultation with the Plan Monitor, of Cash to fund the ongoing legal, accounting, administrative and operating expenses of Reorganized 37 Ventures and of the Monitor, not to exceed _____.

Fifth, the balance of the Cash proceeds shall be distributed to the holders of Class 2(a), Class 2(b), and Class 3 claims, Pro Rata.

Sixth, after payment in full of Class 2(a), Class 2(b), and Class 3 claims, Reorganized 37 Ventures may, in its sole discretion, use a portion or all of the remaining Company Liquidity Event Proceeds to pay creditors of Larada or provide other financial support to Larada.

(ii)   Until all Class 2(a), Class 2(b), and Class 3 Claims are paid in full, Pikover and Reorganized 37 Ventures shall notify the Plan Monitor of all anticipated Company

Liquidity Events at least five business days before the anticipated closing of each such Company

Liquidity Event.  Upon the receipt by the respective Shareholder of the proceeds of the given

Company Liquidity Event, such Shareholder will review in advance with the Plan Monitor the

Shareholder's intended disposition of those proceeds, to assure compliance with the use and

distribution requirements of this Section 5.8 and Section 5.9 below.

**5.9**    **Tax Matters**.   All net operating loss and capital loss carryforwards ("Loss

Carryforwards") owned by Pikover during the calendar year in which a Company Liquidity

Event occurs shall be applied by Pikover, until they are exhausted, to offset (to the extent

permitted by applicable law) the taxable income (including but not limited to ordinary income or

capital gains) generated by the Company Liquidity Events, whether of Caldera or of any of the

Portfolio Companies (including but not limited to the Post-Petition, Pre-Effective Date

MobileCause Liquidity Event).

(a)    Promptly following the occurrence of a Company Liquidity Event (and not

later than the last day of the calendar quarter in which the liquidity event has occurred), Pikover

shall cause his certified public accountant ("CPA") to provide to the Plan Monitor and Pikover a

written estimate, including a statement of the underlying assumptions, facts and calculations on

which the estimate is based, of the amount of federal, state and, if applicable, local income tax

liabilities which Pikover will owe on account of the given Company Liquidity Event, after

application of all then available Loss Carryforwards ("Estimated Tax Liability").  The Estimated

Tax Liability shall be the amount of the "Income Tax Reserve Amount" provided for in

Section 5.8(c)(1), above.

(b)    If the Estimated Tax Liability arises from a Caldera Company Liquidity

Event, Pikover may retain the Estimated Tax Liability from the Proceeds of the Caldera

Company Liquidity Event and pay same to the applicable taxing authorities on or before the

deadline for the timely payment of same, including deadlines for making quarterly estimated

payments of taxes.

(c)    If the Estimated Tax Liability arises from a Company Liquidity Event of

one of the Portfolio Companies, Reorganized 37 Ventures shall pay to Pikover the Estimated Tax

28

Liability at least three business days before the deadline for the timely payment of same, including deadlines for making quarterly estimated payments of taxes; which funds Pikover may then use to make the required payments to the applicable taxing authorities.

**5.10** **Larada Asset Sale Liquidity Event**.  If necessary to ensure timely payment of all amounts it owes under the Plan (other than payment of Class 7 Claims), Reorganized Larada shall, on or before December 31, 2028: (1) obtain a loan in an amount necessary to pay its creditor claims in full ("Plan Loan"), or if such a Plan Loan cannot be obtained, (2) sell all or substantially all of the assets used by Larada in the conduct of its business operations (upon consummation of such a transaction, a "Larada Asset Sale Liquidity Event").  The proceeds of a Plan Loan or a Larada Asset Sale Liquidity Event shall be paid (a) to Alignment, for credit to the remaining balance of its secured claim, (or if applicable to 37 Ventures upon the existence of the 37 Ventures Subrogation Claim) for credit to the secured portion thereof, (b) next to Class 5 and Class 6 General Unsecured Creditors of Larada on a Pro Rata Basis, including Alignment on account of its Unsecured Claim, (or if applicable to Reorganized 37 Ventures on account of the unsecured portion of the 37 Ventures Subrogation Claim), (c) next to Subdebt Holders, on a Pro Rata basis unless their claims have been Desubordinated, in which case, they shall share Pro Rata with Class 5 and Class 6 General Unsecured Creditors, and (d) finally to holders of Interests in Larada pursuant to their respective rights and interests. Larada shall obtain this Court's advance approval of any transaction that would result in a Plan Loan or a Larada Asset Sale Liquidity Event; with notice and an opportunity to be heard on any application for such approval being first given to the then holders of Claims against Larada.

**5.11** **37 Ventures Subrogation Claim**.

(a)      At the time ("Time of Subrogation") when Alignment receives payment in full of its Allowed Claim against Larada, 37 Ventures shall automatically and without further action be subrogated to and hold all of Alignment's rights, claims, liens and security interests under or relating to the Alignment Loan Documents and Alignment's rights under this Plan, including without limitation Alignment's Secured and Unsecured Claims against Larada and its rights and claims against third parties (including without limitation Alignment's rights and

29

claims against the Subdebt Holders and Yuri Pikover) (the "37 Ventures Subrogation Claim"). The amount of the 37 Ventures Subrogation Claim shall be equal to the total amount paid by Pikover, 37 Ventures and/or Reorganized 37 Ventures for credit to the obligations owed by Larada or Reorganized Larada to Alignment and shall be allocated to Alignment's secured claim, to the extent their payments to Alignment have been credited to the Secured Claim and then to Alignment's Unsecured Claim. Alignment shall execute such instruments as 37 Ventures shall reasonably request to further evidence, perfect and effectuate such subrogation.

(b)     Notwithstanding any contrary provision of the Alignment Loan Documents, from and after the Time of Subrogation and until after payment in full of all Class 6 Claims, 37 Ventures shall forbear from enforcing against the property of Larada any of its rights or claims under the 37 Ventures Subrogation Claim, other than to collect distributions otherwise payable to Class 5, 6 and 7 creditors.

### 5.12   Quarterly Reporting by 37 Ventures/Plan Monitor.

(a)     As part of the Confirmation Order, the Court shall appoint a Plan Monitor, selected and empowered as follows:

(i)     Prior to the hearing on confirmation of this Plan, 37 Ventures may nominate in writing up to three individuals and Alignment and Knight and Bishop may together nominate in writing up to an additional three individuals, qualified as follows:

(A) each nominee shall be either an individual holding a current professional fiduciary license issued by the Professional Fiduciaries Bureau of the California State Department of Consumer Affairs, or an individual approved by the Office of the United States Trustee for the Central District of California to be a panel trustee or a special trustee;

(B)  each nominee shall be well experienced and knowledgeable in the field of venture capital and/or private equity investing; and

(C)  each nominee shall have agreed in writing to be bound by the Protective Order.

///

///

(ii)   If, prior to entry of the Confirmation Order, the parties that submitted nominations have not agreed to jointly recommend a single nominee, the Court shall appoint the Plan Monitor from the submitted nominations, at the Court's discretion.

(iii)   The Plan Monitor shall be compensated at the expense of Reorganized 37 Ventures and such compensation shall not exceed the sum of _____, per month, inclusive of costs and expenses.

(b)   The Confirmation Order shall provide that the Plan Monitor shall have: (1) the right to receive directly from each of the Subject Companies copies of all written reports, notices, consent requests, ballots and the like delivered by the Subject Companies, respectively, generally to the holders of their securities; (2) the right to verify directly with the Subject Companies the holdings of Pikover and Reorganized 37 Ventures of securities issued by the Subject Companies, respectively; (3) the right to be informed about any potential or actual liquidity event transactions regarding any of the Portfolio Companies and to report such events to Knight and Bishop and Alignment; and (4) the ability to inquire with the Portfolio Companies as to any potential or actual liquidity event transactions involving them and to report such events to Knight and Bishop and Alignment.

(c)   Within 30 days after the end of each full calendar quarter after the Effective Date, until all claims against Reorganized 37 Ventures are paid in full, Reorganized 37 Ventures will provide to the Plan Monitor a writing, signed under penalty of perjury by Pikover, individually and in his capacity as managing member of Reorganized 37 Ventures, certifying that Reorganized 37 Ventures and Pikover continue to own, free and clear of all liens and security interests, the same securities, in the same quantities, in the Subject Companies that they respectively owned on the Effective Date, or the conversion proceeds thereof, other than changes in ownership occurring by virtue of a Liquidity Event transaction consistent with this Plan or pledges approved in advance by an order of the Court, as provided in Section 5.8(a) of this Plan.

(d)   The Plan Monitor shall not disclose the information it obtains by virtue of his or her status as Plan Monitor to any Person or Entity (as those terms are defined in 11 U.S.C. § 101), unless one of the following "Reportable Events" occurs:

(i) After consulting with Pikover, the Plan Monitor determines that Pikover or Reorganized 37 Ventures has failed to maintain ownership of the securities issued by the Subject Companies as required by this Plan or

(ii) After consulting with Pikover, the Plan Monitor determines that Pikover or Reorganized 37 Ventures intends not to, or has failed to, manage, hold or distribute the proceeds of a Company Liquidity Event or a Larada Asset Sale Liquidity Event in accordance with the requirements of this Plan.

(e)    If a Reportable Event occurs, the Plan Monitor may disclose information relevant thereto only by filing with the Court, under seal, a written report summarizing the facts and circumstances giving rise to his or her determination in that regard, and serve a copy of such report on Pikover, Reorganized 37 Ventures and, if they, respectively, (I) are then bound by the Protective Order and (II) continue to hold claims against Reorganized 37 Ventures, on Alignment and Knight and Bishop.

**ARTICLE 6**

**IMPLEMENTATION OF THE PLAN**

Distributions under the Plan will be made as described in more detail above from the following sources: the 37 Ventures Net Effective Date Cash (Section 5.7 above) and, if applicable, the Hawk contribution (same), Liquidity Event Net Proceeds (Section 5.8, above), the Larada Quarterly Payments (Sections 4.4 and 4.5, above) and, if applicable, the Larada Asset Sale Liquidity Event net proceeds (same).

**6.1    Method of Distributions Under the Plan.**

**1.**    In General.  Subject to Bankruptcy Rule 9010, all distributions under the Plan to be made by the Reorganized Debtors to the holder of each Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules as of the Distribution Record Date, unless the Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules.  The Reorganized Debtors shall have no

obligation to locate such holders whose distributions or notices are properly mailed but nevertheless returned.  Distributions may be made under this Plan through payments directly from the Reorganized Debtors.

       **2.**    <u>Form of Distributions</u>.  Any payment of Cash made by the Reorganized Debtors pursuant to the Plan shall be made by check; <u>provided,</u> <u>however</u>, that after the occurrence of the Effective Date, the Reorganized Debtors are not obligated to make any Cash payment under the Plan unless the payment exceeds ten dollars ($10); <u>provided,</u> <u>further</u>, that Cash equal to 100% of the distributions to which the holder of a Claim would be entitled under the Plan if the payment to such holder was less than or equal to ten dollars ($10) shall be maintained in a reserve (the "<u>Small Payment Reserve</u>") for the benefit of such holder until an aggregate of at least ten dollars is payable to such holder and at such time the holder shall receive a payment equal to 100% of the distributions to which it would otherwise be entitled.

       **3.**    <u>Distributions to be on Business Days</u>.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

       **4.**    <u>Distributions to Holders as of the Distribution Record Date</u>.  As of the close of business on the Distribution Record Date, the claims register shall be closed.  The Reorganized Debtors shall have no obligation to recognize any transfer of any Claims occurring after the close of business on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan with only those holders of record as of the close of business on the Distribution Record Date.

    **6.2**    **Objections to Disputed Claims.**  Any objections to Claims against either of the Estates may be prosecuted only by the respective Debtors or the Reorganized Debtors unless otherwise ordered by the Court.  Except as otherwise provided by order of the Bankruptcy Court, the Reorganized Debtors may file an objection to any Claim until 180 days after the Effective Date.

    **6.3**    **Estimation of Claims.**  The Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c)

33

of the Bankruptcy Code, and the Bankruptcy Court shall have jurisdiction to estimate such Claim

at any time, including, without limitation, during litigation concerning such Claim or an

objection to such Claim.  The Debtors and the Reorganized Debtors shall be entitled to request

that the Bankruptcy Court determine either the Allowed amount of such Claim or a maximum

limitation on such Claim.  If the Bankruptcy Court determines the maximum limitation of such

Claim, such determination shall not preclude the Debtors or Reorganized Debtors from pursuing

any additional proceedings to object to any ultimate payment of such Claim.  If the Bankruptcy

Court determines the Allowed amount of such Claim, the amount so determined shall be deemed

the amount of the Disputed Claim for all purposes under this Plan.  All such proceedings are

cumulative and not exclusive remedies.

   **6.4**   **Reversion of Unclaimed Checks.**  The amount of any checks issued for

distributions under the Plan that remain uncashed for a period of one year after the date of such

distribution shall revert and be vested in the Estates free and clear of any claim or interest of any

holder of a Claim under the Plan.

   **6.5**   **Effect of Convenience Class Election.**  By electing in writing convenience class

treatment under the Plan, the holder of a General Unsecured Claim may elect to reduce the

amount of such holder's Claim to $2,500, and, in such event, only receive treatment as an

Allowed Convenience Claim in the amount of $2,500.  Holders of Allowed Convenience Claims

shall receive a distribution on the Initial Distribution Date in accordance with Section 4.8(b) of

the Plan.  Such an election constitutes a waiver of the amount of such General Unsecured Claim

in excess of $2,500, and the holder of such Allowed Claim shall be deemed to release the Debtor

from any and all liability for such excess amount.

   **6.6**   **Retention and Preservation of Claim Objections and Causes of Action.**

Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, upon entry of the Confirmation

Order, the Debtors' and the Reorganized Debtors' rights to object to all Claims and Interests

asserted against the Estate and all of the Debtors' or Estates' Causes of Action, including without

limitation: (1) the Debtors' Causes of Action asserted in any adversary proceeding, U.S. District

Court litigation, state court proceeding, or any other proceeding  which is pending as of the

Confirmation Date; (2) all Claims and Causes of Action disclosed in the Schedules which are

incorporated herein by reference; (3) all Claims and Causes of Action described in the Disclosure

Statement; (4) any Claims and Causes of Action contained in any contested matter or objection

to Claim pending on the Confirmation Date; and (5) any and all other Claims and Causes of

Action that the Debtors held preconfirmation, including, but not limited to, Claims for unpaid

accounts receivable, shall vest in the Post Confirmation Estates.

Unless a Claim or Cause of Action against any Person is expressly waived or released in

the Plan or any Final Order of the Bankruptcy Court, the Debtors expressly reserve such Claim

or Cause of Action for later adjudication (including without limitation, Claims and Causes of

Action not specifically identified or which the Debtors may presently be unaware or which may

arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time

or facts and circumstances which may change or be different from those which the Debtors now

believes to exist) and, therefore, no preclusion doctrine, including without limitation, the

doctrines of <u>res judicata</u>, collateral estoppel, issue preclusion, claims preclusion, waiver, estoppel

(judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon

or after the confirmation or consummation of the Plan based on the Disclosure Statement, the

Plan, or the Confirmation Order, except where such Claims or Causes of Action have been

expressly released in the Plan or any other Final Order of the Bankruptcy Court.

## ARTICLE 7

### VOTING ON THE PLAN

**7.1    <u>Voting of Claims</u>**.  Each holder of an Allowed Claim in an impaired Class which

retains or receives property under the Plan shall be entitled to vote separately to accept or reject

the Plan and indicate such vote on a duly executed and delivered ballot as provided in such order

as is entered by the Bankruptcy Court establishing certain procedures with respect to the

solicitation and tabulation of votes to accept or reject the Plan.

**7.2    <u>Nonconsensual Confirmation</u>**.  If any impaired Class entitled to vote shall not

accept the Plan by the requisite statutory majorities provided in Sections 1126(c) or 1126(d) of

the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected the Plan,

the Debtor reserves the right (i) to confirm the Plan under Section 1129(b) of the Bankruptcy

Code, and (ii) to amend the Plan in accordance with Section 11.6 hereof to the extent necessary

to obtain entry of a Confirmation Order.

**ARTICLE 8**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**8.1** **Assumption of Executory Contracts and Unexpired Leases; Deemed Cure**

**Amount.**  Any executory contract or unexpired lease which (i) has not expired by its own terms

on or prior to the Confirmation Date, (ii) has not been assumed and assigned or rejected with the

approval of the Bankruptcy Court on or prior to the Confirmation Date, or (iii) is not the subject

of a motion to assume or reject which is pending at the time of the Confirmation Date, shall be

deemed assumed as of the Effective Date; provided, however, the Debtors shall have a period of

60 days after the Effective Date to change the designation of any executory contract from

assumed to rejected. If there has been a default in an executory contract or unexpired lease, then

the Reorganized Debtor who is the counterparty to such contract shall cure or provide adequate

assurance that it will promptly cure such default prior to its assumption of such lease or contract,

as required under (and subject to the limitations of) Bankruptcy Code § 365(b), unless otherwise

agreed to by the applicable Reorganized Debtor and the counterparty to such lease or executory

contract. Unless the counter-party to an unexpired lease or executory contract provides notice to

the Debtors on or before the Confirmation Date, any existing defaults shall be deemed cured as

of the Effective Date, and the deemed cure amount for any such lease or contract is $0. Any

dispute regarding a cure amount or the cure of any other existing default under an unexpired

lease or executory contract shall be heard and determined by the Bankruptcy Court. Any claim

for a cure amount or the cure of any other existing default under an assumed lease or executory

contract must be filed with the Court and served on the Reorganized Debtors by no later than 30

days after the Confirmation Date. Notwithstanding the foregoing, no contracts or agreements

with Alignment or Knight and Bishop shall be assumed pursuant to this Plan; all of which shall

be rejected as of the effective Date.

///

**8.2** **Post-Petition Agreements Unaffected By Plan**.  Except as otherwise expressly provided herein, nothing contained in the Plan shall alter, amend or supersede any agreements or contracts entered into by the Debtors after the Petition Date that were otherwise valid, effective and enforceable against the Debtors as of the Confirmation Date.  The Reorganized Debtors shall be deemed to be substituted for any Debtors in such contract or agreement, as applicable, and the Reorganized Debtors shall have all right, title and interest of the Debtors under such contract or agreement as if the Reorganized Debtors had been the original contracting party thereunder.

**ARTICLE 9**

**CONDITIONS PRECEDENT TO EFFECTIVE DATE**

**9.1** **Conditions Precedent to Effectiveness**.  The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or waived:

9.1.1    the Confirmation Order, in form and substance reasonably acceptable to the Debtors, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

9.1.2    all actions, other documents and agreements necessary to implement the Plan shall have been executed, delivered and, if necessary, properly recorded, and shall have become effective;

9.1.3    the Bankruptcy Court shall have entered orders (or there shall be agreements satisfactory to the Debtors) concerning Claims, any Liens asserted by holders of Claims, and any interest in the Debtors (which may be orders included within the Confirmation Order) that, in the sole discretion of the Debtors are required for the feasibility and implementation of the Plan; and

9.1.4.   the Estates shall have sufficient Cash to meet all Cash funding obligations under the Plan required to be made on the Effective Date.

**9.2** **Failure of Conditions Precedent**.  Notwithstanding anything in this Plan to the contrary, the conditions set forth in Section 9.1 above must be satisfied or waived on or before January 12, 2022.  In the event that the conditions set forth in Section 9.1 above are not satisfied

on or before January 12, 2022 or waived, then the Plan shall be deemed revoked and withdrawn, the Confirmation Order shall be deemed vacated, and Section 11.12 of the Plan shall apply.

**9.3** **Waiver of Conditions**.  The Debtors may waive one or more of the conditions precedent to the effectiveness of the Plan set forth in Section 9.1 above, except that the Debtors may not waive the condition that the Estates will have sufficient Cash to meet all payment and funding obligations under the Plan on the Effective Date.

## ARTICLE 10

## RETENTION OF JURISDICTION

**10.1** **Retention of Jurisdiction**.  After the Effective Date, the Bankruptcy Court shall have exclusive jurisdiction of the following specified matters arising out of, and related to, the Bankruptcy Cases and the Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code:

(a)     to hear and determine any and all objections to the allowance of any Claims or any controversies as to the classification of any Claims or estimate any Disputed Claim;

(b)     to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced before the Confirmation Date, including, any proceeding with respect to a Cause of Action or Avoidance Action;

(c)     to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)     to hear and determine any application to modify the Plan in accordance with Section 1127 of the Bankruptcy Code and to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(e)     to hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any

transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing;

        (f)     to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

        (g)    to enforce all orders previously entered by the Bankruptcy Court;

        (h)    to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

        (i)     to hear and determine any and all applications by Professionals for compensation and reimbursement of expenses;

        (j)     to hear and determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases, and fix and allow any Claims resulting therefrom;

        (k)    to enforce the provisions of the Plan subject to the terms thereof;

        (l)     to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan;

        (m)   to determine any Claim or liability to a Governmental Unit which may be asserted as a result of the transactions contemplated herein;

        (n)    to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

        (o)    to determine such other matters as may be provided for in the Confirmation Order;

        (p)    to hear any other matter not inconsistent with the Bankruptcy Code;

        (q)    to determine whether to approve a transaction that would result in a Larada Asset Sale Liquidity Event; and

        (r)     to enter a final decree closing the Bankruptcy Cases.

**10.2    Closure of Case**.

(a)    Closing the Bankruptcy Case.  As soon as the Reorganized Debtors determine that there is no further need for administration of the Case by the Bankruptcy Court, the Bankruptcy Case shall be closed pursuant to 11 U.S.C. § 350 upon (i) the filing of a report and recommendation to close the Bankruptcy Cases, (ii) after twenty-eight (28) days' notice to parties-in-interest, and (iii) the entry of an appropriate final decree and/or Order by the Court closing the Bankruptcy Cases.  Absent an order extending the time for entry of a final decree entered after notice and opportunity for hearing, a final decree closing the Bankruptcy Cases shall be entered not later than 1 year after the Confirmation Date, and is anticipated to be entered as soon as the Effective Date.  Subject to the Bankruptcy Court's discretion, the Bankruptcy Cases may be closed notwithstanding that: (i) adversary proceedings related to the Bankruptcy Cases may be, and remain, pending; and (ii) distributions remain to be paid under the Plan.

(b)    Post-Confirmation Payments to United States Trustee.  Until entry of an Order closing, dismissing or converting the Bankruptcy Cases, any quarterly payments due to the office of the United States Trustee prior to the Effective Date of the Plan shall be paid in accordance with 28 U.S.C. § 1930(a)(6) by the Reorganized Debtor. No quarterly payments shall come due or be required after the Bankruptcy Cases are closed.

(c)    Reopening Case.  At any time, the Reorganized Debtors may obtain entry of an order reopening the Bankruptcy Cases to obtain any relief or order from the Bankruptcy Court consistent with section 10.1.

**ARTICLE 11**

**MISCELLANEOUS**

**11.1    Continuation of Injunctions or Stays Until Effective Date**.  All injunctions or stays provided for in the Bankruptcy Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**11.2    Discharge**.  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or

document created pursuant to the Plan, the distributions, rights, and treatment that are provided

in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective

Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest

accrued on Claims or Interests from and after the Petition Date, whether known or unknown,

against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors, the

Estates, or any of their assets or properties, regardless of whether any property shall have been

distributed or retained pursuant to the Plan on account of such Claims and Interests, including

demands, liabilities, and Causes of Action that arose before the Confirmation Date, any liability

(including withdrawal liability) to the extent such Claims or Interests relate to services

performed by employees or agents of the Debtors prior to the Confirmation Date and that arise

from a termination of employment, any contingent or non-contingent liability on account of

representations or warranties issued on or before the Effective Date, and all debts of the kind

specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or

not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to

section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or

Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a

Claim or Interest has accepted the Plan or voted to reject the Plan. The Confirmation Order shall

be a judicial determination of the discharge of all pre-Confirmation Date Claims, Interests, and

Causes of Action, subject to the occurrence of the Effective Date, except as otherwise

specifically provided in the Plan.

     **11.3**    **Injunction Relating to the Plan**. **As of the Effective Date, all Persons are
hereby permanently enjoined from commencing or continuing, in any manner or in any
place, any action or other proceeding, whether directly, indirectly, derivatively or
otherwise against the Debtors, their Estates, the Reorganized Debtors, or their successors-
in-interest or assigns, on account of, or respecting any Claims, debts, rights, Causes of
Action or liabilities discharged or treated pursuant to the Plan, except to the extent
expressly permitted under the Plan. Upon entry of the Confirmation Order, all holders of
Claims and Equity Interests and other parties in interest, along with their respective**

**present, future, or former employees, agents, officers, directors, or principals, shall be**
**enjoined from taking any actions to interfere with the implementation or consummation of**
**the Plan.  Further, except as otherwise expressly provided in the Plan or the Confirmation**
**Order, all Persons who have held, hold, or may hold Claims against the Debtors, or who**
**have held, hold or may hold any debt or interest relating to the Debtors, are permanently**
**enjoined, from and after the Effective Date, to the maximum extent permitted by law, from**
**(i) commencing or continuing in any manner any action or other proceeding of any kind**
**with respect to any such Claim, debt or interest against the Reorganized Debtors or the**
**Estates, other than as expressly permitted herein or in the Confirmation Order or (ii)**
**enforcing, attaching, collecting or recovering by any manner or means any judgment,**
**award, decree or order against the immediate or any mediate transferee of any property**
**distributed pursuant to the Plan or of any putative securities, based upon a claim that the**
**transferor's receipt of such property constituted a fraudulent conveyance, preference,**
**violation of bulk sales or other law, or based upon any other claim that receipt and or**
**distribution of property by transfer pursuant to the Plan is wrongful, whether in law or**
**equity.**

      **11.4**    **Broad Injunction**.  The intent of paragraph 11.3 is to provide the broadest possible injunction permitted by law and, to the extent permitted by law, to expand the scope of that injunction for the benefit of the Reorganized Debtors to the extent that, at any time after the Effective Date, the law is clarified or changed to permit such a broader injunction.  The injunction in the Confirmation Order shall provide that, except as otherwise authorized by the Plan or the Confirmation Order, the holders of Claims shall be enjoined from commencing or continuing any such specified action or proceeding against Reorganized Debtors with respect to any Claim or property of the Estate, including Claims based in whole or in part on an allegation: (i) that the Debtors breached any contract, with, or any duty or obligation to the Creditor; (ii) that the Debtors are or were the alter ego or instrumentality of another Person; (iii) that the Debtors made any preferential or fraudulent transfer or any other voidable transfer or payment to any Person; or (iv) that the Debtors or the Estates are liable for any act or omission.

**11.5**    **Exculpation.**  Notwithstanding anything herein to the contrary, the Debtors and

their attorneys, accountants, officers, employees, professionals, or agents (the "Exculpated

Parties") shall not have or incur, and each Exculpated Party is released and exculpated from, any

liability to any Holder of a Cause of Action, Claim, or Interest for any act or omission in

connection with, relating to, or arising out of, the Bankruptcy Cases, the formulation,

preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the

Plan, or any contract, instrument, release or other agreement or document created or entered into

in connection with the Disclosure Statement or the Plan, the filing of the Bankruptcy Cases, the

pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of

the Plan, including the issuance of securities pursuant to or authorized under the Plan or the

distribution of property under the Plan or any other related agreement (whether or not such

issuance or distribution occurs following the Effective Date), negotiations regarding or

concerning any of the foregoing, or the administration of the Plan or property to be distributed

hereunder, except for actions determined by Final Order to have constituted actual fraud or gross

negligence. In all respects such Exculpated Parties shall be entitled to reasonably rely upon the

advice of counsel with respect to their duties and responsibilities pursuant to the Plan and shall

be fully protected in acting or in refraining from acting in accordance with such advice, except to

the extent that their actions are determined by Final Order to have constituted actual fraud or

gross negligence notwithstanding such advice. The Exculpated Parties have, and upon

completion of the Plan shall be deemed to have, participated in good faith and in compliance

with the applicable laws with regard to the solicitation of votes and distribution of consideration

pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be,

liable at any time for the violation of any applicable law, rule, or regulation governing the

solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the

Plan.

**11.6**    **Release of Claims**.  Except as contemplated by the Plan, the rights afforded to

holders of Claims in the Plan shall be in exchange for a complete release, satisfaction and

discharge of all Claims against the Debtors or the Reorganized Debtors, and acceptance of such

distributions under the Plan shall be deemed irrevocably to release any and all claims of any

type, kind or nature against the Debtors.  Persons deemed to have released Claims pursuant to

this paragraph shall be forever precluded from asserting against the Debtors, the Reorganized

Debtors or their respective assets any Claim, including any Claim of the type released or deemed

released herein.

      **11.7**    **Bar Date for Administrative Claims**.  Except as otherwise provided in this Plan,

all applications for allowance of Administrative Claims shall be filed with the Bankruptcy Court

not later than thirty days of the Effective Date, other than (a) fees and expenses of Professionals

Allowed pursuant to an Order of the Bankruptcy Court, and (b) fees and charges assessed against

the Estate pursuant to 28 U.S.C. § 1930.  All Administrative Claims not filed within thirty days

after the Effective Date shall be barred.  The deadline in the preceding sentence shall be

construed and have the same force and effect as a statute of limitations.  The Reorganized

Debtors shall provide notice to all creditors listed on the mailing matrix of this bar date within

ten days after the Effective Date.  The Bankruptcy Court shall determine all Administrative

Claims.

      **11.8**    **Default of Plan**.  In the event of any default of the provisions of this Plan, a

creditor or party in interest aggrieved by such default may provide written notice to the

Reorganized Debtors.  The notice of default must describe with specificity the nature of the

default alleged and the steps required to cure such default.  The Reorganized Debtors shall have

thirty days after receipt of notice of default to cure such default.  If the Reorganized Debtors do

not cure such default within thirty days after receipt of a notice of default, then a creditor or party

in interest aggrieved by such default may apply to the Bankruptcy Court to compel compliance

with the applicable provisions of the Plan.  The Bankruptcy Court, after notice and a hearing,

shall determine whether a default occurred, and if a default occurred, whether such default has

been cured.  Upon finding a material default, the Bankruptcy Court may issue such orders as may

be appropriate, including an order compelling compliance with the pertinent provisions of the

Plan.

/ / /

**11.9** <u>Setoffs</u>.  Except as otherwise provided in this Plan, nothing contained in this Plan shall constitute a waiver or release by the Estate of any rights of setoff the Estate may have against any Person.

**11.10** <u>Amendment or Modification of the Plan</u>.  Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with Section 1125 of the Bankruptcy Code.  The Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under Section 1129 of the Bankruptcy Code. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.  The Debtors may, without notice to holders of Claims insofar as it does not materially and adversely affect the interests of any such holders, correct any defect or omission in this Plan and any exhibit hereto.

**11.11** <u>Severability</u>.  If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, upon the request of the Debtors, alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alternation or interpretation.  The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms.

**11.12  Revocation or Withdrawal of the Plan**.  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Estates or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Estate.

**11.13  Binding Effect**.  The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

**11.14  Notices**.  All notices, requests and demands to or upon the Debtors shall only be effective if in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and confirmed, addressed as follows:

If to 37 Ventures, LLC:
37 Ventures, LLC
Attn: Yuri Pikover, Manager
365 E Avenida De Los Arboles, #B01
Thousand Oaks, CA  91360
Email: ypikover@gmail.com

With a copy to:

Gary E. Klausner
Eve H. Karasik
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA  90067
Email:  gek@lnbyb.com

    And to

Kenneth N. Russak
Law Office of Kenneth N. Russak
360 S. Allen Ave.,
Pasadena, CA  91106
Email: Krussak@knrlaw.com

If to Larada Sciences, Inc.

Larada Sciences, Inc.
Attn: Claire Roberts, CEO
154 East Myrtle Avenue
Suite 101
Murray, UT  84107
Email: claire@laradasciences.com

With a copy to:

George Hofmann
Cohne Kinghorn, P.C.
111 East Broadway, 11th Floor
Salt Lake City, UT  84111
Email: ghofmann@ck.law

**11.15  <u>Governing Law</u>**.  Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California, without giving effect to the principles of conflicts of law of such jurisdiction.

**11.16  <u>Post-Confirmation Fees, Final Decree</u>**.  The Debtors shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C. §1930 and the filing of post-confirmation reports with the Bankruptcy Court, as required, until a final decree is entered.  The Reorganized Debtors will submit quarterly post-confirmation reports to the U.S. trustee, which will include: the total disbursements for the quarter, a comparison between the Plan payments made in each period and the payments projected under the Plan, and a complete list of creditors, payments, and time frames for payment.

**11.17  <u>Headings</u>**.  Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

**11.18  <u>Filing of Additional Documents</u>**.  On or before substantial consummation of the Plan, the Debtor shall file with the Bankruptcy Court any agreements or other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

1     **11.19 Inconsistency.** In the event of any inconsistency between the Plan and the

2     Disclosure Statement, or any other instrument or document created or executed pursuant to the

3     Plan, the terms of the Plan shall govern.

4     **11.20 Exemption From Certain Transfer Taxes.** Pursuant to Section 1146(c) of the

5     Bankruptcy Code, any transfers from the Debtors to the Reorganized Debtors or any other

6     Person in the United States pursuant to the Plan shall not be taxed under any law imposing a

7     stamp tax or other similar tax. Such exemption specifically applies, without limitation, to all

8     documents necessary to evidence and implement distributions under the Plan and to the vesting

9     of the property of the Debtors' Estates in the Reorganized Debtors.

10    **11.21 Corporate Action.** On the Effective Date, all actions contemplated or necessary

11    to implement the transactions described in the Plan shall be authorized and approved in all

12    respects pursuant to the Plan. All matters provided for herein involving the corporate structure

13    of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or

14    Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be

15    in effect, without any requirement of further action by the officers or directors of the Debtors or

16    the Reorganized Debtors. On the Effective Date, the appropriate officers or directors of the

17    Reorganized Debtors are authorized to issue, execute, and deliver the agreements, documents,

18    securities, and instruments contemplated by the Plan in the name of and on behalf of the

19    Reorganized Debtors without the need for any required approvals, authorizations or consents

20    except for express consents required under the Plan.

21    Dated: October 19, 2021                    37 VENTURES, LLC

22

23                                              By:

24                                                 YURI PIKOVER,
                                                   Manager

25                                              LARADA SCIENCES, INC.

26

27                                              By:

28                                                 Claire Roberts,
                                                   President and Chief Executive Officer

48

Presented By:

LEVENE, NEALE, BENDER, YOO & BRILL, L.L.P.


By:    /s/ Gary E. Klausner
          GARY E. KLAUSNER
          EVE H. KARASIK
          JEFFREY S. KWONG
          Attorneys for 37 Ventures, LLC

COHNE KINGHORN


By:    _____
          GEORGE HOFMANN
          Attorneys for Larada Sciences, Inc.


ZOLKIN TALERICO LLP


By:    _____
          DERRICK TALERICO
          Attorneys for Larada Sciences, Inc.

Presented By:

LEVENE, NEALE, BENDER, YOO & BRILL, L.L.P.


By: __*/s/ Gary E. Klausner*_____
    GARY E. KLAUSNER
    EVE H. KARASIK
    JEFFREY S. KWONG
    Attorneys for 37 Ventures, LLC

COHNE KINGHORN


By: _____
    GEORGE HOFMANN
    Attorneys for Larada Sciences, Inc.


ZOLKIN TALERICO LLP


By: _____
    DERRICK TALERICO
    Attorneys for Larada Sciences, Inc.

49

1

# PROOF OF SERVICE OF DOCUMENT

2

3

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067.

4

A true and correct copy of the foregoing document **DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED OCTOBER 19, 2021** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

5

6

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 19, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

7

8

- Jacob Beiswenger    jbeiswenger@omm.com, jacob-beiswenger-5566@ecf.pacerpro.com;swarren@omm.com

9

- Ron Bender    rb@lnbyb.com
- Brian D Fittipaldi    brian.fittipaldi@usdoj.gov

10

- Eric D Goldberg    eric.goldberg@dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com

11

- Kenneth Hennesay    khennesay@allenmatkins.com, ncampos@allenmatkins.com
- Eve H Karasik    ehk@lnbyb.com

12

- Gary E Klausner    gek@lnbyg.com
- Michael S Kogan    mkogan@koganlawfirm.com

13

- Jeffrey S Kwong    jsk@lnbyg.com, jsk@ecf.inforuptcy.com
- Sharlene D Lee    slee@npwlaw.com, sharlene.d.lee@gmail.com

14

- Tania M Moyron    tania.moyron@dentons.com, malka.zeefe@dentons.com;kathryn.howard@dentons.com;derry.kalve@dentons.com;glenda.spratt@dentons.com

15

- Isabelle L Ord    isabelle.ord@dlapiper.com, 5902@ecf.pacerpro.com;san-francisco-bankrupcty-7677@ecf.pacerpro.com;isabelle-ord-7771@ecf.pacerpro.com;5902@ecf.pacerpro.com

16

- Brett Ramsaur    brett@ramsaurlaw.com, stacey@ramsaurlaw.com

17

- Kenneth N Russak    krussak@knrlaw.com, krussak@russaklaw.com
- James R Selth    jim@wsrlaw.net, jselth@yahoo.com;dairi@wsrlaw.net;vinnet@ecf.inforuptcy.com

18

- Steven C Sereboff    ssereboff@socalip.com

19

- David B Shemano    dshemano@shemanolaw.com
- Richard P Steelman    rps@lnbyg.com, john@lnbyb.com

20

- Rachel P Stoian    stoian.rachel@dorsey.com, stell.laura@dorsey.com
- Derrick Talerico    dtalerico@ztlegal.com, maraki@ztlegal.com,sfritz@ztlegal.com

21

- United States Trustee (ND)    ustpregion16.nd.ecf@usdoj.gov

22

**2.  SERVED BY UNITED STATES MAIL**: On **October 19, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

23

24

25

☐  Service information continued on attached page

26

27

28

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

# F 9013-3.1.PROOF.SERVICE

**3.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 19, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**Served via Overnight Mail**

U.S. Securities and Exchange Commission          The Honorable Deborah J. Saltzman
Attn: Bankruptcy Counsel                                   United States Bankruptcy Court
444 S. Flower Street, Suite 900                          255 E. Temple Street, Suite 1634
Los Angeles, CA  90071                                     Los Angeles, CA  90012

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 19, 2021 | Lisa Masse | /s/ Lisa Masse |
|------------------|------------|----------------|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                     **F 9013-3.1.PROOF.SERVICE**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 2818 La Cienega Avenue, Los Angeles, California 90034.

A true and correct copy of the foregoing document **MODIFIED THIRD AMENDED DISCLOSURE STATEMENT TO ACCOMPANY DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION DATED OCTOBER 19, 2021** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **November 11, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Jacob Beiswenger    jbeiswenger@omm.com, jacob-beiswenger-5566@ecf.pacerpro.com;swarren@omm.com
- Ron Bender    rb@lnbyb.com
- Brian D Fittipaldi    brian.fittipaldi@usdoj.gov
- Eric D Goldberg    eric.goldberg@dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com
- Jeffrey I Golden    jgolden@wgllp.com, kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;gestrada@wgllp.com
- Kenneth Hennesay    khennesay@allenmatkins.com, ncampos@allenmatkins.com
- Eve H. Karasik    ehk@lnbyg.com
- Gary E Klausner    gek@lnbyg.com
- Michael S Kogan    mkogan@koganlawfirm.com
- Jeffrey S Kwong    jsk@lnbyg.com, jsk@ecf.inforuptcy.com
- Tania M Moyron    tania.moyron@dentons.com, malka.zeefe@dentons.com;kathryn.howard@dentons.com;derry.kalve@dentons.com;glenda.spratt@dentons.com
- Isabelle L Ord    isabelle.ord@dlapiper.com, 5902@ecf.pacerpro.com;san-francisco-bankrupcty-7677@ecf.pacerpro.com;isabelle-ord-7771@ecf.pacerpro.com;5902@ecf.pacerpro.com
- Brett Ramsaur    brett@ramsaurlaw.com, stacey@ramsaurlaw.com
- Kenneth N Russak    krussak@knrlaw.com, krussak@russaklaw.com
- James R Selth    jim@wsrlaw.net, jselth@yahoo.com;dairi@wsrlaw.net;vinnet@ecf.inforuptcy.com
- Steven C Sereboff    ssereboff@socalip.com
- David B Shemano    dshemano@shemanolaw.com
- Richard P Steelman    rps@lnbyg.com, john@lnbyb.com
- Rachel P Stoian    stoian.rachel@dorsey.com, stell.laura@dorsey.com
- Derrick Talerico    dtalerico@ztlegal.com, maraki@ztlegal.com,sfritz@ztlegal.com
- United States Trustee (ND)    ustpregion16.nd.ecf@usdoj.gov

**2.  SERVED BY UNITED STATES MAIL**: On **November 11, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

3.    **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **November 11, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Served by Overnight Mail**

U.S. Securities and Exchange Commission
Attn: Bankruptcy Counsel
444 S. Flower Street, Suite 900
Los Angeles, CA 90071

The Honorable Deborah J. Saltzman
United States Bankruptcy Court
255 E. Temple Street, Suite 1634
Los Angeles, CA 90012

| **November 11, 2021** | Lisa Masse | /s/ Lisa Masse |
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**